# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMGEN INC., *et al.*,

       *Plaintiffs*,

  v.

ROBERT F. KENNEDY JR., in his official capacity, *et al.*,

       *Defendants*.

Civil Action No. 1:24-cv-3571

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Page

TABLE OF CONTENTS....................................................................................................... i

TABLE OF AUTHORITIES ..............................................................................................ii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 3

      A.    Congress Instructed HRSA to Develop Criteria and a Process for Certification of STD Clinics as 340B-Eligible. ...................................................................... 3

      B.    Sagebrush Attempts to Manufacture 340B-Program Eligibility for Independent Medical Practices that Do Not Treat or Prevent STDs. ........................................ 8

      C.    HRSA Certifies and Recertifies Ineligible Sagebrush Entities as 340B STD Subgrantees. ................................................................................................. 11

      D.    HRSA Belatedly Attempts to Evaluate Some of the Sagebrush Entities' Eligibility. ...................................................................................................... 17

LEGAL STANDARD....................................................................................................... 18

ARGUMENT .................................................................................................................... 18

    I.    HRSA Violated Its Governing Statute by Failing to Develop and Publicize Its Criteria for Certification. ................................................................................... 18

      A.    HRSA's Certification and Recertification of STD Subgrantees Without a Lawful Process for Certification Was Contrary to Law. ..................................... 19

      B.    HRSA's Certification of Entities Without Making Their Criteria Available to Manufacturers Was Contrary to Law.................................................................. 23

    II.    HRSA's Certification Decisions Were Contrary Law Because the Sagebrush Entities Were Ineligible on Multiple Grounds.......................................................... 24

      A.    HRSA's Certification of Sagebrush Entities That Have Unlawfully Diverted 340B Drugs Was Contrary to Law.......................................................... 24

      B.    HRSA's Certification of Entities that Receive Support Only as Sub-subgrantees of Other Certified Entities Was Contrary to Law. ............................................... 32

      C.    HRSA's Certification of Entities Receiving Only In-Kind Contributions, Rather than "Funds," Was Contrary to Law. ...................................................... 34

    III.  HRSA's Certification and Recertification of the Sagebrush Entities Was Arbitrary and Capricious. ....................................................................................... 36

CONCLUSION................................................................................................................. 40

CERTIFICATE OF SERVICE ......................................................................................... 42

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
  429 F.3d 1136 (D.C. Cir. 2005)........................................................................40

*Astra USA, Inc. v. Santa Clara Cnty.*,
  563 U.S. 110 (2011)..........................................................................................3

*AstraZeneca Pharms. LP v. Becerra*,
  543 F. Supp. 3d 47 (D. Del. 2021)..............................................................4, 33

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979)........................................................................................18

*City of Tacoma v. FERC*,
  460 F.3d 53 (D.C. Cir. 2006).........................................................................38

*Drs. for Am. v. Off. of Pers. Mgmt.*,
  793 F. Supp. 3d 112 (D.D.C. 2025).................................................................40

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)........................................................................................18

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)..................................................................................18, 38

*FDA v. Wages & White Lion Invs., LLC*,
  604 U.S. 542 (2025)........................................................................................18

*Fischer v. United States*,
  603 U.S. 480 (2024)........................................................................................29

*Fort Stewart Schs. v. FLRA*,
  495 U.S. 641 (1990)........................................................................................26

*Gallardo By & Through Vassallo v. Marstiller*,
  596 U.S. 420 (2022)........................................................................................35

*Indep. U.S. Tanker Owners Comm. v. Dole*,
  809 F.2d 847 (D.C. Cir. 1987).......................................................................39

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)..................................................................................18, 36

ii

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..........................................................................................18, 36, 38

*Mova Pharm. Corp. v. Shalala*,
  140 F.3d 1060 (D.C. Cir. 1998) ..................................................................................32

*Novartis Pharms. Corp. v. Johnson*,
  102 F.4th 452 (D.C. Cir. 2024)......................................................................................4

*Pereida v. Wilkinson*,
  592 U.S. 224 (2021)......................................................................................................35

*PhRMA v. HHS*,
  43 F. Supp. 3d 28 (D.D.C. 2014) ...................................................................................3

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997)......................................................................................................29

*Sagebrush Health Servs. v. Kennedy*,
  No. 25-cv-915, 2025 WL 1784436 (D.D.C. June 27, 2025)........................................21

*Sanofi Aventis U.S. LLC v. HHS*,
  58 F.4th 696 (3d Cir. 2023) ............................................................................................4

*SNR Wireless LicenseCo, LLC v. FCC*,
  868 F.3d 1021 (D.C. Cir. 2017).....................................................................................26

*United States v. Williams*,
  553 U.S. 285 (2008)......................................................................................................35

**Statutes**

5 U.S.C. § 706................................................................................................................18

42 U.S.C. § 247b-6 ..........................................................................................................6

42 U.S.C. § 247c.................................................................................................5, 34, 35

42 U.S.C. § 256b............................................................................................... *passim*

42 U.S.C. § 300ff-16.......................................................................................................35

**Regulations**

2 C.F.R. § 200.1...............................................................................................................25

42 C.F.R. § 10.10..............................................................................................................4

58 Fed. Reg. 27,289 (May 7, 1993) ...............................................................................21

61 Fed. Reg. 55,156 (Oct. 24, 1996).......................................................................... *passim*

90 Fed. Reg. 38,167 (Aug. 7, 2025)..............................................................22, 23, 39

91 Fed. Reg. 714 (Jan. 8, 2026) .................................................................................23

**Other Authorities**

Adam Fein, *340B Hit $81 Billion in 2024 (+23%): Why CMS and the IRA Are Poised to Cool the Program's Runaway Growth*, Drug Channels (Dec. 15, 2025), https://www.drugchannels.net/2025/12/340b-hit-81-billion-in-2024-23-why-cms.html .............................................................................................................5

Adam Fein, *The 340B Program Reached $66 Billion in 2023-Up 23% vs. 2022: Analyzing the Numbers and HRSA's Curious Actions*, Drug Channels (Oct. 22, 2024), https://www.drugchannels.net/2024/10/the-340b-program-reached-66-billion-in.html ...................................................................................................5

Britton Decl., *Sagebrush Health Servs. v. Kennedy*, No. 25-cv-915 (D.D.C. May 5, 2025), ECF 20-2........................................................................................22, 39

*Fund*, Black's Law Dictionary (11th ed. 2019) ..............................................................34

*Funds*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary /english/funds;..........................................................................................................34

*Grant*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/grant...................................34

HRSA, 340B FAQs, https://www.hrsa.gov/opa/faqs.........................................26, 28, 38

Jonathan D. Shaffer & Daniel H. Ramish, *Federal Grant Practice* § 1:6 (2025 ed.) .........................................................................................................................25

S.J. Reply, *Albany Med. Health Sys. v. HRSA*, No. 23-cv-3252 (D.D.C. Apr. 19, 2024), ECF 24.............................................................................................................7

*Through*, Merriam-Webster, https://www.merriam-webster.com/dictionary/through ...............................................................32

**INTRODUCTION**

The federal 340B Drug Pricing Program requires pharmaceutical manufacturers to offer outpatient drugs at steep discounts to specified healthcare providers. Because insurers reimburse those drugs at full price, 340B eligibility is extraordinarily valuable—and Congress knew it. So Congress drew the lines of eligibility with precision, limiting participation to fifteen defined categories of providers and imposing rigorous requirements that each must satisfy. For the category at issue here—clinics receiving federal grant funds "relating to treatment of sexually transmitted diseases" through a State or local government, 42 U.S.C. § 256b(a)(4)(K)—Congress went further. It directed HHS to develop a "process for the certification" of these STD subgrantees, with criteria made available to manufacturers, and it imposed a requirement that certified entities submit purchase data so the agency can "evaluate the validity of the entity's [340B] purchases" before being recertified. *Id.* § 256b(a)(7). Congress understood that the opportunity to capture the spread between 340B prices and insurance reimbursement would incentivize abuse. It demanded that HRSA serve as the gatekeeper.

HRSA abandoned its post. In the more than three decades since the 340B statute's enactment, HRSA has never developed a lawful certification process for STD subgrantees. It has never published certification criteria. It has never required STD subgrantees to submit the purchase information that Congress mandated. And it has never made any criteria "available to all manufacturers," as the statute commands. *Id.* § 256b(a)(7)(C). Instead, HRSA has rubber-stamped applications based on little more than a cursory email from a state health official—and has recertified entities, year after year, based on nothing at all. These are not minor or technical failures; they constitute a wholesale disregard of the statutory framework governing 340B eligibility.

1

This case concerns HRSA's refusal to perform these mandatory statutory duties. The agency's failure to comply with its statutory obligations has facilitated rampant abuse by the type of covered entity about which Congress was most concerned. Sagebrush Health Services is the poster child for that abuse. Sagebrush is not an STD clinic. It does not treat sexually transmitted diseases. Its supposed "subdivisions" are rheumatology practices, oncology offices, dermatology centers, and infusion clinics scattered across Nevada and Connecticut. Yet Sagebrush has built a multi-million-dollar business model by exploiting HRSA's dereliction.

The administrative record lays bare how Sagebrush leverages a nominal grant from a state healthcare agency into millions of dollars in reduced-price medicines. The maneuver works like this: First, Sagebrush obtains a small portion of an STD-related subaward from a state health agency—in one year a total of $600, which was used to buy six boxes of condoms. Then, Sagebrush makes nominal contributions—of money, condoms, testing kits, or STD pamphlets— to so-called "affiliates," which in reality are just independent practices with which Sagebrush has a contractual relationship. Finally, Sagebrush registers those entities as its own "subdivisions" in HRSA's database. Even though these entities prescribe and administer specialty medications for conditions like arthritis, Alzheimer's disease, psoriasis, and Crohn's disease, they are registered with HRSA as 340B-eligible STD clinics. They use that supposed status to obtain millions of dollars in deeply discounted medicines that have nothing to do with STDs, which they resell at full price to insured patients. To date, Sagebrush entities have claimed *millions of dollars* worth in discounts on Plaintiffs' medicines, even though Plaintiffs manufacture *no products* that treat STDs.

HRSA's certifications and recertifications of the Sagebrush entities were unlawful on every front. The agency never developed the statutory "process for … certification," never made criteria "available to all manufacturers," and never evaluated the validity of any entity's purchases. *Id.*

2

§ 256b(a)(7). The Sagebrush entities are also substantively ineligible: They divert 340B drugs to non-patients receiving specialty care from third-party practices; several receive no "funds … through a State or unit of local government," *id.* § 256b(a)(4)(K), but only secondhand contributions from *another* private subgrantee. And at least two of them received nothing but *de minimis* in-kind support—a few rapid HIV test kits—rather than grant "funds" of any kind. Finally, HRSA's decisions were also arbitrary and capricious: The agency ignored the evidence of ineligibility in its own files.

Since 2022, the nine Sagebrush entities challenged here have extracted more than $27 million in 340B price reductions on Plaintiffs' medicines alone—medicines that do not treat or prevent STDs. The Court should hold HRSA's certifications and recertifications unlawful, set them aside, and order HRSA to fulfill the statutory duty it has ignored for over thirty years: to develop a genuine process for certification and recertification, with transparent criteria, before certifying any entity to claim discounts on other people's drugs.

## STATEMENT OF FACTS

### A. Congress Instructed HRSA to Develop Criteria and a Process for Certification of STD Clinics as 340B-Eligible.

Section 340B of the PHS Act "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health care facilities," known as covered entities, that provide health care to certain underserved populations. *PhRMA v. HHS*, 43 F. Supp. 3d 28, 31 (D.D.C. 2014) (quoting *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011)). As a condition of receiving coverage and reimbursement for its drugs under Medicaid and Medicare Part B, a pharmaceutical manufacturer must enter into a pharmaceutical pricing agreement with HHS. *See* 42 U.S.C. § 256b(a)(1). In that agreement, the manufacturer must "offer each covered entity covered outpatient drugs for purchase" at a specified reduced price "if such drug is made available

3

to any other purchaser at any price." *Id.* The prices required by Section 340B, often called "340B prices," are set by a statutory formula, *see id.* § 256b(a)(2), and they result in steep discounts—with drugs that retail for hundreds or even thousands of dollars being priced as low as a penny. 42 C.F.R. § 10.10(b).

Covered entities initially passed on 340B prices to the "low-income and rural persons" for whom they offer care. *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023). But over time, covered entities realized that if they *did not* pass on the 340B discount, they could use the program to generate "extra revenue from serving insured patients: they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount." *Id.*; *see Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 457 (D.C. Cir. 2024) (covered entities now generate revenue from the "spread between the discounted price and the higher insurance reimbursement rate"). The ability to generate arbitrage revenue gives covered entities "a financial incentive to catalog as many prescriptions as possible as eligible for [a 340B] discount." *Id.* at 457-58.

In an attempt to maintain a narrow scope for the program, thus assuring its integrity and minimizing abuse, Congress defined the types of covered entities eligible for 340B discounts "with a high degree of precision." *AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 60 (D. Del. 2021), *aff'd*, *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023). To qualify as a covered entity, an entity must fall within one of fifteen defined categories of healthcare providers. 42 U.S.C. § 256b(a)(4). Relevant here is "[a]n entity receiving funds under section 247c of this title (relating to treatment of sexually transmitted diseases) … through a State or unit of local government, but only if the entity is certified by the Secretary pursuant to paragraph [(a)](7)." *Id.* § 256b(a)(4)(K). The phrase "section 247c of this title" refers to a provision of the PHS Act that authorizes the

Secretary to make "grants" to States, local government units, and other entities for the prevention, control, and treatment of "sexually transmitted diseases." *Id.* § 247c(b)-(c).

HRSA refers to entities certified on this basis as "Sexually Transmitted Disease" or "STD" covered entities. *See, e.g.*, Amgen_AR_12636. Because these entities must have "receiv[ed] funds" from a State or unit of local government that, in turn, has received a federal STD grant from the Secretary, they are described here as "STD subgrantees." Recent statistics show that STD subgrantees are the fastest-growing category of covered entity, accounting for more than $2.5 billion dollars in reduced-price purchases annually. *See* Adam Fein, *340B Hit $81 Billion in 2024 (+23%): Why CMS and the IRA Are Poised to Cool the Program's Runaway Growth*, Drug Channels (Dec. 15, 2025), https://www.drugchannels.net/2025/12/340b-hit-81-billion-in-2024-23-why-cms.html; Adam Fein, *The 340B Program Reached $66 Billion in 2023—Up 23% vs. 2022: Analyzing the Numbers and HRSA's Curious Actions*, Drug Channels (Oct. 22, 2024), https://www.drugchannels.net/2024/10/the-340b-program-reached-66-billion-in.html.

In addition to requiring a covered entity to fit within one of the fifteen specified categories, Congress defined "the term 'covered entity' [to] mean[] an entity that meets the requirements described in paragraph [a](5)" of the 340B statute. 42 U.S.C. § 256b(a)(4). Paragraph (a)(5) sets out certain requirements applicable to *all* covered entities, including STD subgrantees. Among other obligations, "a covered entity shall not resell or otherwise transfer [a 340B-price] drug to a person who is not a patient of the entity," *id.* § 256b(a)(5)(B), a practice commonly known as "diversion."

In interpreting the prohibition on diversion, HRSA through guidance has expanded on the meaning of the term "patient of the entity." 61 Fed. Reg. 55,156 (Oct. 24, 1996). For covered entities that derive their 340B eligibility from the receipt of federal grant funding, including STD

5

subgrantees, the guidance provides that "[a]n individual is a 'patient' of [such a] covered entity …

only if … the individual receives a health care service or range of services from the covered entity

which is consistent with the service or range of services for which grant funding … has been

provided to the entity." *Id.* at 55,157-58. Accordingly, an individual who *does not* receive services

within the scope of the qualifying grant is *not* a " 'patient' of [that] entity." *Id.* In addition, HRSA

requires that ultimate "responsibility for the care provided remains with the covered entity." *Id.*

Recognizing that STD subgrantees pose a special risk of abusing the 340B program,

Congress imposed additional requirements applicable only to those entities. Paragraph (a)(7) of

Section 340B directs HHS to establish "a process for the certification of" STD subgrantees that

apply for 340B eligibility. 42 U.S.C. § 256b(a)(7)(A).[1] The Secretary must also "require the

recertification" of such entities up to once a year. *Id.* § 256b(a)(7)(E). For both certification and

recertification, the Secretary's process "shall" require the entity to submit purchase information to

enable the agency to "evaluat[e] the validity" of its prior "purchases of covered outpatient drugs

at discounted prices"—that is, its previous purchases of 340B-priced drugs. *Id.* § 256b(a)(7)(B).

While certification of an STD subgrantee does not mean that *all* of the covered entity's purchases

(both retroactive and prospective) are eligible for 340B discounts, the agency must at least evaluate

the entity's business model and purchasing habits to ensure that they support eligibility. *Id.*

In addition, the certification process must "include procedures under which each State shall

… prepare and submit a report to the Secretary that contains a list of [STD covered] entities …

that are located in the State." *Id.* § 256b(a)(7)(D). Importantly, the statute also mandates that "[t]he

---

[1] The statute's certification requirements also apply to entities receiving funds under now-repealed grant programs for tuberculosis treatment. 42 U.S.C. § 256b(a)(4)(K) (referencing grants under Section 247b(j)(2) of the PHS Act). HRSA has interpreted that provision as extending to tuberculosis grant programs under a separate provision, Section 317E(a) of the PHS Act, 42 U.S.C. § 247b-6(a). Those entities are not at issue in this suit.

6

Secretary shall make available to all manufacturers …. a description of the criteria for certification." *Id.* § 256b(a)(7)(C).

In sum, to be eligible for certification under the 340B program as an STD subgrantee, an entity must meet statutory requirements including (but not limited to) the following:

> (1) It must "receiv[e] funds under [a federal STD grant] … through a State or unit of local government." *Id.* § 256b(a)(4)(K).

> (2) It must not "transfer [any 340B] drug to a person who is not a patient of the entity," *id.* § 256b(a)(5)(B), including to an individual who has not received services "consistent with the service or range of services for which grant funding … has been provided to the entity," 61 Fed. Reg. at 55,157-58.

> (3) HRSA must certify the entity under a "process for … certification" allowing the agency to "evaluat[e] the validity of the entity's" 340B purchases with "criteria" that have been "ma[de] available to all manufacturers." 42 U.S.C. § 256b(a)(7).

An entity that fails to meet any one of these requirements is ineligible for certification or recertification as an STD subgrantee.

HRSA itself has emphasized the importance of properly and publicly certifying 340B-eligible covered entities. To allow covered entities to access 340B-priced medicines "without … any verification of their eligibility," HRSA has explained, "would functionally undermine HRSA's responsibility to oversee the fundamental rules that make it possible for this program … to operate smoothly and in compliance with statutory requirements." S.J. Reply at 1, *Albany Med. Health Sys. v. HRSA*, No. 23-cv-3252 (D.D.C. Apr. 19, 2024), ECF 24. If the agency were to fail to appropriately verify eligibility, HRSA explained:

> the government [would be] play[ing] fast and loose with others' (drugmakers') money on the line. And the agreements that manufacturers execute to enter the 340B Program only obligate them to provide discount prices to providers who qualify as covered entities under § 256b(a)(4). Manufacturers cannot satisfy that obligation (nor can HRSA hold them to it) without knowing which provider sites are, indeed, 'covered entities.'"

*Id.* at 17 (citations and quotation marks omitted). However, despite acknowledging the "fundamental" nature of its responsibility to verify covered entity eligibility, *id.* at 1—and despite

7

its statutory obligation to make "criteria for certification" available to manufacturers, 42 U.S.C. § 256b(a)(7)(C)—HRSA has *never* developed certification criteria or made any criteria available to manufacturers.

**B.      Sagebrush Attempts to Manufacture 340B-Program Eligibility for Independent Medical Practices that Do Not Treat or Prevent STDs.**

Notwithstanding the multiple safeguards that Congress imposed, Sagebrush has built a multi-million dollar business model out of the diversion of 340B drugs, transforming *de minimis* contributions of cash, condoms, and testing kits into more than $27 million in 340B profit. At one time or another, Sagebrush has registered more than fifty of its "subdivisions" as 340B covered entities. *See* ECF 1, ¶ 37; Amgen_AR_12448-49, 13164. Despite obtaining certification as purported STD subgrantees, those entities offer services wholly unrelated to STD treatment or prevention. Two of the Sagebrush entities at issue in this suit, for example, are "Rheumatology" practices, *see* Amgen_AR_13452, 13530; one is "an Oncology Solo provider practice," Amgen_AR_13256; and one is a "Dermatology practice," Amgen_AR_13239. Other purported Sagebrush entities are "infusion-based specialty clinics," focused on areas "such as Infectious Disease, Rheumatology, Neurology, Nephrology, Cardiology, Gastroenterology, [and] Oncology." Amgen_AR_13172.

To manufacture 340B eligibility for these practices as STD clinics, Sagebrush has entered into a network of "affiliate" agreements with medical practices. The scheme works like this. First, Sagebrush agrees to "coordinate" STD testing or counseling at a third-party medical provider or practice, promising to secure 340B-priced drugs for that practice and generating arbitrage income when the drugs are sold to insured patients at full price. Amgen_AR_13208, 13212. Then, Sagebrush seeks an STD subaward from a State or local government; Sagebrush seeks such a subaward in its *own* name, listing the independent provider's address as one of its "clinics."

8

Amgen_AR_13167, 13172. Sagebrush itself does not maintain responsibility for medical treatment of the third-party providers' patients; instead, its role is limited to using its subawards to secure 340B discounts to be spread among those providers.

Often, these subawards involve only in-kind contributions (*e.g.*, HIV testing kits or condoms); and as a rule, the subgrant is *de minimis*. For example, a subaward from the Nevada Department of Health and Human Services to "Sagebrush Health Services" for 2023 totaled only $600 (apparently used to purchase "Condoms $100/ box for 6 boxes") for 19 locations, *see* Amgen_AR_13167, 13172, 13191—or approximately $32 for each purported STD clinic. Finally, the independent provider prescribes non-STD-related 340B drugs to its patients, which insurers typically reimburse at full price, and the provider "remit[s]" the 340B profits to Sagebrush. Amgen_AR_13213. Sometimes the third-party provider keeps some of the profits as a "fee" owed to it by Sagebrush. *See, e.g.*, Amgen_AR_13213.

Sagebrush's "Master Affiliate Agreement" with Healthnomic Partners LLC (Healthnomic) illustrates this arrangement. That agreement covers four Sagebrush "subdivisions" relevant to this case—Rainbow Rheumatology, Eastern Rheumatology, Fire Mesa ID, and Battleborn Health Care—as well as at least five other Sagebrush covered entities not at issue in this suit. *See* Amgen_AR_13221, 13225-26. Under that agreement, purported Sagebrush "Affiliate" Healthnomic  describes itself as "a medical practice" that "retains responsibility" for patient care, including "prescrib[ing]" and "administer[ing]" the 340B-priced drugs that Sagebrush acquires for Healthnomic patients. Amgen_AR_13208, 13211-12. Sagebrush—referred to in the agreement as "the Covered Entity" or "the NPO"—"register[s] all the Covered Locations in the 340B Office of Pharmacy Affairs Information System" and "purchase[s] 340B Drugs." Amgen_AR_13212. Although Sagebrush agrees "to coordinate STD testing … and furnish STD support services to

9

individuals with a positive STD test," the agreement calls for Sagebrush to purchase 340B-priced drugs in connection with any "Professional Services" that Healthnomic provides. Amgen_AR_13208, 13212. The agreement is explicit that its purpose is "to have [Healthnomic's] facilities … added to the Grant." Amgen_AR_13208. This is unlawful.

Under the agreement's payment provisions, Sagebrush pockets the 340B profits. At the end of each month, Healthnomic "shall remit to [Sagebrush] an amount equal to … [t]he Net Collections collected … for the 340B Drugs." Amgen_AR_13213. In exchange for its participation, Healthnomic receives various fees from Sagebrush. Amgen_AR_13213 ("As compensation for provision of the Administrative Services, Affiliate shall be entitled to the Administrative Services Fee."); Amgen_AR_13224. Notably, Healthnomic's signatory to the agreement is Rajesh Sonani—Sagebrush's President and Co-Founder.

Sagebrush uses a similar scheme at other locations. Sagebrush contracts both with "Specialists" who provide patient care and with an "Administrator" that processes 340B claims. Amgen_AR_13261; *see, e.g.*, Amgen_AR_13227 (340B Administrative Services Agreement for Hummingbird Clinic); Amgen_AR_13256 (STD Patient Care Agreement for Ann M. Wierman MD LTD). The basics of the arrangement, however, are essentially the same. The "Specialist"—in the case of Ann Wierman MD, "an Oncology Solo provider practice," Amgen_AR_13256—"can obtain medications at the 340b price" even though the medications have nothing to do with STD treatment or prevention. Amgen_AR_13260. Then the "Administrator" transfers to Sagebrush the "Covered Entity Net Savings," which is defined as the "list price for the drug" before any "discounts, rebates, []or reductions in price," less the pharmacy dispense fee, any fees paid to the specialist who actually provides patient care, and an administrative fee retained by the Administrator. Amgen_AR_13263, 13265.

10

Notably, these arrangements operate on what Sagebrush calls a "'winners-only' model." Amgen_AR_13273. Under this model, "no Claims for 340B Drugs shall be processed if such processing would result in a net negative amount in the calculation of the Covered Entity Net Savings." Amgen_AR_13273. In other words, the Administrator agrees to access 340B-discounted drugs *only* for transactions that will result in net revenue and a cash payment to Sagebrush.

### C.    HRSA Certifies and Recertifies Ineligible Sagebrush Entities as 340B STD Subgrantees.

HRSA has never developed a process for certification and recertification of STD clinics, as the 340B statute requires, nor has it published any criteria for certification. Nonetheless, since 2021, HRSA has certified and recertified numerous Sagebrush entities as STD subgrantees, without scrutinizing whether those entities meet statutory eligibility requirements.

For initial certifications, HRSA relied on nothing more than emails from state public health agency officials stating that the entities—or sometimes even just "Sagebrush" generally—had "receive[d] funding," were "part of [the state's] 340b program," or "receive[d] in-kind" support. *See, e.g.*, Amgen_AR_13409, 13412, 13447, 13604, 13681, 13528. The agency did so notwithstanding the statutory requirements that its certification process must include review of purchase "information" submitted by covered entities, as well as a "report" from each State "that contains a list of entities … that are located in the State." 42 U.S.C. § 256b(a)(7)(B), (D). For recertifications, the agency apparently relied on *no* documentation at all: Nothing in the record indicates that it collected any information from state health agencies or the STD subgrantees themselves when deciding whether to recertify the entities. In no case did the agency "evaluate the validity [of the entity's 340B] purchases" to ensure that those entities "meet[] the requirements described" in the 340B statute's anti-diversion provision, as the statute requires. *Id.* § 256b(a)(4), (a)(7)(E).

11

Each of the Sagebrush entities at issue was ineligible on multiple grounds. None of the entities received "fund[s] … through a State or unit of local government," instead receiving grant support only secondhand from *another* private subgrantee—Sagebrush. *See, e.g.*, Amgen_AR_13167 (listing "Sagebrush Health Service" as the only named subaward recipient). Evidence before the agency also showed that the Sagebrush entities—all of which purchased millions of dollars in 340B-priced drugs unrelated to STD treatment or prevention—systematically diverted those drugs to individuals who were neither Sagebrush's patients nor were being treated for STDs. The diversion was so systematic that it was contractually documented. And none of the entities was certified pursuant to a statutorily permissible "process for … certification" or "recertification" based on criteria that had been "ma[de] available to all manufacturers." 42 U.S.C. § 256b(a)(7)(A), (C), (E). Two were described by state health agencies and registered by HRSA as receiving only "in-kind" contributions such as condoms or STD test kits, *see* Amgen_AR_13372, 13409, 13412, 13414, rather than receiving "funds," as the statute requires, 42 U.S.C. § 256b(a)(4)(K).

At issue in this suit are HRSA's certifications and recertifications of the following nine ineligible entities:

**Southington Clinic - CT**. HRSA first certified Southington Clinic - CT effective December 28, 2022, and recertified the entity in 2023 and 2024. *See* Amgen_AR_13372-406. Throughout its participation in the 340B program, Southington Clinic - CT received only "in-kind" support in the form of "Rapid HIV Kits." Amgen_AR_13372; *see* Amgen_AR_13409. No record evidence indicates that HRSA received or considered any documentation of the entity's purchases in connection with its recertification in 2023 or 2024. HRSA terminated Southington Clinic - CT from the 340B program on July 28, 2025. *See* Amgen_AR_13372.

**Danbury Rd Clinic**. HRSA first certified Danbury Rd Clinic effective April 1, 2022, and recertified it in 2023 and 2024. *See* Amgen_AR_13414-45. Throughout its participation in the 340B program, Danbury Rd Clinic received only "in-kind" support in the form of "Rapid HIV testing kits." Amgen_AR_13414; *see* Amgen_AR_13412. No record evidence reflects that HRSA received or considered any documentation in connection with its recertification in 2023 or 2024. Despite the fact that Danbury Rd Clinic became ineligible according to HRSA's online database on April 1, 2023—that is, *before* its most recent recertification—HRSA did not terminate the entity from the 340B program until January 14, 2025. *See* Amgen_AR_13414.

**Rainbow Rheumatology**. HRSA first certified Rainbow Rheumatology effective January 1, 2022, and recertified it in 2023 and 2024. *See* Amgen_AR_13452-523. The sole basis for the entity's certification was an email from Nevada's Department of Health and Human Services stating that a list of entities including Rainbow Rheumatology (then under the name "ARI Rainbow") "receive[d] funding." Amgen_AR_13722-24. No record evidence indicates that HRSA received or considered any documentation in connection with its recertification in 2023 or 2024. HRSA terminated the entity on January 14, 2025, and subsequently reinstated it effective July 1, 2025, based on an email from Nevada's Department of Health and Human Services stating that the entity was "part of our 340b program." Amgen_AR_13528; *see* Amgen_AR_13452-523. Rainbow Rheumatology is listed as a "covered location" in Sagebrush's Master Affiliate Agreement with Healthnomic, *see* Amgen_AR_13208, 13221, which states that only Healthnomic will perform "medical or other health care services …, including the prescription and administration of infusion drugs at Covered Locations," Amgen_AR_13210.

**Eastern Rheumatology**. HRSA first certified Eastern Rheumatology effective January 1, 2022, and recertified it in 2023 and 2024. *See* Amgen_AR_13530-602. The sole basis for the

13

certification was an email from Nevada's Department of Health and Human Services stating that a list of several entities, including Eastern Rheumatology (then under the name "ARI Henderson"), "receive[d] funding." Amgen_AR_13524-27. No record evidence indicates that HRSA received or considered any documentation in connection with its recertification in 2023 or 2024. HRSA terminated the entity on January 14, 2025, and subsequently reinstated it effective July 1, 2025, based on an email from Nevada's Department of Health and Human Services stating that the entity was "part of our 340b program." Amgen_AR_13528; *see* Amgen_AR_13530-602. Eastern Rheumatology is listed as a "covered location" in Sagebrush's Master Affiliate Agreement with Healthnomic, *see* Amgen_AR_13208, 13221, which states that only Healthnomic will perform "medical or other health care services …, including the prescription and administration of infusion drugs at Covered Locations," Amgen_AR_13210.

**Hummingbird Medical Group**. HRSA first certified Hummingbird Medical Group effective November 29, 2022, and recertified it in 2023 and 2024. *See* Amgen_AR_13629-680. The sole basis for certification was an email from the Nevada Department of Health and Human Services stating that "Sagebrush receives funding." Amgen_AR_13604. No record evidence indicates that HRSA received or considered any documentation in connection with its recertification in 2023 or 2024. HRSA terminated the entity on January 14, 2025, and subsequently reinstated it effective October 1, 2025, based on an email from the Nevada Department of Health and Human Services stating that "Sagebrush receives eligible 318 funding." Amgen_AR_13607; *see* Amgen_AR_13629-680. An entity identified as "Hummingbird Clinic" with the same address as that registered for Hummingbird Medical Group is the "Administrator" under a "340B Administrative Services Agreement" with Sagebrush. Amgen_AR_13277; *see* Amgen_AR_13238, 13629. That agreement provides that "the Administrator operates only as an

intermediary between [Sagebrush] and [pharmacies]" in connection with Sagebrush's purchase of 340B drugs. Amgen_AR_13232.

**Battleborn Health Care**. HRSA first certified Battleborn Health Care effective October 1, 2023, and recertified it in 2024 and 2025. *See* Amgen_AR_13683-720. The sole basis for the certification was an email from the Nevada Department of Health and Human Services stating that a list of entities including Battleborn Health Care "receive[d] funds." Amgen_AR_13681. No record evidence reflects that HRSA received or considered any documentation in connection with its recertification in 2024. Battleborn Health Care is listed as a "covered location" in Sagebrush's Master Affiliate Agreement with Healthnomic, *see* Amgen_AR_13208, 13226, which states that only Healthnomic will perform "medical or other health care services …, including the prescription and administration of infusion drugs at Covered Locations," Amgen_AR_13210.

**Fire Mesa ID**. HRSA first certified Fire Mesa ID effective January 1, 2022, and recertified it in 2023 and 2024. *See* Amgen_AR_13727-821. The sole basis for certification was an email from the Nevada Department of Health and Human Services stating that a list of entities including "Fire Mesa Clinic" "receive[d] funding." Amgen_AR_13722-23. No record evidence indicates that HRSA received or considered any documentation in connection with its recertification in 2023 or 2024. HRSA terminated the entity on January 14, 2025, and subsequently reinstated it effective July 1, 2025, based on an email from Nevada's Department of Health and Human Services stating that the entity was "part of our 340b program." Amgen_AR_13725; *see* Amgen_AR_13727-821. Fire Mesa ID is listed as a "covered location" in Sagebrush's Master Affiliate Agreement with Healthnomic, *see* Amgen_AR_13208, 13221, which states that only Healthnomic will perform "medical or other health care services …, including the prescription and administration of infusion drugs at Covered Locations," Amgen_AR_13210.

15

**Dr. Ann Wierman, MD**. HRSA first certified Dr. Ann Wierman, MD effective May 1, 2023, and recertified it in 2024. *See* Amgen_AR_13824-76. The sole basis for certification was an email from the Nevada Department of Health and Human Services stating that a list of entities including Dr. Ann Wierman, MD "receive[d] funding." Amgen_AR_13822. "Dr. Ann Wierman, MD" is not listed in Sagebrush's Nevada subaward for 2023. *See* Amgen_AR_13322. No record evidence indicates that HRSA received or considered any documentation in connection with its recertification of the entity in 2024. HRSA terminated the entity on January 14, 2025, and subsequently reinstated it effective July 1, 2025, although HRSA has not identified any record evidence it relied on in making that reinstatement decision. *See* Amgen_AR_13824-76. "Dr. Ann M. Wierman, MD LTD" is listed as a "Specialist" under an STD Patient Care Agreement with Sagebrush at the same address registered for Dr. Ann Wierman, MD. Amgen_AR_13256; *see* Amgen_AR_13259, 13824. That agreement states that it is "Sagebrush" who "participate[s] in the 340B Program," but the agreement nonetheless provides that "[t]he specialist can obtain medications at 340b price for eligible patients." Amgen_AR_13257, 13260.

**Centennial SACI**. HRSA first certified Centennial SACI effective May 1, 2023, and recertified it in 2024. *See* Amgen_AR_13879-929. The sole basis for certification was an email from the Nevada Department of Health and Human Services stating that a list of entities including Centennial SACI "receive[d] funding." Amgen_AR_13877. "Centennial SACI" is not listed in Sagebrush's Nevada subaward for 2023. *See* Amgen_AR_13322. No record evidence indicates that HRSA received or considered any documentation in connection with its recertification of the entity in 2024. HRSA terminated the entity on January 14, 2025, and subsequently reinstated it effective July 1, 2025, although HRSA has not identified any record evidence it relied on in making that reinstatement decision. *See* Amgen_AR_13879-929. "SACI Centennial" is listed as an

16

"Eligible Location" with the same address registered to Centennial SACI under an STD Patient Care Agreement between Sagebrush and the Skin and Cancer Institute. Amgen_AR_13239, 13243, 13879. That agreement states that it is "Sagebrush" who "participate[s] in the 340B Program." Amgen_AR_13240.

### D. HRSA Belatedly Attempts to Evaluate Some of the Sagebrush Entities' Eligibility.

In 2024, in light of concerns raised by Plaintiff Eli Lilly and Company and others, *see* Amgen_AR_79-85, HRSA commenced a "compliance review" of the Sagebrush entities. *See* Amgen_AR_12504. As part of that review, HRSA terminated Sagebrush entities that failed to provide the agency with documentation showing their receipt of federal STD grant support. *See* Amgen_AR_12189-90, 12280. Although HRSA determined that multiple Sagebrush entities *had not been eligible for years*, *see* Amgen_AR_12189, HRSA did not solicit any appropriate documentation before its compliance review; as a result, the agency terminated those entities only in 2025, *see* Amgen_AR_12280. HRSA ultimately reinstated many of the Sagebrush entities that it had terminated, including six of the entities at issue here. *See* Amgen_AR_13452, 13530, 13629, 13727, 13824, 13879.

Had HRSA reviewed the drug purchase information that it is required by statute to collect, *see* 42 U.S.C. § 256b(a)(7)(B), (E), it would have shown that, from 2022 to 2024, the Sagebrush entities at issue in this suit obtained more than $27 million in 340B price reductions on Plaintiffs' drugs alone—none of which treat or prevent STDs. *See* ECF 1, ¶ 7; *see* Amgen_AR_79-81. Instead, their medications treat conditions including Alzheimer's disease, arthritis, psoriasis, Crohn's disease, osteoporosis, migraines, ulcerative colitis, spondylitis, diabetes, and obesity. ECF 1, ¶¶ 44, 58, 81. Plaintiffs do not manufacture any medications that treat or prevent STDs. ECF 1, ¶ 7.

17

**LEGAL STANDARD**

Under the Administrative Procedure Act, the Court must hold unlawful and set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Agency action that "violates [a statute] is 'not in accordance with law' within the meaning of [the APA]." *Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979) (quoting 5 U.S.C. § 706(2)). And courts must interpret statutory text according to "the best reading of the statute." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency decision-making is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When an agency departs from its past statements or practice, at least on matters other than statutory interpretation, it must "'display awareness that it is changing position' and offer 'good reasons'" for its change in approach. *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 570 (2025) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

**ARGUMENT**

**I.     HRSA Violated Its Governing Statute by Failing to Develop and Publicize Its Criteria for Certification.**

HRSA's certifications and recertifications of ineligible Sagebrush entities were unlawful because the agency failed to observe statutorily required procedures. Under the 340B statute, HRSA was required, "[n]ot later than 60 days after November 4, 1992," to "develop and implement a

18

process for the certification of [STD subgrantees]." 42 U.S.C. § 256b(a)(7)(A). That process "shall include a requirement that an entity applying for certification" submit drug-purchase information enabling HRSA to "evaluat[e] the validity" of that entity's 340B purchases. *Id.* § 256b(a)(7)(B); *see id.* § 256b(a)(7)(E) (similar for recertification). And HRSA "shall make available to all manufacturers of covered outpatient drugs a description of the criteria for certification." *Id.* § 256b(a)(7)(C). Today, more than *thirty years* after the deadline that Congress set, the agency has yet to fulfill either of these statutory duties.

An STD subgrantee is eligible to participate in the 340B program "only if the entity is certified by the Secretary pursuant to paragraph [(a)](7)" of the statute. *Id.* § 256b(a)(4)(K). Following that initial certification, STD subgrantees remain eligible only if "recertif[ied]" by HRSA "on a not more frequent than annual basis." *Id.* § 256b(a)(7)(E). Because HRSA has never implemented the statutorily required certification process or disclosed its criteria, none of the certifications at issue were issued "pursuant to paragraph [a](7)," and accordingly each was unlawful.

A.    **HRSA's Certification and Recertification of STD Subgrantees Without a Lawful Process for Certification Was Contrary to Law.**

HRSA has failed to adequately "develop and implement a process for the certification" of STD subgrantees, and its decisions to certify and recertify the Sagebrush entities were accordingly unlawful.  42 U.S.C. § 256b(a)(7). The statute spells out what the agency's certification process for STD subgrantees must entail. At a minimum, it "shall include a requirement that an entity applying for certification … submit information to the Secretary concerning the amount" that the entity "expended for covered outpatient drugs in the preceding year"—a requirement designed "to assist the Secretary in evaluating the validity of the entity's subsequent purchases of covered outpatient drugs at discounted prices." *Id.* § 256b(a)(7)(B). The statute also requires that HRSA's

19

*recertification* procedures "shall require that such entities submit information to the Secretary to permit the Secretary to evaluate the validity of subsequent purchases by such entities in the same manner" as required for initial certification decisions. *Id.* § 256b(a)(7)(E).

The administrative record makes clear that HRSA fell down on the job. The record includes materials that the agency describes as relating to Sagebrush's "registration records," ECF 33 at 1, yet is completely devoid of evidence that HRSA has actually obtained "information" sufficient for the agency to "evaluat[e] the validity of the entity's subsequent purchases of covered outpatient drugs at discounted prices," as it must before certifying an entity as 340B-eligible. 42 U.S.C. § 256b(a)(7)(B). Nor does any record evidence show that HRSA has undertaken *any* eligibility review when recertifying STD subgrantees, much less that the agency fulfilled its obligation "to evaluate the validity" of those entities' purchases before doing so. *Id.* § 256b(a)(7)(E).

To the contrary, the record shows the opposite. It contains no "information" about the 340B-priced drugs that the entities at issue purchased. *Id.* And neither HRSA's correspondence with state health agencies nor any decisional document reflects consideration of whether those entities' 340B purchases were "valid[]." *Id.* Moreover, where the evidence indicates that an STD subgrantee's purchases raised red flags—for example, where Sagebrush purchased millions of dollars worth of 340B drugs for 19 different locations on the basis of a single $600 grant, Amgen_AR_13172-73— the agency simply ignored the problem altogether. Even offers by state agencies to assist HRSA in performing its statutory recertification obligations went unanswered: For three of the Sagebrush entities that Plaintiffs challenge, a state official asked HRSA for guidance in instances where "the entities stop receiving funding," inquiring about any "process" through which the agency "should let [HRSA] know." Amgen_AR_13722. There is no evidence that HRSA provided a response.

20

The statute makes clear that certification and recertification are not supposed to be check-the-box exercises: The law obligates HRSA to obtain drug purchase information from each entity and to "evaluat[e] the validity" of the entity's past drug purchases before HRSA certifies or recertifies a covered entity. 42 U.S.C. § 256b(a)(7)(B), (E). To satisfy these requirements, HRSA must do more than rely on self-attestations submitted by Sagebrush and other entities claiming eligibility for 340B pricing by virtue of receiving state and local grant funding, or one-line emails from state health departments reporting that Sagebrush receives in-kind funding. *Sagebrush Health Servs. v. Kennedy*, No. 25-cv-915, 2025 WL 1784436, at *4 (D.D.C. June 27, 2025) ("The statute does not require HRSA to take 340B participants' self-reported information at face value … ."). HRSA cannot determine the "validity" of an entity's post-certification purchases without reviewing information about those "subsequent purchases." 42 U.S.C. § 256b(a)(7)(B), (E).

Agency guidance issued shortly after the law's enactment suggests that the agency once appreciated the force of these statutory commands: HHS guidance requires States to certify at the outset that would-be STD subgrantee covered entities do, in fact, receive federal grant funds. 58 Fed. Reg. 27,289, 27,290 (May 7, 1993). For purposes of the recertification process under 42 U.S.C. § 256b(a)(7)(E), the guidance also contemplates that HRSA will annually compile a list of covered entities, along with an estimate of each entity's covered drug purchases within the preceding fiscal year—information that "will be kept on file so that they can be used for audit purposes." 58 Fed. Reg. at 27,290.

Yet HRSA has all but admitted that it has historically fallen short of its certification and recertification obligations. In its declaration opposing Sagebrush's preliminary injunction motion in parallel litigation, HRSA claims the agency "may certify or recertify a covered entity *based on the covered entity's attestation* that the *self-reported* information it has provided in OPAIS

21

[*i.e.*, HRSA's database] is accurate and the covered entity is eligible to participate in the 340B Program." Britton Decl. ¶ 25, *Sagebrush Health Servs. v. Kennedy*, No. 25-cv-915 (D.D.C. May 5, 2025), ECF 20-2 (emphases added). That is not what the statute says. Congress put the burden on the Secretary to establish a meaningful process for certifying entities—not simply to take would-be STD subgrantees at their word. HRSA must "include a requirement that an entity applying for certification … submit information" concerning its past drug purchases; it must "evaluat[e] the validity" of those purchases to ensure the entity is not engaged in unlawful diversion; and it must "include procedures under which each State shall … prepare and submit a report" listing the covered entities in the State. 42 U.S.C. § 256b(a)(7)(B), (D), (E). To be sure, HRSA reserves for itself the option to "conduct[] compliance reviews to confirm eligibility for the program" on the back end. Britton Decl. ¶ 25, *supra*. But any such review would occur only after HRSA has *already* "certified" STD subgrantees such as the Sagebrush entities, thereby allowing them to access 340B pricing based on nothing more than their own self-reported information and attestations.

In a recent information collection proposal issued pursuant to the Paperwork Reduction Act, the agency doubled down on its refusal to follow statutorily required certification and recertification procedures. This agency action—initiated three days after this Court denied the Government's partial motion to dismiss—perpetuates HRSA's misreading of the statute. 90 Fed. Reg. 38,167, 38,168 (Aug. 7, 2025). The agency's proposal describes HRSA as "*requesting* that STD and TB grantees provide supporting documentation to demonstrate 340B eligibility pursuant to section 340B(a)(4)(K) of the PHS Act during initial registration as well as during recertification *if requested* to ensure compliance." *Id.* (emphases added). But the 340B statute requires more:  HRSA must implement a process *requiring* STD subgrantees to submit this information. *See* 42 U.S.C. § 256b(a)(7)(A). Put simply, to "request" is not to "require." And even that "request" was not in

place for most of the certifications and recertifications at issue. Thus, the agency has all but conceded that the approach it has taken since the enactment of the 340B statute falls short of what the statute requires.

**B.      HRSA's Certification of Entities Without Making Their Criteria Available to Manufacturers Was Contrary to Law.**

The agency's certifications and recertifications of the entities here also contravened required statutory procedures in another way: HRSA has *never* "ma[de] available to all manufacturers" "a description of the criteria for certification" under the process the statute required it to develop. 42 U.S.C. § 256b(a)(7)(C). Nor has the agency otherwise disclosed the steps it has taken (if any) to verify the eligibility of STD subgrantees or to require the submission of purchase information. This obligation is independent of the agency's duty to develop a certification process under the 340B statute, and the agency's failure to fulfill it renders its certification and recertification decisions unlawful.

Perhaps worse, there is no evidence that any such criteria even exist. In the agency's recent information-collection request for STD subgrantees, Section 256b(a)(7)(C) goes entirely unmentioned. 90 Fed. Reg. 38,167 (Aug. 7, 2025); 91 Fed. Reg. 714 (Jan. 8, 2026). The agency likewise has issued no guidance describing its criteria; published no information about criteria anywhere on its website, including those portions of the website dedicated to 340B Program "Eligibility," "Registration," "Program Requirements," "Recertification," "Manufacturer Resources," or "Program Updates," https://www.hrsa.gov/opa; and has not conveyed any descriptions of criteria to manufacturers in response to efforts to engage with the agency on this issue. *See, e.g.*, Amgen_AR_101-104.

Because HRSA has certified and recertified the eligibility of the Sagebrush entities that Plaintiffs challenge without making its criteria available to manufacturers—even assuming those

23

decisions were guided by any discernible criteria or process at all—those agency actions were not properly conducted "pursuant to paragraph [(a)](7)." 42 U.S.C. § 256b(a)(4)(K). They are accordingly unlawful and must be set aside for this reason as well.

## II. HRSA's Certification Decisions Were Contrary Law Because the Sagebrush Entities Were Ineligible on Multiple Grounds.

Each of the Sagebrush entities at issue is ineligible to participate in the 340B program on multiple grounds. Those entities divert 340B-priced drugs to non-patients, they receive grant support only from other private subgrantees rather than through a State or unit of local government, and several received only in-kind contributions rather than grant funds as the 340B statute requires.

### A. HRSA's Certification of Sagebrush Entities That Have Unlawfully Diverted 340B Drugs Was Contrary to Law.

An entity that fails to "meet[] the requirements" in the 340B statute's anti-diversion provisions is ineligible to participate in the 340B program. *Id.* § 256b(a)(4). At a minimum, HRSA was required to evaluate diversion—and did not. Each of the Sagebrush entities at issue here routinely diverts 340B-priced drugs to non-patients, and thus fails to "meet[] the requirements" to be certified as a covered entity.

To be clear, when HRSA certifies an entity as a 340B-eligible covered entity, the determination does not grant the covered entity a free pass to purchase as many discounted drugs as it wishes, as Sagebrush has alleged in a separate lawsuit it brought against Amgen in California after this action was commenced. But HRSA's certification and recertification decisions must at least consider factors such as whether the entity is typically purchasing 340B-priced drugs for a patient who meets the statute's patient definition criteria, and whether it is purchasing 340B-discounted drugs for treatment of diseases within the scope of a qualifying grant.

24

**1. The Sagebrush Entities Engage in Disqualifying Diversion by Purchasing 340B Drugs Beyond the Scope of a Qualifying STD Grant.**

To be eligible to receive 340B-priced drugs based on the receipt of funds "under" a federal STD grant program, an entity must use those funds for "treatment of sexually transmitted diseases"—that is, for purposes consistent with the scope of the STD grant. 42 U.S.C. § 256b(a)(4)(K) ("relating to treatment of sexually transmitted diseases"); *see* 61 Fed. Reg. at 55,157-58 (construing the term "patient of the entity" to impose the same limitation). Congress did not authorize entities that provide *no* STD treatment to qualify as 340B-eligible based on the receipt of grant funds for STD treatment; nor did it intend for those entities to access 340B pricing on drugs not used to treat sexually transmitted diseases.

An entity that purchases 340B-priced drugs for purposes unrelated to the qualifying grant, like the Sagebrush entities, is not 340B-eligible. When an entity obtains its eligibility by "receiving funds under" the federal STD grant program "through a State or unit of local government," 42 U.S.C. § 256b(a)(4)(K), the entity is limited to what the direct funding recipient may do under the grant. *See* 2 C.F.R. § 200.1 ("[A]n award provided by a pass-through entity to a subrecipient [is] for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity."); *accord* Jonathan D. Shaffer & Daniel H. Ramish, *Federal Grant Practice* § 1:6 (2025 ed.). An entity whose 340B eligibility is based on receiving STD grant funds accordingly acts as an STD subgrantee only when it is engaged in preventing and treating sexually transmitted diseases. Conversely, when such an entity engages in unrelated activity—activity *outside* the scope of the grant to the State or unit of local government from which the entity receives funds—the entity is *not* acting as an STD subgrantee and is not eligible to access 340B-discounted drugs.

HRSA guidance confirms this common-sense interpretation. The agency has interpreted the 340B statute to permit covered entities to make 340B-discounted purchases only for services "consistent with the service or range of services for which grant funding … has been provided to the entity." 61 Fed. Reg. at 55,157-58; *see* 42 U.S.C. § 256b(a)(4)(K) (providing that such covered entities must receive grant funding "relating to treatment of sexually transmitted diseases"). Consistent with that interpretation, HRSA has explained in its 340B FAQs that STD clinics "may purchase and dispense any 340B drugs *associated with a service* for which the covered entity is responsible, including contraceptives, to that patient, *to the extent it … is consistent with the scope of the grant*." HRSA, 340B FAQs, https://www.hrsa.gov/opa/faqs (emphases added).

For each Sagebrush entity at issue, HRSA has made no attempt to ascertain whether the entity's 340B purchases were "consistent with the scope of the grant." HRSA, 340B FAQs, *supra*. When an agency strays from the standard it has maintained in its published guidance, the agency must at the very least "acknowledge and explain any departure" from its prior position. *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1029 (D.C. Cir. 2017); *see Fort Stewart Schs. v. FLRA*, 495 U.S. 641, 654 (1990) ("It is a familiar rule of administrative law that an agency must abide by its own regulations."). HRSA has not acknowledged, much less explained, its departure here. Nor does the record reflect any review of purchase data "to evaluate the validity of [the entity's 340B] purchases," as the statute requires. 42 U.S.C. § 256b(a)(7)(E); *see id.* § 256b(a)(7)(B).

To the contrary, the evidence before the agency demonstrates that the Sagebrush entities purchased 340B drugs overwhelmingly, if not exclusively, for purposes unrelated to the treatment or prevention of STDs. Sagebrush expressly "include[s] patients at their infusion-based specialty clinics," which provide services unrelated to STD treatment or prevention "such as Infectious

26

Disease, Rheumatology, Neurology, Nephrology, Cardiology, Gastroenterology, Oncology, and other applicable specialties." Amgen_AR_13172. And Sagebrush's affiliate agreements with medical practices—including preexisting rheumatology and cancer centers that provide no STD care—provide that Sagebrush will purchase 340B drugs not only for "STI [sexually transmitted infection] Services," but also for any "Professional Services" those practices offer their patients. *See, e.g.*, Amgen_AR_13212. In Connecticut, Sagebrush's services appear to be limited to "conduct[ing] testing at different testing events/tables across the State." Amgen_AR_12463; *see* Amgen_AR_13372, 13414 (listing the only grant support these entities received as "in-kind" support in the form of rapid HIV test kits). These entities annually purchase millions of dollars in 340B-priced medications from Plaintiffs, none of which are indicated for the treatment of prevention of STDs. ECF 1, ¶ 7; *see* Amgen_AR_79-81 Plaintiffs manufacture no STD medications.; ECF 1, ¶ 7. HRSA's certifications and recertifications of these entities were accordingly arbitrary, capricious, and contrary to law.

### 2. The Sagebrush Entities Engage in Disqualifying Diversion by Providing 340B-Priced Drugs to Non-340B Patients.

Each of the Sagebrush entities was also ineligible for certification or recertification because those entities systematically divert 340B-priced drugs to persons who are "not a patient of the entity." 42 U.S.C. § 256b(a)(5)(B). Compliance with the diversion prohibition is an express requirement for 340B program eligibility. Section 340B formally defines "the term 'covered entity'[to] mean[] an entity that meets the requirements described in paragraph [(a)](5)." *Id.* § 256b(a)(4). Thus, if an entity transfers 340B-priced drugs to persons who are *not* "patient[s] of the entity," then the entity *does not* "meet[] the requirements described in paragraph [a](5)," and so does not qualify as a covered entity entitled to 340B pricing, even if it satisfies other eligibility

27

criteria. HRSA accordingly cannot certify or recertify that such an entity is an eligible covered entity.

The Sagebrush entities have consistently failed to conform to this unambiguous statutory requirement for two independent reasons—each evident from the record before the agency when it certified and recertified those entities.

*First,* individuals prescribed 340B-priced drugs for conditions unrelated to STDs do not qualify as patients of an STD covered entity. As noted, HRSA's longstanding guidance provides that an individual is a "patient" of an STD grant recipient for purposes of program eligibility "only if … the individual receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding … has been provided to the entity." 61 Fed. Reg. at 55,157-58; *accord* HRSA, 340B FAQs, *supra* ("STD (318 grantee) clinics that participate in the 340B Program may purchase 340B drugs (including prescribed contraceptives), for grantee patients *that meet the patient definition criteria*.") (emphasis added).

For STD covered entities, that means only individuals receiving services "relating to treatment of sexually transmitted diseases" are patients of the entity. 42 U.S.C. § 256b(a)(4)(K). Accordingly, an STD covered entity that provides 340B-priced medications to individuals who are *not* receiving STD treatment is ineligible because fails to "meet[] the requirement[] described in paragraph (5)" that the entity "shall not resell or otherwise transfer the [340B] drug" to nonpatients, 42 U.S.C. § 256b(a)(4), (a)(5)(B).

As discussed above, the rheumatology, dermatology, and other specialty practices HRSA has certified as STD clinics purchase 340B drugs wholly unrelated to STD treatment. *See supra*, at pp. 26-27. To the extent Sagebrush provides any STD-related services at all, these appear to be

28

limited to distributing condoms and offering occasional STD testing. *See* Amgen_AR_13167, 13172, 13191 (entire Nevada grant for 19 Sagebrush entities comprised $600 spent on 6 boxes of condoms); Amgen_AR_13372, 13414 (sole grant support to Connecticut Sagebrush entities was in-kind contribution of HIV test kits). Merely providing individuals condoms or one-off STD counseling—even assuming Sagebrush in fact does so—does not transform the individuals into Sagebrush "patients" for whom it may purchase 340B-priced drugs unrelated to STD treatment or prevention.

Construing "patient[s]" of an STD subgrant recipient to include only individuals receiving STD treatment also comports with the statute's structure and purpose. Section 340B allows STD subgrantees to obtain reduced-price drugs to facilitate the purpose of those federal grants—namely, "treatment of sexually transmitted diseases." *Id.* § 256b(a)(4)(K). Permitting STD subgrantees to obtain 340B-priced drugs with no nexus to STD treatment advances neither the purpose of the grants nor the interests of the individuals whom the grants seek to benefit. Instead, it encourages abuse. It would similarly make no sense to require HRSA to "evaluate the validity of subsequent purchases by such entities"—as Congress specifically did for STD covered entities—if the entities had carte blanche to purchase 340B-priced drugs for individuals receiving no STD treatment. *Id.* § 256b(a)(7)(E). Courts must construe statutory language in "the broader context of the statute as a whole." *Fischer v. United States*, 603 U.S. 480, 486 (2024) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

***Second***, most, if not all, of the Sagebrush entities at issue systematically divert 340B-priced drugs to individuals who are not Sagebrush "patients" even under an impermissibly broad definition of that term. Sagebrush's "affiliate" agreement, and its similar agreements with third-party medical providers, do not merely *permit* diversion of 340B-priced drugs—they *require* it.

Case 1:24-cv-03571-JEB    Document 35-1    Filed 03/20/26    Page 35 of 47

Start with Sagebrush's Master Affiliate Agreement with Healthnomic Partners LLC, which covers four of the entities at issue here. *See* Amgen_AR_13221, 13225-26. Under that agreement, Healthnomic (the Affiliate) purports to maintain total control over care of patients for whom Sagebrush purchases 340B-priced drugs. Healthnomic operates the "medical practice" and provides all "professional medical or other health care services performed by a Practitioner, including the prescription and administration of infusion drugs at Covered Locations." Amgen_AR_13208-10. Healthnomic "retains responsibility for the performance of all Professional Services." Amgen_AR_13211. Sagebrush Health Services—despite calling itself the "Covered Entity," Amgen_AR_13222; *see* Amgen_AR_13208—lacks any authority "to exercise any control or discretion over any Practitioner's professional judgment" or to prescribe "340B Drugs" to patients directly. Amgen_AR_13212. Sagebrush's role is instead limited to "coordinat[ing] STD testing and reporting." Amgen_AR_13208. The upshot is that Healthnomic, not Sagebrush, maintains "responsibility for the care provided." 61 Fed. Reg. at 55,157.

Despite the fact that Healthnomic—not Sagebrush—performs all patient care, the agreement expressly calls for Sagebrush to "purchase 340B Drugs for Eligible Patients" and to "provide or arrange for the provision of those 340B Drugs to Affiliate for Affiliate to administer to Eligible Patients at Affiliate Locations." Amgen_AR_13212. Sagebrush invokes Healthnomic as its "affiliate" to claim 340B eligibility; but if Healthnomic *provides* the medical services, *prescribes* all medications, and *administers* the 340B-priced drugs that Sagebrush purchases at 340B-discounted prices as a covered entity, then the patients to whom Healthnomic administers the drugs are *its* patients—not Sagebrush's.

Nonetheless, Sagebrush has registered as a 340B-eligible covered entity, and it has used that supposed eligibility to access 340B-discounted pricing, which in turn it uses to generate

substantial arbitrage revenues. The Master Affiliate Agreement thus formalizes precisely the sort of unlawful diversion that the 340B statute forbids: Sagebrush "tranfer[s] the drug[s]" that it purchases at 340B discounts "to a person who is not a patient of the entity"—namely, to Healthnomic, which administers those drugs to *its own* patients, for purposes unrelated to STD treatment or prevention. 42 U.S.C. § 256b(a)(5)(B).

Sagebrush's arrangements with other third-party medical practices are more complex, but equally unlawful. For other Nevada locations, Sagebrush contracts both with "Specialists" who provide patient care and with an "Administrator" that processes 340B claims. *See, e.g.*, Amgen_AR_13227, 13256, 13261. The record does not include the agreements for every relevant Nevada location, if such agreements even exist, but the general contours of this arrangement are clear. The "Specialists" provide medical services like "Dermatology" and "Oncology" and "can obtain medications at 340b price" for their patients. Amgen_AR_13239, 13256, 13260. Meanwhile Sagebrush, working with its third-party Administrator, "purchase[s] [drugs] at the 340B price" as the "Covered Entity," and provides them for use by these Specialists. Amgen_AR_13227. Sagebrush then receives a portion of  the "Covered Entity Net Savings"—that is, the arbitrage revenue generated from resale of the drugs at full price. Amgen_AR_13231. Here, too, the agreements explicitly purport to allow Sagebrush to acquire drugs at 340B-discounted prices and divert them to the patients of third parties for a profit.

In certifying and recertifying the Sagebrush entities at issue, HRSA made no attempt ascertain whether those entities had diverted 340B-drugs to nonpatients. And it ignored the clear evidence in its hands, which demonstrated that the diversion of drugs to third-party medical practices is the core of Sagebrush's business model. Its certifications and recertifications were accordingly unlawful.

**B.      HRSA's Certification of Entities that Receive Support Only as Sub-subgrantees of Other Certified Entities Was Contrary to Law.**

Under Section 340B, an entity qualifies as a covered entity based on its receipt of STD grant funds only if it is "receiving funds under section 247c of this title (relating to treatment of sexually transmitted diseases) …. through a State or unit of local government." 42 U.S.C. § 256b(a)(4)(K). This provision addresses federal grants that are issued under the PHS Act to state and local public health agencies (grantees) and then distributed by those states directly to local providers offering STD treatment (subgrantees). The statute does not authorize such a subgrantee to pass on 340B eligibility further down the chain, by transferring a portion of its *own* grant funds to *other* providers (*sub*-subgrantees) and thereby expanding the 340B program without limit.

To begin, the statute requires that STD grant funds be received "*through* a State or unit of local government." The ordinary meaning of "through" requires that an entity receive funds "by way of" a State or unit of local government. *Through*, Merriam-Webster, https://www.merriam-webster.com/dictionary/through. An entity that receives funds only from *another* private subgrantee does not receive those funds "by way of" a State or unit of local government, even if that governmental entity possessed the funds at some point earlier in the chain. Interpreting the statute to include sub-subgrantees would effectively rewrite the statutory text, conferring eligibility on providers that "receiv[e] funds … through a State or unit of local government *or through a subgrantee*."

Rewriting the statute that way would also allow a covered entity to  allocate a portion of its grant support to effectively create brand new covered entities without any certification process. Congress has never allowed covered entities to unilaterally create *other* independent covered entities. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998) ("[A] statute should not be construed to produce" a result that is "contrary to common sense" or "inconsistent

with the clear intentions of the statute's drafters."). And allowing a subgrantee to multiply 340B eligibility by transferring fractional amounts of the original subgrant award to other entities also has no limiting principle or logical stopping point. It would allow grant funds to be transferred *ad infinitum* from provider to provider to provider—all of which could declare themselves covered entities because the funds once passed, however distantly, through a state agency. The 340B statute does not permit this conduct.

The care and precision with which Section 340B identifies and defines the list of eligible covered entities underscores that Congress never intended to create such a perpetually cascading authorization structure. *See AstraZeneca Pharms.*, 543 F. Supp. 3d at 60 ("It is hard to believe that Congress enumerated 15 types of covered entities with a high degree of precision and intended to include [others] by implication."). Indeed, Congress subjected STD covered entities to *heightened* restrictions—the certification and recertification requirements—precisely because it had special concerns about "the validity of …. purchases by such entities." 42 U.S.C. § 256b(a)(7)(E).

The record here underscores the untenable consequences of allowing a covered entity to mint new covered entities in this manner. The 2023 subaward that Sagebrush received in Nevada, for example, provided only $600 dollars total. *See* Amgen_AR_13167, 13191. And although the Nevada subaward lists a number of addresses within Sagebrush's "[s]cope of work," Amgen_AR_13172, only one entity is listed as the actual subrecipient of the award: "Sagebrush Health Service" [sic]. Amgen_AR_13167. Sagebrush apparently used that money to purchase 6 boxes of condoms, which it claimed to have distributed among its 19 subdivisions in the State— though no record evidence shows that it actually did so. But any subsequent distribution of goods purchased with subgrantee funds does not transform those entities into subgrantees "receiving

33

funds … through a State or unit of local government." 42 U.S.C. § 256b(a)(4)(K). Rather, these entities are ineligible sub-subgrantees that received grant support only through Sagebrush.

HRSA's certifications and recertifications of these ineligible entities have allowed Sagebrush to extend an umbrella of 340B eligibility over unrelated medical practices that neither provide STD treatment themselves nor receive any grant funds through the State. As a result, Sagebrush has turned a $600 subgrant for STD services into a multi-million-dollar arbitrage scheme.

**C.      HRSA's Certification of Entities Receiving Only In-Kind Contributions, Rather than "Funds," Was Contrary to Law.**

HRSA's certification of Sagebrush entities receiving only in-kind contributions was also unlawful. Section 340B limits program eligibility to "entit[ies] receiving *funds*" under a qualifying grant. 42 U.S.C. § 256b(a)(4)(K) (emphasis added). The plain meaning of "funds" is "money, often money for a specific purpose." *Funds*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/funds; *see Fund*, Black's Law Dictionary (11th ed. 2019) (similar). Thus, only entities that receive *money*—not those that receive goods—qualify as covered entities under this statutory definition.

The statute's plain meaning is bolstered by the fact that the cross-referenced provision authorizes States and units of local government to receive "grants." 42 U.S.C. § 247c(b)-(d). That term likewise refers to "an amount of money." *Grant*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/grant ("an amount of money given especially by the government to a person or organization for a special purpose"). States and units of local governments receive *money* as grant recipients under Section 247c, and when they transmit a portion of that money to an STD clinic, the recipient may become "[a]n entity receiving funds under section 247c." 42 U.S.C. § 256b(a)(4)(K). The associated reference to "grants" thus

34

reinforces the monetary meaning of "funds." *See United States v. Williams*, 553 U.S. 285, 294 (2008) (applying "the commonsense canon of noscitur a sociis"). The cross-referenced provision also expressly distinguishes "grants" from "supplies or equipment," by authorizing the Secretary to "reduce [a] grant by the fair market value of any supplies or equipment furnished to such recipient." 42 U.S.C. § 247c(e)(4). The provision "show[s] that Congress knows how" to refer to in-kind contributions in the context of federal public health grants when it intends to do so. *Pereida v. Wilkinson*, 592 U.S. 224, 232 (2021).

Other structural clues point in the same direction. Congress used different language to describe the requisite support that different categories of covered entity must receive, underscoring that "funds" means money. Under subparagraph (a)(4)(J), an entity "receiving *assistance* under subchapter XXIV" is eligible to be a covered entity. 42 U.S.C. § 256b(a)(4)(J) (emphasis added). That subchapter authorizes not only monetary grants, but also "technical assistance" to prospective grantees. *Id.* § 300ff-16. Thus, when Congress intended non-monetary support to suffice for 340B eligibility, it said so clearly. *Compare id.* § 256b(a)(4)(J) ("assistance"), *with id.* § 256b(a)(4)(E) ("financial assistance"). "[T]he Court must give effect to, not nullify, Congress' choice to include limiting language in some provisions"—like the one governing STD covered entities—"but not others." *Gallardo By & Through Vassallo v. Marstiller*, 596 U.S. 420, 422 (2022).

HRSA has expressed a contrary view in guidance on its website, stating that "the receipt of in-kind contributions" can qualify a recipient as a 340B-eligible STD clinic. HRSA, 340B FAQs, *supra*; *see* Amgen_AR_12495, 13413 (making similar statements to state health agencies). But that view cannot be squared with the 340B statute's text. An entity receiving only in-kind contributions for STD treatment does not receive "funds" through a State or local unit of government as required by 42 U.S.C. § 256b(a)(4)(K). In posting this guidance, HRSA did not

35

claim any interpretative authority in this area—for good reason: it has none—nor did the agency offer any justification for its view that in-kind contributions can suffice to qualify the recipient as a covered entity.

Courts must interpret statutory text according to "the best reading of the statute," which is "the reading the court would have reached if no agency were involved." *Loper Bright*, 603 U.S. at 400 (quotation marks omitted). Here, the statute's plain text and context make clear that "funds" in the 340B statute refers to money alone. Both of the Connecticut covered entities at issue here received only "in-kind" support in the form of rapid HIV test kits. Amgen_AR_13372, 13414; *see* Amgen_AR_13409, 13412. Because these entities did not receive "funds," they are ineligible to be STD covered entities. 42 U.S.C. § 256b(a)(4)(K). As a result, HRSA's certifications and recertifications of these entities were arbitrary, capricious, and contrary to law.

## III.    HRSA's Certification and Recertification of the Sagebrush Entities Was Arbitrary and Capricious.

HRSA's certifications and recertifications of the Sagebrush entities must also be set aside on the independent ground that the agency failed to engage in the reasoned decision-making that the APA requires. In certifying and recertifying ineligible entities, the agency neglected the core requirements of its statutory task. And its decision to recertify entities based on no evidence whatsoever—while failing even to acknowledge affirmative evidence before it showing those entities were ineligible—was arbitrary and capricious.

To begin, the agency failed to consider the single most "important aspect of the problem" before it: the statutory eligibility requirements for covered entities that Congress imposed. *State Farm*, 463 U.S. at 43. The agency based its initial certification decisions entirely on emails from state health agencies that asserted, without elaboration, that the Sagebrush entities received support pursuant to a qualifying grant. *See* Amgen_AR_13407-11 (Southington Clinic - CT);

36

Amgen_AR_13412-13 (Danbury Rd Clinic); Amgen_AR_13446-49 (Rainbow Rheumatology); Amgen_AR_13524-27 (Eastern Rheumatology); Amgen_AR_13603-06 (Hummingbird Medical Group); Amgen_AR_13681-82 (Battleborn Health Care); Amgen_AR_13721-24 (Fire Mesa ID); Amgen_AR_13822-23 (Dr. Ann Wiermen, MD); Amgen_AR_13877-78 (Centennial SACI). And the same was true when the agency reinstated covered entities that it had previously terminated, at least in the subset of instances where the agency relied on anything at all. Amgen_AR_13450-51 (Rainbow Rheumatology); Amgen_AR_13528-29 (Eastern Rheumatology); Amgen_AR_13607-28 (Hummingbird Medical Group); Amgen_AR_13725-26 (Fire Mesa ID).

Even putting aside that Sagebrush itself (not the "affiliated" entities) was the subgrantee, and even putting aside that several of the entities received only in-kind contributions (not funds), the receipt of grant funds is only *one* of many eligibility requirements for STD covered entities. In addition to "receiving funds under [a federal STD grant] … through a State or unit of local government," 42 U.S.C. § 256b(a)(4)(K), an STD covered entity also must "meet[] the requirements" in the statute's anti-diversion provisions, *id.* § 256b(a)(4). Further, it must be "certified by the Secretary pursuant to paragraph [a](7)," *id.* § 256b(a)(4)(K), which requires the agency to employ a "process for … certification" that allows HRSA "to evaluate the validity of [the entity's 340B] purchases" under "criteria for certification" that have been "ma[de] available to all manufacturers," *id.* § 256b(a)(7)(A)-(C), (E). In basing its certification decisions on nothing other than the supposed receipt of grant support, the agency entirely ignored two of the applicable statutory eligibility requirements.

HRSA's recertification actions reflect an agency process that does not even attempt to meet the APA's reasoned decision-making requirement. The record contains no evidence upon which the agency could have relied in annually recertifying each covered entity. That rubber-stamp

approach is flatly inconsistent with the 340B statute's command that the agency "shall require that [entities seeking recertification] submit information to the Secretary to permit the Secretary to evaluate the validity of subsequent purchases by such entities in the same manner as that required" for initial certification decisions. *Id.* § 256b(a)(7)(E). And it falls woefully short of the reasoned and reasonable decision-making the APA demands. *Prometheus Radio Project*, 592 U.S. at 423.

Case in point: Although HRSA ultimately determined that Danbury Rd Clinic had become ineligible as of April 1, 2023, it failed to terminate that entity until January 14, 2025, having performed no assessment of eligibility whatsoever when it recertified the entity in 2023 and 2024. *See* Amgen_AR_13414-45. "[B]lindly adopt[ing]" an entity's self-serving assertion that it remains eligible for the program is arbitrary and capricious. *City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006).

HRSA also failed to assess—at any stage of certification or recertification—whether, pursuant to its own guidance, the Sagebrush entities limited their 340B purchases to those that "align[ed] with [the] patient definition and [were] consistent with the scope of the grant." HRSA, 340B FAQs, *supra*; *see* 61 Fed. Reg. at 55,157-58 (limiting the provision of 340B drugs to individuals who "receive[] a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding … has been provided to the entity"). Had it done so, HRSA would have realized that, since 2022, the Sagebrush entities had obtained more than $27 million in 340B-reduced prices on drugs purchased from Plaintiffs that have nothing at all to do with treating STDs.

By basing its certification and recertification decisions on single-line emails and covered entity self-attestations, rather than considering drug purchase information as the 340B statute requires, HRSA has also "relied on factors which Congress has not intended it to consider." *State*

38

*Farm*, 463 U.S. at 43; *see, e.g.*, Amgen_AR_13412; Britton Decl. ¶ 25, *supra*; 90 Fed. Reg. at 38,168. Congress spoke plainly when it prescribed what information HRSA must consider, and what steps it must take: It must "evaluate the validity of … purchases" based on drug purchase "information" that it "shall require" covered entities to submit under "criteria for certification" that have been "ma[de] available to all manufacturers." 42 U.S.C. § 256b(a)(7)(B)-(C), (E). The agency's reliance solely on other, plainly inadequate factors was unlawful. The record reveals the extent of the agency's shortcoming: HRSA *still* has not adopted any criteria for certification or procedures consistent with the statute more than thirty years after the deadline Congress set only underscores the arbitrariness of its certification and recertification decisions. *See* Amgen_AR_101 (asserting, as of August 2024, that the agency was "looking into this" issue); *see also Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987) (agency's failure to discuss how action squares with statute's objective is arbitrary and capricious).

In enacting the 340B statute, Congress prescribed detailed eligibility requirements and, for those categories of covered entities most likely to abuse the program (STD subgrantees), charged HRSA with certifying and recertifying those entities' eligibility. To ensure that the process was effective and fair, it further required the agency to perform that task with procedures that would allow it to meaningfully assess eligibility, under criteria known to manufacturers and covered entities alike. HRSA has not fulfilled that statutory mandate. And its perfunctory review of STD covered entities has fostered, rather than checked, serious 340B program abuse. Its certifications and recertifications of ineligible Sagebrush entities were arbitrary and capricious, and this Court should declare those decisions unlawful and set them aside.

**CONCLUSION**

Because HRSA acted unlawfully in certifying the challenged Sagebrush entities, the only appropriate remedy here is vacatur of those certifications. *Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 148 (D.D.C. 2025) ("[U]nsupported agency action normally warrants vacatur.") (quoting *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005)). The Court should enter judgment in Plaintiffs' favor, declare HRSA's certifications and recertifications of the challenged Sagebrush entities unlawful, and vacate those certifications and recertifications. The Court should also order HRSA to promptly develop and implement a process for certification of STD clinics consistent with 42 U.S.C. § 256b(a)(7) and to make available to all manufacturers its criteria for certification and recertification of those entities.

40

Dated: March 20, 2026

Respectfully submitted,

*/s/ Allon Kedem*
Allon Kedem (D.C. Bar No. 1009039)
Jeffrey L. Handwerker (D.C. Bar. No. 451913)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
allon.kedem@arnoldporter.com
jeffrey.handwerker@arnoldporter.com

*Counsel for Plaintiffs Eli Lilly and Company and UCB, Inc.*

HOGAN LOVELLS US LLP

/s/ *Susan Cook*
Susan Cook (D.C. Bar No. 462978)
Marlan Golden (D.C. Bar No. 1673073)
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel: (202) 637-5600
susan.cook@hoganlovells.com
marlan.golden@hoganlovells.com

*Counsel for Plaintiff Amgen Inc.*

41

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2026, the foregoing memorandum of law was served via ECF to all counsel of record.

/s/ Allon Kedem
Allon Kedem
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000

42