**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMGEN INC., et al.,<br><br>  *Plaintiffs*,<br><br>  –v–<br><br>ROBERT F. KENNEDY, JR., Secretary of Department of Health and Human Services, et al.,<br><br>  *Defendants*,<br><br>and<br><br>COMMUNITY CARE RESOURCES OF FLORIDA<br><br>  *Intervenor-Defendant.* | Case No. 1:24-cv-3571-JEB |

**<u>INTERVENOR-DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ........................................................................................................................ 1

LEGAL BACKGROUND ........................................................................................................... 5

    I.      The 340B Program .......................................................................................... 5

    II.     STD Grant Funds and the Secretary's 340B Certification Process ...................... 8

          A.      Federal Disease Control Legislation............................................................. 8

          B.      STD Grant Funds ......................................................................................... 8

          C.      STD Testing, Treatment, and Prevention ................................................ 10

    III.    Qualification and Certification of 340B STD Grantees...................................... 12

    IV.    Importance of the 340B STD Program .................................................................. 13

STATEMENT OF THE FACTS ............................................................................................... 15

STANDARD OF REVIEW ....................................................................................................... 18

ARGUMENT ............................................................................................................................. 19

    I.      The Drug Companies' Facial Challenges in Claims One Through Four Are Barred by the Statute of Limitations................................................................................. 20

    II.     The Court Should Grant Summary Judgment on Counts One and Two Because the Drug Companies Are Precluded from Challenging STD Clinic Recertifications on Diversion Grounds Without First Exhausting ADR Remedies ................................................................................................................. 21

          A.      Claims One and Two Are Diversion Claims ........................................... 22

          B.      CCRF Is Entitled to Summary Judgment on Claims One and Two Because the Drug Companies Failed to Exhaust Administrative Remedies........... 23

    III.    The Drug Companies' Claims One, Two, Four, and Five Fail on the Merits ...... 25

          A.      Claim One:  The Scope of a Grant Does Not Determine Which Drugs Are Discounted ................................................................................................ 26

               1.      The 340B Program's Scope-of-the-Grant Limitation Applies to the 340B Eligibility of Patients, Not Drugs....................................... 26

2. Application of the Scope-of-the-Grant Restriction to Individual Drugs Is Impractical .......................................................................... 29

B. Claim Two: The Secretary's Procedures for Ensuring That Covered Entities Are Not Certified or Recertified if They Engage In Diversion Are Consistent With the Statute .......................................................................... 29

C. Claim Four: The Secretary's Certification of Entities Receiving Only In-Kind Contributions is in Accordance With Federal Grants Law .............. 32

D. Claim Five: The Secretary's Certification and Recertification Procedures Are in Accordance With the 340B Statute ................................................ 39

1. The Secretary Has a Lawful Certification and Recertification Process for Covered Entities ............................................................ 39

2. The Secretary's Certification Practices Are Consistent With His Certification Procedures and Otherwise Permissible .................... 42

3. The Secretary Does "Make Available" Its Criteria to Manufacturers ...................................................................................................... 43

CONCLUSION ................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) ........................................................................................18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...........................................................................................................18

*Astra USA, Inc. v. Santa Clara County*,
563 U.S. 110 (2011) .................................................................................................2, 7, 23, 25

*Avocados Plus Inc. v. Veneman*,
370 F.3d 1243, 1247 (D.C. Cir. 2004) ...............................................................................24

*Biden v. Nebraska*,
600 U.S. 477 (2023) ...........................................................................................................33

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*,
419 U.S. 281 (1974) .......................................................................................................19, 43

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...........................................................................................................18

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ...........................................................................................................21

*Darby v. Cisneros*,
509 U.S. 137 (1993) ...........................................................................................................25

*Eli Lilly & Co. v. Kennedy*,
No. 21-CV-02608, 2025 WL 1423630 (D.D.C. May 15, 2025) .........................................19

*F.T.C. v. Standard Oil Co. of California*,
449 U.S. 232 (1980) ...........................................................................................................41

*Federal Crop Ins. Corp. v. Merrill*,
332 U.S. 380 (1947) ...........................................................................................................44

*Fox v. Clinton*,
684 F.3d 67 (D.C. Cir. 2012) ...........................................................................................19, 43

*Genesis Health Care, Inc. v. Becerra*,
701 F.Supp.3d. 312 (D.S.C. 2023) .....................................................................................27

*Humane Soc'y of the U.S. v. USDA*,
41 F.4th 564 (D.C. Cir. 2022)................................................................................44

*Ind. Mun. Power Agency v. FERC*,
56 F.3d 247 (D.C.Cir.1995)....................................................................................19

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
591 U.S. 657 (2020)................................................................................................39

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)................................................................................................19

*Mackinac Tribe v. Jewell*,
87 F. Supp. 3d 127 (D.D.C. 2015)....................................................................23, 24

*Marshall Cnty. Health Care Auth. v. Shalala*,
988 F.2d 1221 (D.C. Cir. 1993)..............................................................................18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..................................................................................................19

*N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc.*,
416 U.S. 267 (1974)................................................................................................41

*In re Permanent Surface Mining Regulation Litigation*,
653 F.2d 514 (D.C. Cir. 1981)..........................................................................39, 41

*PhRMA v. McClain*,
645 F. Supp. 3d 890 (E.D. Ark. 2022), *aff'd*, 95 F.4th 1136 (8th Cir. 2024)............6

*Pierce v. SEC*,
786 F.3d 1027 (D.C. Cir. 2015)........................................................................19, 42

*Pugin v. Garland*,
599 U.S. 600 (2023)................................................................................................33

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696, 699 (3rd Cir. 2023) ............................................................................6

*Servier Pharms. LLC v. Becerra*,
No. CV 24-2664, 2025 WL 27352 (D.D.C. Jan. 3, 2025) .......................................19

*Sierra Club v. Mainella*,
459 F. Supp. 2d 76 (D.D.C. 2006).........................................................................18

*Smith v. United States*,
508 U.S. 223 (1993)................................................................................................33

*U.S. v. Faiella,*
    39 F. Supp. 3d 544 (S.D.N.Y. 2014)..................................................................................36

*United States v. Murgio,*
    209 F. Supp. 3d 698 (S.D.N.Y. 2016)...........................................................................36, 37

*United States v. Nat'l Treasury Emps. Union,*
    513 U.S. 454 (1995)..........................................................................................................20

*United States v. Salerno,*
    481 U.S. 739 (1987)..........................................................................................................20

**Federal Statutes**

5 U.S.C. § 706(2)(A), (C), (E) ...............................................................................................18

18 U.S.C. § 1001.....................................................................................................................30

28 U.S.C § 2401......................................................................................................................21

28 U.S.C § 2401(a) ..............................................................................................................2, 21

42 U.S.C.  256b(a)(7)..............................................................................................................39

42 U.S.C. § 245b(d)(3)(A)......................................................................................................24

42 U.S.C. § 247c.................................................................................................................6, 12

42 U.S.C. §§ 247c....................................................................................................................16

42 U.S.C. § 247c(a)-(d)...........................................................................................................37

42 U.S.C. § 247c(d) ..................................................................................................................9

42 U.S.C. § 247c(e)(4)........................................................................................................34, 35

42 U.S.C. § 256b
    ................1, 3, 4, 5, 6, 7, 8, 12, 13, 15, 16, 17, 18, 20, 21, 25, 26, 27, 28, 30, 31, 32, 38, 39, 44

42 U.S.C. § 256b(a)(1)..........................................................................................................5, 6

42 U.S.C. § 256b(a)(4)....................................................................................................22, 26, 42

42 U.S.C. § 256b(a)(4)(K) .............................................................................................4, 6, 12, 32

42 U.S.C. § 256b(a)(4)(K) ......................................................................................................26

42 U.S.C. § 256b(a)(5)(A) ........................................................................................................7

42 U.S.C. § 256b(a)(5)(B) ...........................................................................................3, 7, 26

42 U.S.C. § 256b(a)(5)(C) ....................................................................................................7

42 U.S.C. § 256b(a)(5)(C)-(D) ...........................................................................................42

42 U.S.C. § 256b(a)(7)........................................................................................12, 39, 40, 41, 42

42 U.S.C. § 256b(a)(7)(A), (E) ..........................................................................................16

42 U.S.C. § 256b(a)(7)(B) ..................................................................................................40

42 U.S.C. § 256b(a)(7)(C) .........................................................................................43, 44, 45

42 U.S.C. § 256b(a)(8)........................................................................................................28

42 U.S.C. § 256b(d)(2)(B)(v)(II) ...................................................................................3, 32

42 U.S.C. § 256b(d)(3) ...............................................................................................7, 24, 42

42 U.S.C. § 256b(d)(3)(A)...................................................................................................23

42 U.S.C. § 256b(d)(3)(C) ............................................................................................7, 24

42 U.S.C. § 1396r-8(a)(1) ....................................................................................................6

Administrative Procedure Act...............................................................2, 18, 21, 23, 42

Communicable Disease Control Amendments Act of 1972. Pub. L. No. 92-449, §§ 201-203, 318, 86 Stat. 748, 750–54 (1972).....................................................................................................8

Public Health Service Act § 318 (codified at 42 U.S.C. § 247c) .......................................................................................4, 6, 8, 9, 10, 12, 16, 34, 35, 36, 37, 38, 43

**Rules**

Fed. R. Civ. P. 56(a) ...........................................................................................................18

**Regulations**

2 C.F.R. § 200.1 ..................................................................................................................34

2 C.F.R. § 200.331 ..............................................................................................................10

42 C.F.R. § 10.21(a)..............................................................................................................7

42 C.F.R. § 10.21(a)(2), (b)(1)...........................................................................................24

42 C.F.R. § 10.21(a)(2), (b)(3), (d)....................................................................................22

42 C.F.R. § 10.23(a), (b) ..................................................................................................7

42 C.F.R. § 10.23(c) ......................................................................................................24

42 C.F.R. § 10.24(a) ........................................................................................................7

42 C.F.R. § 10.24(e) ........................................................................................................7

**Other Authorities**

137 Cong. Rec. E. 3138-02 (Sept. 24, 1991) (statement of Rep. Ron Wyden) ............................13

340B Drug Pricing Program; *Administrative Dispute Resolution Regulation*, 89 Fed. Reg. 28,643, 28,649 (Apr. 19, 2024) (hereinafter "ADR Rule") ................................................24, 31

*340B Office of Pharmacy Affairs Information System (OPAIS): Public User Guide* 149, HRSA https://www.hrsa.gov/sites/default/files/hrsa/opa/public-user-guide.pdf ................................30

340B Prime Vendor Program, *HRSA FAQs*, Apexus (Sept. 30, 2020), https://www.340bpvp.com/search#q=1565&tab=all (FAQ ID: 1565) ...................................28

Apexus, *340B Frequently Asked Questions*, https://www.340bpvp.com/hrsa-faqs (last visited Apr. 24, 2026) ...........................................................................................................45

Apexus, *Sample HRSA 340B Audit Data Request List (DRL) for Covered Entities*, https://www.340bpvp.com/Documents/Public/340B%20Tools/sample-hrsa-340b-audit-data-request-for-covered-entities.pdf (last visited April 24, 2026) ................................................31

Beth E. Meyerson et al., *Existence, Distribution, and Characteristics of STD Clinics in the United States, 2017*, 134 Pub. Health Reps., 371, 373 (2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC6598148/pdf/10.1177_0033354919847733.pdf ..14

CDC, *Budget, Grants & Funding: Direct Assistance: Frequently asked questions* (May 15, 2024), https://www.cdc.gov/public-health-gateway/php/our-work/budget-grants-funding-direct-assistance.html#:~:text=What%20to%20know,and%20how%20to%20use%20it .......36

CDC, *Dictionary of Terms: Direct Assistance* (Sept. 15, 2025), https://www.cdc.gov/grants/dictionary-of-terms/index.html#cdc_generic_section_4-d .........35

CDC, *Fast Facts: HIV in the United States* (Apr. 22, 2024), https://www.cdc.gov/hiv/data-research/facts-stats/index.html .............................................................................................11

CDC, *Sexually Transmitted Infections Surveillance 2023*, 29, 125, 157 (2023), https://www.cdc.gov/sti-statistics/media/pdfs/2025/09/2023_STI_Surveillance_Report_FINAL_508.pdf .............10, 11

Connie L. Celum, *Patients Attending STD Clinics in an Evolving Health Care Environment: Demographics, Insurance Coverage, Preferences for STD Services, and STD Morbidity*, 24 Sexually Transmitted Diseases 599, 599 (1997) ......................................................................14

*Fund*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/fund (last visited Apr. 22, 2026) ..................................................................................................36

*Fund*, Merriam-Webster Law Dictionary, https://www.merriam-webster.com/dictionary/fund#legalDictionary (last visited Apr. 22, 2026) ............................33

*Grant Terminology: Award*, Grants.gov, https://www.grants.gov/learn-grants/grant-terminology.html (last visited Apr. 3, 2026)..........................................................................34

H.R. Conf. Rep. 92-1376 (1972)......................................................................................37

H.R. Conf. Rep. 103-397, 20 (1993).................................................................................38

H.R. Rep. No. 102-384, pt. 2, at 12 (1992)............................................................1, 5, 38

HHS, *Guidance Regarding Section 602 of the Veterans Health Care Act of 1992; Limitation on Prices of Drugs Purchased by Covered Entities*, 58 Fed. Reg. 27,289, 27,290 (May 7, 1993) (hereinafter "1993 Guidance")...................................................................................40, 41

HHS, *Sexually Transmitted Infections National Strategic Plan for the United States 2021-2025* (2020), https://www.hhs.gov/sites/default/files/STI-National-Strategic-Plan-2021-2025.pdf 13

*HIV Basics: Overview: Data & Trends: U.S. Statistics*, HIV.gov (Feb. 25, 1016), https://www.hiv.gov/hiv-basics/overview/data-and-trends/statistics ......................................11

HRSA, *340B Administrative Dispute Resolution*, https://www.hrsa.gov/opa/340b-administrative-dispute-resolution (last visited Apr. 24, 2026).............................................................31

HRSA, *340B Office of Pharmacy Affairs Information System (OPAIS): Manufacturer Search*, https://340bopais.hrsa.gov/SearchMfr (last visited Apr. 24, 2026)........................................21

HRSA, *340B Program Registration Form for Covered Entities*, § IV(3), https://www.reginfo.gov/public/do/DownloadDocument?objectID=39408801 .....................30

HRSA, *Program Integrity*, https://www.hrsa.gov/opa/program-integrity (last visited Apr. 24, 2026) ......................................................................................................................30, 31

Karen W. Hoover et al., *Continuing Need for Sexually Transmitted Disease Clinics After the Affordable Care Act*, 105 Am. J. Pub. Health S690, S690 (2015), https://pmc.ncbi.nlm.nih.gov/articles/PMC4627523 .............................................................14

Kimberly A. Workowski et al., *Sexually Transmitted Diseases Treatment Guidelines 2021*, 70 CDC Morbidity & Mortality Weekly Rep. (July 23, 2021), https://www.cdc.gov/std/treatment-guidelines/STI-Guidelines-2021.pdf...............................11

Merriam-Webster's Dictionary of Law 337 (1996) ......................................................33

Nat'l Acads. of Scis., Eng'g & Med., *Sexually Transmitted Infections: Adopting a Sexual Health Paradigm*, ch. 4, at 221 (Jeffrey S. Crowley et al. eds., 2021), https://www.ncbi.nlm.nih.gov/books/NBK573155/ (hereinafter "*Sexually Transmitted Infections*") ............................................................................................................................9, 13

OPAIS, Covered Entity Search, https://340bopais.hrsa.gov/SearchCe .........................................38

Pilar Galicia et al*, Barriers and Facilitators to the Diagnosis of HIV and Other STIs in Primary Care Within Publicly Funded Healthcare Systems: A Systematic Review of Qualitative Studies*, PLoS One 1, 3, 13 (Feb. 5, 2026), https://pmc.ncbi.nlm.nih.gov/articles/PMC12875586/ ......................................................................................................................................................13

*Promising Practices from Sexual Health Clinics*, CDC, https://www.cdc.gov/sti-funding/php/promising-practices/index.html (last visited Apr. 24, 2026) .......................................................................................................................................14

RWC-340B, *Value of Ryan White Providers and Impacts Associated with Resource Reduction* 2 (Oct. 2023), https://rwc340b.org/wp-content/uploads/2023/10/RWC340B-White-Paper-Value-of-Ryan-White-Providers.pdf .......................................................................................12

RWC-340B, *Value of Ryan White Providers and Impacts Associated with Resource Reduction* 2 (Oct. 2023), https://rwc340b.org/wp-content/uploads/2023/10/RWC340B-White-Paper-Value-of-Ryan-White-Providers.pdf .......................................................................................15

Ryan P. Knox et al., *Outcomes of the 340B Drug Pricing Program*, JAMA Health Forum (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10665972/ ...........................................................8

S. Rep. No. 92-825, at 3431 (1972) ..............................................................................................9

*Sexually Transmitted Disease Clinics*, HRSA (June 2022), https://www.hrsa.gov/opa/eligibility-and-registration/specialty-clinics/sexually-transmitted-disease .................................................9

*Sexually Transmitted Diseases (STD) Prevention and Control Grants*, SAM.Gov (Jan. 9, 2026), https://sam.gov/workspace/assistance/fal/c2f36c61796c48d98293bdae03c25be3/view ..........9

*Strengthening STD Prevention and Control for Health Departments*, CDC (Jan. 31, 2025), https://www.cdc.gov/sti/php/projects/pchd.html .........................................................................9

*Strengthening STD Prevention and Control for Health Departments (STD PCHD)*, Grants.gov (Aug. 30, 2018), https://www.grants.gov/search-results-detail/304454 .................................10

Tracking Accountability in Government Grants System, *Sexually Transmitted Diseases (STD) Prevention and Control Grants*, https://taggs.hhs.gov/Detail/CFDADetail?arg_CFDA_NUM=93977 .......................................8

**INTRODUCTION**

Plaintiffs Amgen, Inc., Eli Lilly and Company, and UCB, Inc. (collectively, the "Drug Companies") ask this Court to dismantle a critical public health infrastructure that protects vulnerable patients, and the nation at large, from the impacts of sexually transmitted diseases ("STDs"). They style their suit as an attack on procedures used by the Secretary of Health and Human Services ("Secretary") to certify particular STD clinics operated by Sagebrush Health Services ("Sagebrush") for participation in the federal 340B Drug Pricing Program at 42 U.S.C. § 256b ("340B Program"). But their prayer for relief reveals a much broader purpose to invalidate the Secretary's 340B certification of virtually every STD clinic in the country. They present Sagebrush as a boogeyman to convince the Court that the Secretary's certification procedures are contrary to law in general. But the Drug Companies' claims all fail.

The 340B Program, established under 42 U.S.C. § 256b, entitles certain safety-net health care providers, known as "covered entities," to discounts on covered outpatient drugs. STD clinics are among the statutorily authorized covered entities. Drug companies voluntarily participate in the program, and the discounted drugs lower costs to covered entities and provide income because, if a patient has health insurance, the difference between the insurance payment and the discounted price is income to the covered entity. This is exactly how Congress intended the program to work. H.R. Rep. No. 102-384, pt. 2, at 12 (1992). The 340B Program is vital to the nation's health care safety net, and without it, many covered entities, including STD clinics, would close.

The Drug Companies advance five claims in their complaint, all of them challenging the certification and recertification of Sagebrush and other STD clinics. As a threshold matter, the Drug Companies' facial challenges to the Secretary's 340B certification and recertification procedures are barred by the six-year statute of limitations applicable to suits against the federal

government.  28 U.S.C. § 2401(a).  The Secretary issued 340B certification procedures for STD clinics in 1993 and recertification procedures thereafter, and the Drug Companies' deadline to facially attack those procedures has long passed.

So, the Drug Companies fall back on as-applied challenges to certification of the Sagebrush entities to accomplish what they plainly cannot achieve via a facial challenge.  Claims One and Two, however, are barred because the Drug Companies failed to exhaust their administrative remedies.  Intervenor-Defendant, Community Care Resources of Florida ("CCRF"), acknowledges that this Court previously denied the Secretary's partial motion to dismiss Claim Two for failing to exhaust its administrative remedies.  *See* Order, Mot. to Dismiss, ECF 21.  In concluding that exhaustion was not required, this Court reasoned that the Drug Companies were challenging final agency action under the Administrative Procedure Act ("APA") and that the existence of an administrative dispute resolution process, standing alone, did not bar judicial review.  *Id.*  In reaching that decision, however, this Court did not have the benefit of considering the Supreme Court's decision in *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), which addressed Congress's intent to foreclose private enforcement of 340B compliance in favor of an administrative enforcement framework overseen by the Secretary.  CCRF therefore respectfully requests that the Court revisit its decision in light of *Astra* and apply that precedent to both Claims One and Two.

Claims One, Two, Four, and Five also fail on the merits.[1]  Claim One alleges that STD

---

[1] CCRF takes no position on the merits of Claim Three, which challenges so-called "sub-sub grants."  To CCRF's knowledge, certification of 340B STD clinics are rarely, if ever, based on such sub-sub grants.  Transfers of grant funds from a state to local governments, however, are not sub-sub grants but intergovernmental transfers from a sovereign entity, the state, to subcomponents of the state.  Those are permissible, and CCRF does not understand the Drug Companies to challenge certification of STD clinics based on intergovernmental transfers.

clinics may not dispense 340B drugs to treat non-STD conditions. In essence, the Drug Companies want to limit the definition of "patient" as applied to STD clinics. Under this radically circumscribed definition, a person would be a "patient" of the clinic for some purposes (STD treatment) but would not be a "patient" of the clinic when receiving treatment for non-STD conditions. The 340B statute imposes no such absurd result, and the Secretary's longstanding definition of "patient" confirms that if a person receives STD treatment from an STD clinic, that person is a patient for all treatment purposes, including non-STD conditions.

Claim Two alleges that the Secretary may not certify a covered entity for participation in the 340B Program if the entity engages in "diversion," which is the impermissible transfer of a 340B drug to a person or entity that is not a patient of the covered entity. Although diversion is prohibited by the 340B statute, 42 U.S.C. § 256b(a)(5)(B), diversion does not automatically prevent the entity from participating in 340B. There are several reasons for this, but the most salient is that an entity may only be excluded from the program if "the Secretary determines a violation of [the diversion prohibition] was systematic and egregious as well as knowing and intentional." 42 U.S.C. § 256b(d)(2)(B)(v)(II). Determining whether diversion has occurred requires an investigation of the facts of each individual drug dispensation or administration, and application of those facts to the legal definition of a patient. Isolated or unintentional diversion does not lead to exclusion, and the covered entity is entitled to statutory processes prior to exclusion.

Claim Four challenges certification of STD clinics based on their receipt of in-kind contributions from an STD grant holder. This usually occurs when a state or local government receives an STD grant from the federal government, and the state or local government enters into a subgrant with a public or private entity in which the state or local government provides "in-

3

kind" STD-related supplies or services as part of the subgrant. A clinic qualifies as a covered entity eligible to participate in the 340B Program if it is "receiving funds" under a grant issued pursuant to § 318 of the Public Health Service Act ("PHSA"). 42 U.S.C. § 256b(a)(4)(K). The Drug Companies allege that such a subgrantee clinic does not qualify for participation in the 340B Program because in-kind contributions are not "funds" as that term is used in the 340B statute. But the plain meaning of "funds" encompasses more than money, and § 318 and other federal statutes and guidance establish that in-kind contributions qualify as funds.

Claim Five alleges that the Secretary has failed to develop a lawful certification and recertification process for covered entities. The record plainly reflects that the Secretary issued certification procedures in 1993, first by informing drug companies directly, AR 7–14, and then by publishing those procedures in the Federal Register. AR 17–21. The Drug Companies argue that this is not enough, and they demand far more detailed and stringent standards. The 340B statute, however, does not require these standards and leaves the Secretary with substantial discretion. He lawfully exercised that discretion, and his procedures comply with the statute.

The stakes are high. A ruling in favor of the Drug Companies could cripple our nation's fragile defense against the rise of sexually transmitted infections in the United States. Section 318 of the PHSA is the primary federal funding source of STD testing, counseling and treatment in the U.S. The recipients and subrecipients of 318 funding—especially community-based organizations like CCRF that are located in high-risk areas and specially trained to serve hard-to-reach populations—are the primary providers of STD services. The gap between § 318 funding and the actual cost of preventing and treating STDs has widened significantly over the past three decades. The 340B Program helps STD clinics close this gap. Still, rates of STD infections remain alarming in many parts of the country. Without the cost savings and revenue generated

4

by the 340B Program, the providers on the front lines of battling these infections will lose ground to the expanding epidemics.  A ruling in favor of the Drug Companies disqualifying most, if not all, STD clinics participating in the 340B Program will irreparably harm our nation's fight against sexually transmitted infections.

Fortunately, the Drug Companies' claims are meritless, and CCRF is entitled to judgment as a matter of law.  CCRF respectfully requests that the Court grant its motion for summary judgment and deny the Drug Companies' motion for summary judgment.

## **LEGAL BACKGROUND**

### I.      The 340B Program

The 340B Program is named for Section 340B of the PHSA, which was enacted as part of the Veterans Health Care Act of 1992.  Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967–71 (codified as amended at 42 U.S.C. § 256b).  It is administered by the Health Resources and Services Administration ("HRSA"), which is a subcomponent of the United States Department of Health and Human Services ("HHS").  Drug companies that choose to participate in the 340B Program must offer discounts on covered outpatient drugs to specified safety-net health care providers, referred to as "covered entities."  42 U.S.C. § 256b(a)(1).

Congress created the 340B Program to protect covered entities from increasing drug costs and to benefit them.  Congress was clear that the intent of the program is to assist safety-net health care providers that receive federal support: "In giving these 'covered entities' access to price reductions," Congress intended "to enable these entities to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. 2, at 12 (1992).

By lowering the cost of drugs purchased by covered entities, the 340B Program helps stretch the federal taxpayer support they receive to cover expenses not otherwise reimbursed by

patients and their insurance plans. *Id.*; *PhRMA v. McClain*, 645 F. Supp. 3d 890, 896 (E.D. Ark. 2022), *aff'd*, 95 F.4th 1136 (8th Cir. 2024). Covered entities lose less money on their uninsured and underinsured patients when they purchase their drugs at 340B discounts because, in the absence of any insurance reimbursement, covered entities must absorb the cost of caring for such patients. *See Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023). The 340B Program mitigates these losses, allowing covered entities to be more generous with reducing or waiving patient pharmacy copayments or by providing other necessary health care services. *Id.* If a covered entity provides 340B drugs to patients who have prescription drug coverage, the difference between the insurer's payment and the discounted price is income to the covered entity that supplements the federal support it receives. *Id.*

While the program covers a variety of safety-net providers, STD clinics supported under Section 318 of the PHSA, 42 U.S.C. § 247c, are specifically recognized as a type of covered entity under 42 U.S.C. § 256b(a)(4)(K), allowing them to purchase outpatient drugs at discounted prices to support the federal objectives of the Section 318 program.

Though participation in the 340B Program is voluntary for drug companies, they have a financial incentive to enroll. Each drug company that elects to participate in the 340B Program must execute a 340B pharmaceutical pricing agreement with HHS requiring the manufacturer to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." 42 U.S.C. § 256b(a)(1). Drugs made by manufacturers that elect not to participate are excluded from reimbursement by Medicaid and Medicare Part B. *Id.* §§ 256b(a)(1), 1396r-8(a)(1).

The 340B statute places two limits on the use of discounted drugs. A covered entity may not bill Medicaid for reimbursement for a 340B-discounted drug if that drug is eligible for a

6

rebate under the Medicaid program. *Id.* § 256b(a)(5)(A). A covered entity also may "not resell or otherwise transfer the drug to a person who is not a patient of the entity." *Id.* § 256b(a)(5)(B). These limitations are known as the duplicate discount and diversion prohibitions, respectively. HRSA and drug manufacturers have statutory authority to audit covered entities to confirm their compliance with the limitations. *Id.* § 256b(a)(5)(C).

Congress designed the 340B Program as an administratively enforced program. As part of that design, the 340B statute directs the Secretary to establish an administrative dispute resolution ("ADR") process to adjudicate disputes arising under the program between manufacturers and covered entities, including claims relating to pricing, diversion, and duplicate discounts. *See id.* § 256b(d)(3). The Secretary has established an ADR process that entitles drug companies to bring claims against covered entities for alleged violations of the duplicate discount or diversion prohibitions, but only after conducting an audit of the covered entity to collect evidence. 42 C.F.R. § 10.21(a). The Secretary then assigns the claim to an ADR panel that reviews the claim and evidence submitted by the parties and issues a decision. *Id.* § 10.23(a), (b). Either party may appeal the ADR panel's decision to the HRSA Administrator. *Id.* § 10.24(a). The HRSA Administrator's decision is a "final agency decision." *Id.* § 10.24(e). Such "a final agency decision and shall be binding upon the parties involved, unless invalidated by an order of a court of competent jurisdiction." 42 U.S.C. § 256b(d)(3)(C).

The Supreme Court confirmed Congress's choice to centralize enforcement of the 340B Program in an administrative framework in *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011). In *Astra*, the Court held that the 340B statute does not create a private right of action to enforce program requirements, either expressly or by implication through pharmaceutical pricing agreements. *Id.* at 113–14, 118. The Court held that Congress vested enforcement authority for

7

the 340B Program in the Secretary and required compliance disputes to be addressed through the ADR process, rather than through private actions in federal court. *Id.* at 118–21.

Since enactment of the 340B statute in 1992, federal support for safety-net providers—including direct grants, disproportionate share hospital payments, and Medicare and Medicaid reimbursements—has repeatedly been reduced, forcing providers to cover increasing uncompensated care costs. STD grant funding has declined. *See e.g.*, Tracking Accountability in Gov't Grants System, *Sexually Transmitted Diseases (STD) Prevention and Control Grants*, https://taggs.hhs.gov/Detail/CFDADetail?arg_CFDA_NUM=93977. The 340B Program helps cover these funding shortfalls by allowing safety-net entities to purchase outpatient drugs at significant discounts and to generate revenue from the difference between the drugs' acquisition cost and standard reimbursement rates. Ryan P. Knox et al., *Outcomes of the 340B Drug Pricing Program*, JAMA Health Forum (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10665972/.

## II.    The Section 318 Grant Program

### A.    Federal Disease Control Legislation

Well before enacting the 340B Program, Congress approved funding for STD clinics as part of the Communicable Disease Control Amendments Act of 1972. Pub. L. No. 92-449, §§ 201-203, 318, 86 Stat. 748, 750–54 (1972) (establishing Section 318 of the PHSA). Congress found that the number of cases of STDs (then referred to as "venereal diseases") had "reached epidemic proportions in the United States" and, therefore, found it critical to "establish a national program for the prevention and control of" such diseases. *Id.* The law and subsequent amendments authorized grants to states and their subdivisions for the research, prevention, and control of STDs.

### B.    Section 318 STD Grant Funds

Section 318 of the PHSA authorizes the Secretary to make grants to "States and political

8

subdivisions of States for the . . . implementation . . . of innovative, interdisciplinary approaches to the prevention and control of sexually transmitted diseases." 42 U.S.C. § 247c(d).  Congress structured the Section 318 program as a partnership between the Secretary and state and local governments "to provide a specially targeted program" for "prevention, control, diagnosis, and treatment" of STDs.  S. Rep. No. 92-825, at 3431 (1972).  Section 318 grants are "[t]he only federal categorical funding stream specifically dedicated to [STD] prevention and control." Nat'l Acads. of Scis., Eng'g & Med., *Sexually Transmitted Infections: Adopting a Sexual Health Paradigm*, ch. 4, at 221 (Jeffrey S. Crowley et al. eds., 2021), https://www.ncbi.nlm.nih.gov/books/NBK573155/ (hereinafter "*Sexually Transmitted Infections*").

The Secretary's Centers for Disease Control and Prevention ("CDC") administers the Section 318 grant program in collaboration with state and local partners.  *Sexually Transmitted Disease Clinics*, HRSA (June 2022), https://www.hrsa.gov/opa/eligibility-and-registration/specialty-clinics/sexually-transmitted-disease.  Since 2019, Section 318 grants are commonly administered under CDC's flagship funding known as the Strengthening STD Prevention and Control for Health Departments ("STD PCHD") award.  *Strengthening STD Prevention and Control for Health Departments*, CDC (Jan. 31, 2025), https://www.cdc.gov/sti/php/projects/pchd.html.  Operationally, the STD PCHD grants are subject to cooperative agreements between the CDC and the state or local grantee.  *Sexually Transmitted Diseases (STD) Prevention and Control Grants*, SAM.Gov (Jan. 9, 2026), https://sam.gov/workspace/assistance/fal/c2f36c61796c48d98293bdae03c25be3/view. Cooperative agreements reflect a relationship between the federal government and a state or local grantee where substantial involvement is expected between the executive agency and the

state, local government, or other recipient when carrying out the activity contemplated in the agreement.  31 U.S.C. § 6305(b); *see also* 2 C.F.R. § 200.1 (defining "cooperative agreement"). In other words, grants awarded under Section 318 are expected to create a partnership between the federal government and the state and local grantees.

State and local grantees are expected to provide Section 318 support in the form of subawards to other entities for the purpose of carrying out portions of the grant.  *See* 2 C.F.R. § 200.331.  The CDC expects awardees to "collaborate with partners across the public health, health care, academic, and community-based sectors in their project areas," and they should "seek partnerships with clinical providers and health care organizations such as federally qualified health centers, school-based health centers, correctional facilities, Medicaid programs, large health plans and professional medical and nursing organizations."  *See Strengthening STD Prevention and Control for Health Departments (STD PCHD)*, Grants.gov (Aug. 30, 2018), https://www.grants.gov/search-results-detail/304454 (select "Related Documents" tab and then open file name "CDC-RFA-PS19-1901-Full Announcement - FULL_ANNOUNCEMENT.zip"). In the current STD PCHD program, a state may provide up to ten percent of its overall award, without prior approval from the CDC, "to not-for-profit or governmental clinics that can document their ability to provide safety-net STD clinical preventive services as per CDC guidance," including the ability to "rapidly diagnose and treat bacterial STDs."  *Id.* at 15.

C.    STD Testing, Treatment, and Prevention

The sustained rise of sexually transmitted diseases such as gonorrhea and syphilis and the alarming emergence and epidemic of diseases such as HIV/AIDS cemented the role of STD clinics as crucial front-line providers managing the prevention and treatment of these life-threatening diseases.  Infection rates for STDs like chlamydia, gonorrhea, and syphilis have stayed staggeringly high in the U.S.  CDC, *Sexually Transmitted Infections Surveillance 2023*,

10

29, 125, 157 (2023), https://www.cdc.gov/sti-statistics/media/pdfs/2025/09/2023_STI_Surveillance_Report_FINAL_508.pdf.  In 2023, more than 2.4 million cases of chlamydia, gonorrhea, and syphilis were reported.  *Id.* at 11.  According to the CDC, HIV remains a "persistent problem in the United States," with 31,800 estimated new infections in 2022.  CDC, *Fast Facts: HIV in the United States* (Apr. 22, 2024), https://www.cdc.gov/hiv/data-research/facts-stats/index.html (hereinafter "*Fast Facts: HIV in the United States*").  Today, approximately 1.2 million Americans live with HIV.  *HIV Basics: Overview: Data & Trends: U.S. Statistics*, HIV.gov (Feb. 25, 2016), https://www.hiv.gov/hiv-basics/overview/data-and-trends/statistics.

The CDC's evidence-based strategy for preventing and controlling STDs relies on a series of services that are only successful if offered and performed together: identifying and testing individuals at risk of contracting STDs; educating and counseling individuals about STD prevention; linking individuals who test positive to appropriate care; effectively retaining and following up with individuals in care; and ensuring individuals comply with prescribed treatment regimens.  *See, e.g.*, Kimberly A. Workowski et al., *Sexually Transmitted Diseases Treatment Guidelines 2021*, 70 CDC Morbidity & Mortality Weekly Rep. (July 23, 2021), https://www.cdc.gov/std/treatment-guidelines/STI-Guidelines-2021.pdf.  Each of these steps is crucial to reducing the spread of STDs.  If any step in this chain of events is missed, STDs will continue to spread.

The risk of missing a step is substantially increased for individuals facing food insecurity, unemployment, unstable housing, drug use, and addiction.  STD clinics often provide support in each of these areas so that individuals at highest risk for STDs maintain access to traditional health care resources.  *See*, *supra*, *Fast Facts: HIV in the United States*.  The incidence of STDs

11

such as HIV fall disproportionately on racial and ethnic minorities and individuals with lower incomes.  RWC-340B, *Value of Ryan White Providers and Impacts Associated with Resource Reduction* 2 (Oct. 2023), https://rwc340b.org/wp-content/uploads/2023/10/RWC340B-White-Paper-Value-of-Ryan-White-Providers.pdf.  These challenges limit access to medical care and prescription drugs and lead to worse health outcomes for these groups.

### III.    Qualification and Certification of 340B STD Grantees

The 340B statute defines an STD grantee covered entity by cross-referencing § 318 of the PHSA, codified at 42 U.S.C. § 247c.  42 U.S.C. § 256b(a)(4)(K).  The statute defines a 340B-eligible STD clinic as "[a]n entity receiving funds under section 247c of this title (relating to treatment of sexually transmitted diseases) . . . through a State or unit of local government, but only if the entity is certified by the Secretary . . . ."  *Id.*

The 340B statute requires the Secretary to develop a process for certifying STD clinics for participation in the 340B Program and to ensure that the process includes certain requirements listed in the statute.  42 U.S.C. § 256b(a)(7).  In 1993, the Secretary informed drug companies in a "Dear Manufacturer Letter" that "criteria for section 340B eligibility include state certification that the entity does receive Federal grant funds and is an entity described under section 340B(a)(4)(J) or (K) of the PHS Act."  AR 7.  HRSA elaborated in the letter that if federal regulators do not have the necessary information for certification, "States will be asked to compile the list of eligible entities and estimate the amount of outpatient drug purchases."  AR 8.  Because states have discretion over how Section 318 subawards are made, HRSA relies on states to perform many of the functions of STD clinic certification.

The Secretary published these certification requirements in a 1993 Federal Register notice, describing the steps necessary to implement the certification process laid out in the statute.  AR 17–21.  The Secretary identified clinics treating STDs and tuberculosis, as well as

12

Ryan White HIV/AIDS Program subgrantees, as covered entities requiring certification. *Id.* at 18.  The Secretary also announced a process for estimating the amount of the covered entities' outpatient drug purchases in the preceding year and for recertifying the covered entities. *Id.*

## IV.    Importance of the 340B STD Program

STD clinics are uniquely suited to ensure that individuals with, or at risk of contracting, STDs are connected to and remain in care.  They cannot deliver these services without access to the 340B Program.

Recognizing STD clinics' heavy reliance on federal funding to serve patients and to control the spread of STDs, Congress in 1992 included STD clinics in the list of "covered entities" in the 340B statute to help relieve them from the burden of high drug prices.  Congress emphasized that community clinics, including "clinics that treat sexually transmitted diseases," were the "one group of health care providers who [it] can help right now."  137 Cong. Rec. E. 3138–02 (Sept. 24, 1991) (statement of Rep. Ron Wyden).  Then-Representative Ronald Wyden stated that manufacturer price increases were "going to directly affect the number of people which can be served by these clinics and reduce the effectiveness of Federal public health spending." *Id.*  STD clinics rely heavily on federal funding to keep their doors open. *Sexually Transmitted Infections* at 236.

High-risk populations are often disconnected from the traditional public health system due to geographic, language, and cultural barriers, and the continuing stigma surrounding STDs further exacerbates difficulties in reaching these patients.  *See* Pilar Galicia et al*, Barriers and Facilitators to the Diagnosis of HIV and Other STIs in Primary Care Within Publicly Funded Healthcare Systems: A Systematic Review of Qualitative Studies*, PLoS One 1, 3, 13 (Feb. 5, 2026), https://pmc.ncbi.nlm.nih.gov/articles/PMC12875586/; HHS, *Sexually Transmitted*

13

*Infections Nat'l Strategic Plan for the United States 2021-2025*, 6-11, 34, 38-42 (2020),

https://www.hhs.gov/sites/default/files/STI-National-Strategic-Plan-2021-2025.pdf.

Community-based organizations like STD clinics are better able to reach these patients compared

to state STD agencies due to their proximity to underserved populations, cultural competence,

and operational flexibilities.  For example, STD clinics are more likely to be located in counties

with high rates of STDs, low high school graduation rates, and low social associations.  Beth E.

Meyerson et al., *Existence, Distribution, and Characteristics of STD Clinics in the United States,*

*2017*, 134 Pub. Health Reps., 371, 373 (2017),

https://pmc.ncbi.nlm.nih.gov/articles/PMC6598148/pdf/10.1177_0033354919847733.pdf.

Patients report seeking care from an STD clinic due to the availability of same day or walk-in

services, financial assistance, and confidentiality concerns.  Connie L. Celum, *Patients Attending*

*STD Clinics in an Evolving Health Care Environment: Demographics, Insurance Coverage,*

*Preferences for STD Services, and STD Morbidity*, 24 Sexually Transmitted Diseases 599, 599

(1997).

A survey of over 4,300 STD clinic patients found that STD clinics were the only source

of care for approximately forty percent of patients.  Karen W. Hoover et al., *Continuing Need for*

*Sexually Transmitted Disease Clinics After the Affordable Care Act*, 105 Am. J. Pub. Health

S690, S690 (2015), https://pmc.ncbi.nlm.nih.gov/articles/PMC4627523.  Almost half of

individuals surveyed were uninsured, and almost one-fourth of individuals reported that they

sought care from STD clinics due to their relatively low cost.  *Id.*  STD clinics employ strategic

interventions to ensure that individuals receive and remain engaged in their care, including teams

dedicated to providing HIV pre-exposure prophylaxis ("PrEP"), digital check-in and self-

scheduling, express STD testing, and case management.  *Promising Practices from Sexual*

14

*Health Clinics*, CDC, https://www.cdc.gov/sti-funding/php/promising-practices/index.html (last visited Apr. 24, 2026).

STD clinics cannot provide this critical care and do their part in controlling STD epidemics without the drug discounts provided through the 340B Program. While the proliferation of STDs has increased over the years, federal spending for prevention and treatment has been stagnant. *Sexually Transmitted Infection* at 220. Therefore, STD clinics, like most safety net providers, have increasingly relied on the 340B Program to help support their prevention and treatment efforts. Further, many of the outreach services that STD clinics use to test, counsel and treat the STD population are not reimbursed by third-party payers, so the clinics have to rely on revenue generated through the 340B Program to fund these initiatives. STD clinics also rely on the 340B Program to provide support for patient assistance programs, patient engagement activities, quality improvement, and other wraparound services and supports. RWC-340B, *Value of Ryan White Providers and Impacts Associated with Resource Reduction* 2 (Oct. 2023), https://rwc340b.org/wp-content/uploads/2023/10/RWC340B-White-Paper-Value-of-Ryan-White-Providers.pdf. Any reduction in resources generated through participation in the 340B Program jeopardizes these critical services. STD clinics cannot continue to spearhead this nation's effort to prevent and treat STDs without the 340B Program's vital support.

<u>**STATEMENT OF THE FACTS**</u>

CCRF is a non-profit patient-centered healthcare provider that provides a broad range of medical services in Florida—including, testing, therapy, and outreach to individuals affected by STD, HIV, Hepatitis C, and/or substance abuse. ECF No. 27-3, Declaration of Victoria Barnhart, CEO, CCRF ¶ 3 ("Barnhart Decl"). CCRF serves approximately 2,000 patients annually and treats a large numbers of uninsured patients. *Id.* ¶ 10.

CCRF has three locations registered as 340B STD covered entities in Florida. *Id.* ¶ 6.

15

Each location participates in the 340B Program because of receiving in-kind funding from their local county health departments. *Id.* ¶¶ 4, 6. These counties received intergovernmental transfers from the Florida Department of Health, which was awarded grant funding by the Centers for Disease Control and Prevention under section 318 of the PHSA. *Id.* ¶ 4; 42 U.S.C. §§ 247c; 256b(a)(4)(K). CCRF also entered into a Memorandum of Agreement ("MOA") with each health department, enabling CCRF to receive in-kind funding from each county. Barnhart Decl. ¶ 5. Under the MOAs, CCRF agrees to provide counseling, testing, referrals, and treatment services to patients who have or are at risk of having a sexually transmitted infection and/or HIV. CCRF also agrees to provide such services regardless of the patient's ability to pay. *Id.*

Savings generated from the 340B Program are essential to CCRF's financial stability. These savings enable CCRF to provide free or reduced-cost medications, expand access to testing and treatment, and support community outreach and prevention programs. *Id.* ¶ 15. The funds also help maintain wraparound services, including nutritional counseling, chronic disease education, wellness initiatives, case management, and telehealth services. *Id.* Without 340B savings, CCRF could be forced to close its facilities. *Id.* ¶ 12.

CCRF's operations depend heavily on federal support, including federal sources such as HRSA and in-kind funds from county health departments. *Id.* ¶¶ 4, 5, 13. These grants provide essential supplies and training necessary for CCRF's certification and recertification as a covered entity under the 340B Program. *Id.* ¶¶ 5, 13; 42 U.S.C. § 256b(a)(7)(A), (E). Loss of these contributions—for example, through termination of the state memorandum of understanding ("MOU") for Section 318 funding—would result in the loss of 340B status and jeopardize CCRF's ability to continue serving its patients. *Id.* ¶¶ 12, 13.

16

Plaintiffs filed their Complaint on December 20, 2024, challenging the Secretary's process for certifying and recertifying STD covered entities under the 340B Program. ECF No. 1. The Complaint describes five claims for relief. The first four claims for relief allege that HRSA violated the APA by certifying or recertifying STD entities that (1) did not provide services within the scope of an STD grant, (2) diverted 340B drugs to non-patients, (3) related to sub-subgrantees, and (4) received only in-kind contributions. Compl. at 35, 36, 38, 39. These claims contain a mixture of facial and as-applied challenges. The claims for relief are facial in nature and apply broadly to all STD clinics. Compl. at 35 (first claim challenging "HRSA's decisions to certify and recertify entities that do not provide services within the scope of an STD grant"); Compl. at 36 (second claim challenging "HRSA's decisions to recertify entities that divert 340B-priced drugs to non-patients"); Compl. at 38 (third claim challenging "HRSA's decisions certifying and recertifying subsubgrantees"); Compl. at 39 (fourth claim challenging "HRSA's decisions certifying and recertifying entities receiving only in-kind contributions"). Each of the four claims also contain specific details and allegations that apply solely to Sagebrush. Compl. ¶¶ 136, 138, 142, 148-151, 154, 156-157. Plaintiffs' Prayers for Relief related to these first four claims are facial and apply to all STD clinics. Compl. at 42 (requesting that this Court "Declare that Defendants' certifications and recertifications of subgrantees that use 340B-priced medicines to provide services not within the scope of an STD grant, transfer 340B-priced drugs to individuals for purposes other than STD prevention, do not directly receive contributions from any government, or receive only in-kind contributions like condoms, are contrary to law").

The fifth and final claim for relief contains a facial challenge, alleging that "HRSA's failure to establish the requisite process for the certification of STD grantees and to make its

criteria for certification available to manufacturers" was unlawful.  Compl. at 40.  Some facts

described in the fifth claim pertain to Sagebrush specifically, Compl. ¶ 166.  The Prayer for

Relief requests relief that applies to the entirety of HRSA's STD certification and recertification

process.  Compl. at 41 ("Declare that Defendants' failure to comply with Paragraph (a)(7) of

Section 340B, by establishing the requisite 'process for the certification of' STD grantees and

making 'criteria for certification' available to manufacturers, is contrary to law.").  The third,

fourth, fifth, and sixth Prayers for Relief request that this Court declare unlawful, set aside, and

rescind certain Sagebrush certifications and recertifications and prohibit the certification and

recertification of those Sagebrush entities.  Compl. at 42.

## STANDARD OF REVIEW

Summary judgment is granted if the evidence, viewed in the light most favorable to the

nonmoving party, presents no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

This case challenging federal agency action is reviewed under the APA, 5 U.S.C. §§ 551–

559.  In APA cases, summary judgment "serves as the mechanism for deciding, as a matter of

law, whether the agency action is supported by the administrative record and otherwise

consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90

(D.D.C. 2006); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir.

2001); *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

The APA requires that an administrative decision be set aside if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right," or "unsupported by

substantial evidence . . . on the record of an agency hearing. . . ."  5 U.S.C. § 706(2)(A), (C), (E).

18

A court's review of an arbitrary and capricious challenge is narrow in scope. *Servier Pharms. LLC v. Becerra*, No. CV 24-2664, 2025 WL 27352, at \*9 (D.D.C. Jan. 3, 2025). Review of the Secretary's certification and recertification determinations must be "fundamentally deferential— especially with respect to matters relating to an agency's areas of technical expertise." *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (internal quotation marks and alteration omitted); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) ("Section 706 does mandate that judicial review of agency policymaking and factfinding be deferential."). The burden of proof rests with the party challenging an agency's action as arbitrary and capricious. *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

Arbitrary and capricious challenges require a determination of whether the agency's decision was "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). A court's review is "fundamentally deferential—especially with respect to matters relating to an agency's areas of technical expertise." *Fox*, 684 F.3d at 75 (quotation marks and alteration omitted). A court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86 (1974). "Once assured the [agency] has engaged in reasoned decisionmaking, it is not for [the Court] to reweigh the conflicting evidence or otherwise to substitute [its] judgment for that of the [agency]." *Ind. Mun. Power Agency v. FERC,* 56 F.3d 247, 254 (D.C. Cir. 1995). A court may not "substitute its judgment for that of the agency." *Eli Lilly & Co. v. Kennedy*, No. 21-CV-02608, 2025 WL 1423630, at \*7 (D.D.C. May 15, 2025).

## **ARGUMENT**

The facial challenges to Claims One through Four are barred by the APA's statute of limitations. Claims One and Two must be rejected as an attempt to bypass the required

administrative process for allegations of 340B drug diversion and the unanimous Supreme Court decision citing that process as the exclusive remedy for parties participating in the 340B Program.  Claims One, Two, Four and Five must also be rejected on substantive grounds as explained in Section III.

**I.      The Drug Companies' Facial Challenges in Claims One Through Four Are Barred by the Statute of Limitations**

The Drug Companies have carefully crafted the first four counts of their complaint to appear as challenges to the Secretary's certification processes as applied to Sagebrush entities, but their prayer for relief reveals that each count also includes a facial challenge to particular aspects of the policies.  These facial challenges are barred by the APA's six-year statute of limitations because HRSA's certification procedures have been in place for far longer than six years.  AR 7-14, 17-21.

The foundational rule governing facial challenges is that a challenger "must establish that no set of circumstances exist under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  This is a demanding standard.  Here, the Drug Companies attempt to use the certification of Sagebrush STD clinics to dismantle the entire certification process.  Under *Salerno*, using Sagebrush's singular certification as a means to invalidate a thirty-three-year-old certification process (AR 17- 21) is insufficient to meet the demanding standard of a facial challenge.  Further, a facial challenge to the certification process asks the Court to engage in judicial legislation by re-defining when a covered entity is eligible for the 340B Program.  It is the Court's "obligation to avoid judicial legislation" and leave "to Congress the task of drafting a narrower statute."  *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 479 (1995).  Lastly, although the occasional case may require a facial challenge, courts tend to favor a narrower remedy to fully protect litigants.  *See id.* 477–78.  Plaintiffs' facial challenge will

impact a wide array of STD clinics and covered entities.  This over-inclusive remedy will have sweeping consequences on Congress' efforts to combat STDs and promote public health.  For these reasons, the Court should limit any remedy to Sagebrush.

Under 28 U.S.C. § 2401, claimants generally must file civil suits against the government "within six-years after the right of action first accrues."  28 U.S.C. § 2401(a).  A claim first accrues under the APA for purposes of a facial challenge to agency action when a plaintiff is injured by a final agency action.  *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 810 -811 (2024).  The Supreme Court clarified that a cause of action accrues "only after the plaintiff suffers the injury required to press her claim in court."  *Id*.  The Secretary issued certification procedures for STD clinics in 1993.  AR 7-14, 17-21.  The Secretary first directly informed drug companies of the procedures via a "Dear Manufacturer Letter" dated April 15, 1993.  AR 7-14.  That letter informed them that the Secretary would subsequently publish the procedures in the Federal Register.  AR 7.  The Secretary did so on May 1, 1993.  Plaintiffs Amgen and UCB both participated in the 340B Program in 1993.  *See* HRSA, *340B Office of Pharmacy Affairs Information System (OPAIS): Manufacturer Search*, https://340bopais.hrsa.gov/SearchMfr (last visited Apr. 24, 2026) (Labeler Codes 55513, 50474).  Therefore, the statute of limitations as to them began to run as early as April 15, 1993 and as late as May 1, 1993.  The six-year statute of limitations ended on May 1, 1996.  Eli Lilly & Co began participating in the 340B Program in 1998.  *See id.* (Labeler Code 00002).  The statute of limitations for Lilly therefore ended for it in 2004.  The Drug Companies are decades too late to bring their facial challenges.

**II.**     **The Court Should Grant Summary Judgment on Counts One And Two Because the Drug Companies Are Precluded from Challenging STD Clinic Recertifications on Diversion Grounds Without First Exhausting ADR Remedies**

CCRF respectfully contends that the Court lacks jurisdiction over Claims One and Two,

21

which are premised on diversion allegations.  Diversion is plainly subject to ADR.  When a manufacturer accuses a covered entity of diversion, it must first audit the clinic and file an ADR petition with HRSA.  42 C.F.R. § 10.21(a)(2), (b)(3), (d).  The Drug Companies have taken neither of these steps with Sagebrush or any other STD clinic.  They therefore have failed to exhaust their administrative remedies, invalidating the claims.

### A.    Claims One and Two Are Diversion Claims

Although Claim One superficially appears to be limited to STD clinics "that do not provide services within the scope of an STD grant," Compl. at 35, it is actually a diversion claim. The Drug Companies attempt to characterize their first and second claims as challenges to a clinic's 340B eligibility, presumably to avoid dismissal on exhaustion grounds.  Relying on 42 U.S.C. § 256b(a)(4), they argue that because a covered entity must "meet the requirements described in paragraph (5)," including the anti-diversion requirement, a violation of those requirements presents an eligibility question.  Compl. ¶ 32.  They further suggest that HRSA must evaluate whether an STD clinic is engaging in diversion before certifying or recertifying it as 340B eligible.  MSJ Br. 24.  That claim, however, does not fall outside the ADR framework. Plaintiffs may be correct that a covered entity's eligibility can be placed in jeopardy if it violates the anti-diversion requirement.  But where, as here, the asserted loss of eligibility is premised on alleged diversion, a determination that diversion occurred is a necessary predicate to the question of eligibility.

The Drug Companies challenge the certification and recertification of STD covered entities that do not "furnish 340B-priced drugs for STD treatment or prevention," that use 340B medicines in connection with services outside "the scope of the grant through which eligibility is claimed," and that use "340B-priced medicines to provide services not within the scope of an

STD grant." Compl. ¶¶ 2, 135, 138. These are allegations that STD clinics misuse their 340B drugs after purchasing them—in other words, diversion claims.

Claim Two asserts that nine Sagebrush-related medical practices engaged in diversion by "routinely transfer[ing] 340B-priced medicines to non-patients" and that HRSA violated the APA by recertifying them as 340B eligible covered entities. Compl. ¶ 142. The Drug Companies' summary judgment brief elaborates on this claim. MSJ Br 24-31. They allege that Sagebrush engaged in diversion by, among other things, "purchasing 340B drugs beyond the scope of its qualifying STD grant," "providing 340B-priced drugs to non-patients," and "providing individuals condoms or one-off STD counseling" that, according to the Drug Companies, "do not transform the individuals into Sagebrush patients." *Id*. at 25, 27, 29.

**B.      CCRF Is Entitled to Summary Judgment on Claims One and Two Because the Drug Companies Failed to Exhaust Administrative Remedies**

Therefore, a factual predicate of Claims One and Two is that certain Sagebrush entities have diverted drugs to ineligible patients. Congress established ADR, in part, "for the resolution of . . . claims by manufacturers, after the conduct of audits as authorized by subsection (a)(5)(C), of violations of subsections (a)(5)(A) [duplicate discounts] or (a)(5)(B) [diversion]." 42 U.S.C. § 256b(d)(3)(A). The Drug Companies' diversion claims must be established through ADR before this Court has jurisdiction to consider it and whether such diversion, if shown, led to improper certifications. *Astra*, 563 U.S. at 121-122.

A "long-settled rule of judicial administration is the principle that a court that has been asked to compel an agency to act will stay its hand until the plaintiff has exhausted whatever internal remedies the agency provides[.]" *Mackinac Tribe v. Jewell*, 87 F. Supp. 3d 127, 137 (D.D.C. 2015) (summarized). The purpose of administrative exhaustion is to give agencies the opportunity to correct their own errors, afford the parties and the court the benefit of agency

23

expertise, and allow for the compilation of a record that is adequate for judicial review. *Id*. (quoting *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004)).

The plain language of the 340B statute requires the Drug Companies to exhaust their administrative remedies before seeking judicial review. The 340B statute establishes an ADR process to adjudicate manufacturer claims, including allegations of diversion. *See* 42 U.S.C. § 256b(d)(3). In doing so, the statute anticipates that such claims will arise from manufacturer audits of covered entities and be resolved through the ADR process established by the Secretary, thereby channeling these disputes into an administrative forum in the first instance. *Id.* § 245b(d)(3)(A). Resolution of a diversion claim through the ADR process constitutes "a final agency decision and shall be binding upon the parties involved, unless invalidated by an order of a court of competent jurisdiction." *Id*. § 256b(d)(3)(C).

Consistent with this statutory structure, HRSA promulgated regulations implementing the ADR process to resolve payment, pricing, diversion, or discount disputes that arise between manufacturers and covered entities. 340B Drug Pricing Program; *Administrative Dispute Resolution Regulation*, 89 Fed. Reg. 28,643, 28,649 (Apr. 19, 2024) (hereinafter "ADR Rule"). The regulations not only confirm that manufacturers must pursue diversion claims through this administrative process, they establish detailed, mandatory procedural requirements governing such claims. 42 C.F.R. § 10.21(a)(2), (b)(1). They command that "regarding the prohibition of the resale or transfer of covered outpatient drugs to a person who is not a patient of the covered entity," a "manufacturer must file a claim under this section in writing to [HRSA] within 3 years of the date of the alleged violation." *Id*. The regulations contain no exception permitting manufacturers to circumvent the ADR process. And like the statute, diversion claims must be adjudicated by the Secretary before being pursued in court. *Id.* § 10.23(c).

24

The obligation to complete the ADR process before going to court was confirmed by the Supreme Court in *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011). The Supreme Court held in *Astra* that there is no private right of action under Section 340B to enforce compliance with the requirements of the 340B Program. *Id.* at 117-122. By mandating that HHS create the ADR process, Congress deliberately vested enforcement authority for the 340B Program in the Secretary, not in private litigants. *Id.* at 121-122. The Supreme Court emphasized that allowing parties to bypass that administrative framework and proceed directly to court would undermine Congress's choice to centralize enforcement of the program in the agency. *Id.* at 120. Although *Astra* arose in the context of overcharge claims brought by covered entities, its reasoning did not turn on the identity of the party seeking relief. Its conclusion applies equally to claims brought by manufacturers. The Court was clear that if parties regulated by 340B bypass ADR, the Secretary will be "unable to hold the control rein," and "the risk of conflicting adjudications would be substantial." *Id.*

The Drug Companies chose to file their first and second claims with this Court instead of using the 340B Program's mandatory ADR process. As a result, the Drug Companies failed to exhaust their administrative remedies under HHS regulations before filing suit in federal court. Thus, the Court lacks subject matter jurisdiction over Claims One and Two. *See Darby v. Cisneros*, 509 U.S. 137, 154 (1993).

## III. The Drug Companies' Claims One, Two, Four, and Five Fail on the Merits

Claims One, Two, Four and Five also must be rejected on the merits. Claim One would require an interpretation of the definition of a "patient" in the 340B statute far narrower than its plain meaning. Claim Two would require the Secretary to ignore clear statutory language relating to 340B Program audits, hearing rights and enforcement, and impose ad hoc eligibility determinations. Claim Four applies a narrow reading of the word "funds" that is inconsistent

25

with its plain meaning, especially in the context of the Section 318 grant program.  Claim Five ignores the substantial certification and recertification process for STD 340B entities that has existed for decades.

### A.    Claim One:  The Scope of a Grant Does Not Determine Which Drugs Are Discounted

The Drug Companies' first claim stems from the erroneous proposition that the scope of the Section 318 grant determines which drugs are discounted.  Claim One asserts that STD clinics may not purchase discounted drugs that do not treat STDs.  Claims One is contrary to the 340B statute, which imposes no such limitation.

#### 1.    The 340B Program's Scope-of-the-Grant Limitation Applies to the 340B Eligibility of Patients, Not Drugs

STD clinics qualify for the 340B Program based on their receipt of grant or subgrant funds awarded by the CDC under section 318 of the PHSA.  42 U.S.C. § 256b(a)(4)(K).  Like other 340B grantees and subgrantees, they may only use the 340B Program within the scope of their qualifying grant.  That is because only "covered entities" are eligible for the 340B Program, and the definition of "covered entity" incorporates these grant-qualifying conditions.  *Id.* § 256b(a)(4).  The Drug Companies misread the 340B statute by asserting that the scope-of-the-grant limitation prohibits STD clinics from dispensing non-STD drugs to eligible patients.

The Drug Companies erroneously assert that, under the scope-of-the-grant limitation, STD clinics may not dispense or otherwise use 340B drugs for non-STD conditions.  Plaintiffs seriously misunderstand what is considered "diversion" under the 340B statute.  Both the 340B statute and guidance from HRSA are clear that diversion occurs when a covered entity dispenses or administers drugs purchased at 340B pricing to individuals who are not its "patients."  *Id.* § 256b(a)(5)(B).  Neither this prohibition, nor any other provision in the 340B statute restricts the type of drugs covered entities may use or prescribe for their patients.  The scope-of-the-grant

limitation applies to the covered entity and its patients, not to the individual drugs purchased by the covered entity.

In 2023, a federal court confirmed that the word "patient" in the 340B statute is to be interpreted in accordance with its plain meaning. *Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d. 312 (D.S.C. 2023). That court rejected attempts by HRSA to narrow its interpretation of "patient" to focus on individual prescriptions rather than the provider-patient relationship: "[t]he legislative history behind the 340B Program suggests a broad reading of the term 'patient' . . . the only logical conclusion is that Congress intended to apply the common everyday meaning of the term patient," and "it is reasonable to conclude that Congress intended patient to have its plain and ordinary meaning: an individual awaiting or under medical care and treatment." *Id.* at 325 (cleaned up). Interpreting the scope-of-the-grant limitation to narrow the individual prescriptions that a covered entity can fill using 340B drugs would impose a prescription test rather than the patient test required by the plain meaning of the word "patient."

Application of the scope-of-the-grant limitation with respect to each patient rather than each prescription is supported by the Secretary's longstanding patient definition guidance, which emphasizes the importance of the relationship between the patient and the covered entity and does not attempt to define what is considered an eligible drug. AR 4-6. That guidance established a three-pronged definition of "patient." The last prong, often referred to as the "scope-of-the-grant" test, requires that "the individual must receive health care services that are consistent with the services for which grant funding . . . has been provided to the covered entity." *Id.* at 5-6. Under this test, an individual may only be considered a patient of the STD clinic if the individual receives a health care service consistent with the Section 318 grant or sub-grant. Once a patient receives services that are within the scope of the clinic's grant, thereby satisfying

27

HRSA's 340B patient definition guidance, nothing in the 340B statute prohibits the clinic from purchasing and dispensing 340B drugs that are not directly related to the patient's STD treatment or prevention.

In fact, when the Secretary developed the patient definition guidance thirty years ago, he rejected the Drug Companies' position here. The Secretary responded to a comment that covered entities "should be required to restrict purchases to drug products that are directly related to the provision of services for which Federal funding has been provided." *Id.* at 5. The Secretary disagreed with the proposal and stated that it did "not consider a limitation on which drug products a covered entity may purchase to be a reasonable component of the definition of covered entity 'patient'" and that if "purchasing certain drugs would contravene a Federal or State law or certain PHS grant principles . . . the Department reserves the right to take such action as it deems appropriate." *Id.* The Secretary's recognition that covered entities may use 340B drugs not "directly related to the provision of services for which Federal funding has been provided" is restated in guidance from its prime vendor, Apexus.[2] Apexus states that the "340B Program does not limit the drugs a covered entity can use or prescribe; however, 340B drugs may only be provided to individuals who are patients of the covered entity grantee." 340B Prime Vendor Program, *HRSA FAQs*, Apexus (Sept. 30, 2020), https://www.340bpvp.com/search#q=1565&tab=all (FAQ ID: 1565). In short, the prohibition against covered entities diverting 340B drugs only applies to *people* who are not patients of the covered entity—not to certain classes of drugs.

---

[2] The Prime Vendor is a statutorily authorized contractor that provides guidance to the public. *See* 42 U.S.C. § 256b(a)(8).

### 2. Application of the Scope-of-the-Grant Restriction to Individual Drugs Is Impractical

Application of the scope-of-the-grant limitation to patients rather than individual drugs is not only consistent with the 340B statute and HRSA guidance, it makes better sense. Consider the practical hardships that would arise if the limitation is applied at the individual drug level. In assessing the 340B eligibility of a given drug, covered entities, manufacturers and the government would have to agree whether the drug is an STD or non-STD medication. Lack of consensus on this question would be inevitable because there are too many competing factors to consider. What does the drug's labeling say? Why is the drug being prescribed? Will the patient's STD status affect the drug's safety or effectiveness? What other drugs is the patient taking and could they cause STD-related drug to drug interaction problems? Does the patient have STD-related co-morbidities?

The reality is that, if a patient has one or more STDs, the STD condition will have an impact, potentially a significant impact, on all the diagnostic and therapeutic decisions made for that individual, including the individual's recommended drug regimen. That is because pharmaceuticals affect the entire human body, not just one aspect of the body, and many drugs are contraindicated for individuals with sexually transmitted infections. AR 110-111. Distinguishing between a drug's STD and non-STD status would be an inherently impossible task. Hence, both the law and common sense dictate that 340B scope-of-the-grant eligibility be applied at the patient level.

### B. Claim Two: The Secretary's Procedures for Ensuring That Covered Entities Are Not Certified or Recertified if They Engage In Diversion Are Consistent With the Statute

The Secretary has taken multiple steps to ensure covered entities are not certified or recertified if they engage in diversion. The Drug Companies assert that the Secretary exceeds his

29

statutory authority and acts arbitrarily by certifying and recertifying STD clinics that engage in diversion. Compl. 36-37. Regarding particular entities, the Drug Companies claim the certifications and recertifications are unlawful because "HRSA made no attempt to ascertain whether those entities had diverted 340B-drugs to non-patients." MSJ Br. 31. Such claims are simply untrue.

First and foremost, the Secretary will not certify or recertify an STD clinic unless it attests to its compliance with the 340B prohibition against diversion. The STD clinic registration form requires the clinic's Authorizing Official to certify that the clinic "will comply with all the requirements of Section 340B of the Public Health Service Act and accompanying regulations including, but not limited to, the prohibition against…diversion." HRSA, *340B Program Registration Form for Covered Entities*, § IV(3),
https://www.reginfo.gov/public/do/DownloadDocument?objectID=39408801. The Authorizing Official must make the same attestation during the clinic's annual recertification process. *340B Office of Pharmacy Affairs Information System (OPAIS): Public User Guide* 149, HRSA https://www.hrsa.gov/sites/default/files/hrsa/opa/public-user-guide.pdf. These are not administrative forms that get filled out simply for clerical purposes. They carry significant legal weight that expose the Authorizing Official—who is typically the CEO or other officer— to personal criminal liability because submission of a false attestation can result in imprisonment as well as fines. 18 U.S.C. § 1001. Yet, if the Authorizing Official fails to provide the requested attestations, the STD clinic is automatically removed from the 340B Program.

Second, the Secretary has established a robust audit program in which covered entities, including STD clinics, are randomly selected for on-site inspection of their records so that HRSA can evaluate their 340B compliance status. HRSA, *Program Integrity*,

30

https://www.hrsa.gov/opa/program-integrity (last visited Apr. 24, 2026). Approximately 200 of these HRSA audits are performed annually and the results are published on the agency's website. HRSA, *Program Integrity*, https://www.hrsa.gov/opa/program-integrity (last visited Apr. 24, 2026). The audits entail, among other things, the submission of voluminous data by the clinic, including the submission of its policies and procedures, detailed eligibility information, and all of the clinic's 340B purchases and dispenses for a six-month period. Apexus, *Sample HRSA 340B Audit Data Request List (DRL) for Covered Entities*, https://www.340bpvp.com/Documents/Public/340B%20Tools/sample-hrsa-340b-audit-data-request-for-covered-entities.pdf (last visited April 24, 2026). If HRSA uncovers evidence of diversion or non-compliance in other specified areas, the STD clinic may be subject to "removal from the program." HRSA, *Program Integrity*, https://www.hrsa.gov/opa/program-integrity (last visited Apr. 24, 2026).

Third, HRSA has established a process for manufacturers to exercise their statutory right to audit covered entities for compliance with the anti-diversion requirement. *See* Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406 (Dec. 12, 1996). If the manufacturer's auditor discovers that an STD clinic has engaged in diversion, the manufacturer may present the relevant evidence to HRSA by filing an ADR petition. ADR Rule, 89 Fed. Reg. 28,643. The ADR Panel, after adjudicating the petition, is authorized to levy penalties against the clinic if it determines that the diversion claim has been substantiated. HRSA, *340B Administrative Dispute Resolution*, https://www.hrsa.gov/opa/340b-administrative-dispute-resolution (last visited Apr. 24, 2026). Among the available penalties is termination from the 340B Program. *Id.*

Each of the steps described above can result in an STD clinic being removed from the

340B Program for engaging in diversion or not being enrolled in the first place.  But the Drug

Companies want more.  They still accuse the Secretary of acting in "excess of [his] statutory

jurisdiction" and in a manner that is "arbitrary, capricious and an abuse of discretion."  Compl.

¶¶ 143, 144.  They apparently want automatic exclusion of STD clinics from the 340B Program

for diversion.  *See* MSJ Br. 25, 27 (referring to diversion as "disqualifying" and asserting that the

Sagebrush entities were "ineligible for certification and recertification").

Enforcement of the anti-diversion requirement in this more aggressive manner, however,

is not permitted under another provision of the 340B statute, which the Drug Companies neglect

to mention.  A covered entity may only be removed from the 340B Program "if the Secretary

determines a violation of [the diversion prohibition] was systematic and egregious as well as

knowing and intentional."  42 U.S.C. § 256b(d)(2)(B)(v)(II).  This is an extraordinarily high

standard that the Secretary must satisfy before excluding an STD clinic, or any covered entity,

from the 340B Program.  This provision does not allow the Secretary to exclude STD clinics in

the automatic manner sought by the Drug Companies. Before exclusion can be taken, the

Secretary needs evidence not only of knowledge and intent, but how serious the diversion is and

whether it is ongoing.  Even if the Secretary wanted to impose the Drug Companies' sweeping,

automatic exclusions, he could not.

## C.     Claim Four:  The Secretary's Certification of Entities Receiving Only In-Kind Contributions Is in Accordance With Federal Grants Law

An entity qualifies as a covered entity eligible to participate in the 340B Program if it is

"receiving funds" under a Section 318 grant.  *Id.* § 256b(a)(4)(K).  The Drug Companies' claim

that the plain meaning of "funds" only includes money.  Thus, they argue that entities that

"receive money—not those that receive goods—qualify as covered entities under this statutory

definition."  MSJ Br. 34.  They further argue that the term "grant" in Section 247c refers to "an

amount of money" which they claim "bolster[s]" their argument. *Id*. In both instances, the Drug Companies' interpretation of what constitutes "funds" and "grants" is artificially narrow and conflicts with federal grant law.

A well-established tenet of statutory construction is that words are given their "ordinary or natural meaning" unless there is a specific indication otherwise. *See e.g. Smith v. United States,* 508 U.S. 223, 228 (1993). To determine natural meaning, courts commonly reference widely used dictionaries when interpreting the plain meaning of a statutory term that is not defined in the statute. *Biden v. Nebraska,* 600 U.S. 477, 494-495 (2023) (citing Webster's Third New International Dictionary); *Pugin v. Garland*, 599 U.S. 600, 604 (2023) (citing Merriam-Webster's Dictionary of Law 337 (1996)). Merriam-Webster defines "fund" in the legal sense to mean "a sum of money *or other resources* whose principal or interest is set apart for a specific objective." *Fund*, Merriam-Webster Law Dictionary, https://www.merriam-webster.com/dictionary/fund#legalDictionary (last visited Apr. 22, 2026) (emphasis added). The Merriam-Webster Dictionary similarly defines "fund" to include "an available quantity of *material* or intangible resource." *Id*. These definition in no way limits the term "fund" to money alone.

The Drug Companies argue that the term "funds" must be interpreted to only mean money by referencing Section 318's use of the word "grants." MSJ Br. 34. The definition of "grant," however, supports the notion that "funds" means more than just money. The term "grant" has a specific meaning in the context of federal awards. For purposes of the Federal Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, "grant" is defined as "a legal instrument of financial assistance between a Federal agency and a recipient or between a pass-through entity and a subrecipient . . . used to enter into

33

a relationship, the principal purpose of which is to *transfer anything of value to carry out a public purpose* authorized by a law of the United States." 2 C.F.R. § 200.1 (emphasis added). Likewise, "federal financial assistance" is defined to include "[a]ssistance that recipients or subrecipients receive or administer in the form of (i) Grants; (ii) Cooperative agreements; [and] (iii) Non-cash contributions or donations of property." *Id.* Furthermore, the Secretary defines "award" as financial assistance that provides support or stimulation to accomplish a public purpose . . . awards include grants and other agreements in the form of money or *property in lieu of money*, by the federal government to an eligible recipient." *Grant Terminology: Award*, Grants.gov, https://www.grants.gov/learn-grants/grant-terminology.html (last visited Apr. 3, 2026) (emphasis added).

The Drug Companies argue that their interpretation of "fund" is further "bolstered" by the use of the word "grants" in the cross-referenced provision in Section 247c. MSJ Br. 34. They point to Section 247c(e)(4) distinguishing "'grants' from 'supplies or equipment,' by authorizing the Secretary to 'reduce [a] grant by the fair market value of any supplies or equipment furnished to such recipient.'" *Id.* at 35. They argue that because the statute differentiates between "grants" and "supplies or equipment," the term "grants" can only be referring to money. *Id.*

The Drug Companies misinterpret 42 U.S.C. § 247c(e)(4), which includes "supplies or equipment" within the scope of the grant:

> The Secretary, at the request of a recipient of a grant under [Section 318] may reduce such grant by the fair market value of any supplies or equipment furnished to such recipient . . . when the furnishing of such supplies or equipment . . . is for the convenience of and at the request of such recipient and for the purpose of carrying out the program with respect to which the grant under this section is made. The amount by which any such grant is so reduced shall be available for payment by the Secretary of the costs incurred in furnishing the supplies, equipment, or personal services on which the reduction of such grant is based.

42 U.S.C. § 247c(e)(4). In other words, the Section 318 program was designed by Congress to

34

allow for the substitution of "supplies or equipment" in lieu of cash.  A state can ask the Secretary to use grant money to purchase in-kind supplies and send them to the state.  The amount of money provided by the federal government to the state is reduced to reflect the in-kind funds received instead, but the in-kind contributions are specifically to be used "for the purpose of carrying out the program."  *Id.* § 247c(e)(4).  The importance is not that Congress appears to have used "grant" to refer to the financial portion of the award in Section 318(e)(4); it is that Congress recognized that the federal funds that best support the execution of a Section 318 program might be in the form of supplies and equipment.

The exact same flexibility exists between Section 318 recipients (states and units of local government) and their subrecipients.  States can make funds available in the form of money, or they can choose to make funds available in the form of in-kind contributions purchased with that same money.  That flexibility, explicitly described by Congress in the context of these awards, makes sense because the state grantor in both scenarios has better access to treatment kits, contraceptives, laboratory services, and other forms of non-cash assistance.  A state that uses its scale and purchasing power to convert monetary funds into in-kind funds is more efficient and a better steward of federal grant dollars than one that provides monetary funds to its community partners and has them navigate the retail market to purchase the same supplies or services.

In line with both the Uniform Guidance and HHS grant terminology, the CDC defines "direct assistance" as a "financial assistance support mechanism, which must be specifically authorized by statute, *whereby goods or services are provided to recipients in lieu of cas*h. Direct assistance generally involves the assignment of federal personnel *or the provision of equipment or supplies* such as vaccines."  CDC, *Dictionary of Terms: Direct Assistance* (Sept. 15, 2025), https://www.cdc.gov/grants/dictionary-of-terms/index.html#cdc_generic_section_4-d (emphasis

added).  This type of financial assistance also is described as "non-monetary assistance."  *Id.*

The CDC specifically identifies Section 318 grantees as those allowed to receive Direct

Assistance.  CDC, *Budget, Grants & Funding: Direct Assistance: Frequently asked questions*

(May 15, 2024), https://www.cdc.gov/public-health-gateway/php/our-work/budget-grants-

funding-direct-assistance.html#:~:text=What%20to%20know,and%20how%20to%20use%20it

("Q: Which Programs are eligible for DA?").  The Secretary's allowance for goods and services

instead of purely monetary funds mirrors CDC guidance, which is in line with HHS grant policy

and is in accordance with the Uniform Guidance for all federal grants.

Furthermore, the Secretary has repeatedly and publicly affirmed that the plain meaning of

the term "fund" includes in-kind contribution funds.  The Secretary stated that an "entity

receiving in-kind contributions through section . . . 318 may qualify for the 340B Drug Pricing

Program provided all the remaining 340B requirements are met."  AR 27–28.  This guidance is

consistent with the above-mentioned plain meaning of the term "fund."  *See also Fund*, Merriam-

Webster Dictionary, https://www.merriam-webster.com/dictionary/fund (last visited Apr. 22,

2026). Thus, the Secretary's interpretation aligns with both components of Merriam-Webster

Dictionary's common and plain definition of the term "fund."  The Secretary has consistently

interpreted "funds" to mean more than just cash across programs and agencies.

The Secretary's interpretation of funds beyond conventional currency is in line with

federal case law.  Courts have consistently rejected the argument that "funds" should be

construed narrowly to mean only "currency" in the formal sense of government-issued legal

tender.  *See e.g.*, *United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016); *U.S. v. Faiella*,

39 F. Supp. 3d 544 (S.D.N.Y. 2014).  As the *Murgio* court held, resort to legal dictionaries'

specialized or UCC-derived definitions of "money" would "only be relevant if Congress

36

intended that these terms be given special meaning as legal 'terms of art'"—a conclusion for which there is no evidence in the statutes at issue in the present case. *Murgio*, 209 F. Supp. 3d at 708 (quoting *Faiella*, 39 F. Supp. 3d at 545 n.2). In fact, as indicated by Section 318(e)(4) and recognized by the CDC's "direct assistance" provisions, Congress explicitly recognized that funds other than money could be delivered to further program objectives.

Federal courts have thus confirmed that the definition of "funds" includes assets that function as a medium of exchange, measure of value, or means of payment. For STD covered entities, the in-kind contributions are the means of payment. These testing supplies, trainings services and courses, technical assistance, and laboratory services are a payment that the state or local government agrees to provide in exchange for STD covered entities providing STD counseling, testing, and referrals to members of the state and local government populations. Barnhart Decl. ¶ 5.

Not only has Congress, and federal agencies, spoken clearly on in-kind donations as "funds" under Section 318, but Congress also intended states to have flexibility when providing STD grants to state partners. Section 318 provides that the Secretary may award grants to state and local governments, in consultation with the state health authority, to political subdivisions of states, for: (1) provision of technical assistance; (2) fund research, public education, training, and surveillance activities; and (3) fund innovative and interdisciplinary approaches to STD prevention and control. 42 U.S.C. § 247c(a)-(d).

This congressional direction for states to dictate the use of federal grant funds originates from the inception of Section 318. *See* H.R. Conf. Rep. 92-1376 (1972) ("The Senate bill adds a new Section 318 to title III of the Public Health Service Act to authorize the Secretary . . . (3) to make grants to *States* for establishing and maintaining public health programs for the diagnosis

37

and treatment of venereal disease, and (4) to make project grants to *States* and, in consultation with the *State health authority*, to political subdivisions for the conduct of certain venereal disease prevention and control programs.") (emphasis added).  Subsequent Congressional reports support that Congress intended for Section 318 to be "for area- and state-specific approaches to control of these diseases [STDs]."  H.R. Conf. Rep. 103-397, 20 (1993).  Because the 340B statute gives state and local governments the ability to issue funds to the covered entities, it follows that the statute would afford them discretion as to how to steward the STD Grant funds, including by providing in-kind donations.

The interpretation that funds include in-kind contributions is also consistent with congressional intent behind the 340B Program.  As reflected in the House report that accompanied the legislation creating the program, when crafting the 340B Program, the Committee's intent was to enable covered entities "to stretch scare Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services."  H.R. Rep. No. 102-384, pt. 2, at 12 (1992).  By referencing Federal "resources," the Committee was clearly thinking beyond dollar-funding arrangements.

Use of these in-kind contributions is not only necessary for "stretching scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services," but also for the sake of public health.  There are over 3,300 STD covered entities relying on the in-kind model for 340B eligibility.[3]  Similarly to CCRF, invalidating the in-kind

---

[3] OPAIS, Covered Entity Search, https://340bopais.hrsa.gov/SearchCe) (Search using "Participating = Yes" and "Entity Type = Sexually Transmitted Diseases."  Then click "Export All," which allows you to generate a custom Excel file including selected OPAIS elements.   Select All and Export the Excel file (attached). The Excel spreadsheet will have a separate tab labeled "Nature of Support Details."  Filter for entities that have "Nature of Support" equal to "In-Kind products or services (see note below; must have been purchased with section 318 funds).").

model means that many of these covered entities will be forced to shut down.

**D.    Claim Five:  The Secretary's Certification and Recertification Procedures Are in Accordance With the 340B Statute**

Plaintiffs contend that the Secretary violated 42 U.S.C. § 256b(a)(7) by failing to develop a lawful certification and recertification process for STD grantees and by failing to make its certification criteria available to manufacturers.  MSJ Br. 18–24.  That premise is incorrect. From the inception of the 340B Program, the Secretary has maintained a structured certification and recertification framework for STD grantees, has relied on state and federal program administrators to collect and verify outpatient drug purchase information, and has made the applicable certification criteria publicly available to manufacturers through multiple channels. Because the Secretary satisfied the procedural requirements imposed by § 256b(a)(7), the Drug Companies' claim fails as a matter of law.

**1.    The Secretary Has a Lawful Certification and Recertification Process for Covered Entities**

Section 256b(a)(7) directs the Secretary to "establish a process for the certification" of STD covered entities and to require recertification on at least an annual basis.  The statute does not prescribe the mechanics of that process, require centralized submission of drug purchasing data directly to the Secretary, or mandate front-end prescription-level validation as a condition of certification.  Instead, Congress left the details of implementation to agency discretion, particularly in light of the cooperative federal–state structure through which STD funding is administered.  *See, e.g.*, *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (explaining that Congress could have limited the Secretary's discretion but chose not to, and that courts may not impose limits on agency discretion not supported by statutory text); *see also In re Permanent Surface Mining Regulation Litigation*, 653 F.2d 514, 523 (D.C. Cir. 1981) (explaining that once a state program is approved in a cooperative federal–

state scheme, the state "plays the major role," exercising "front-line supervision" due to its greater manpower and familiarity with local conditions, while the federal agency retains oversight authority).

The Secretary exercised that discretion early and consistently.  In May 1993, the Secretary issued Federal Register guidance contemporaneous with the enactment of the 340B statute expressly identifying STD clinics funded under Section 318 of the Public Health Service Act as covered entities eligible for certification.  *See* AR 17, 18 (hereinafter "1993 Guidance").  The 1993 Guidance described a certification and recertification framework involving compilation of eligible entities by Public Health Service program directors, inclusion of estimated outpatient drug purchase amounts, verification of eligibility and funding at the state level, and annual recertification conducted in the same manner as initial certification.

Those procedures satisfy each component of § 256b(a)(7).  Subsection (A) requires the Secretary to establish a certification process, which he plainly did.  Subsection (B) requires submission of information "to assist the Secretary in evaluating the validity of subsequent purchases," not submission of drug purchasing data directly to the Secretary or at the point of certification.  And subsection (E) requires periodic recertification "in the same manner" as initial certification, which the Secretary implemented through recurring verification cycles consistent with its original framework.

The Drug Companies' assertion that no certification "process" exists unless the Secretary personally collects outpatient drug purchase data directly from each covered entity at certification finds no support in the statutory text.  Section 256b(a)(7)(B) does not specify who must submit information, in what format, or when such information must be evaluated.  Nor does it require front-end prescription-level validation as a precondition to certification.  To the

40

contrary, by referring to information used to assess the validity of "subsequent purchases," the statute contemplates that purchasing data will be evaluated through ongoing oversight mechanisms—not as a threshold eligibility requirement. *See F.T.C. v. Standard Oil Co. of California,* 449 U.S. 232, 241–42 (1980) (explaining that an agency's threshold determination that further proceedings are warranted is a preliminary step with no legal or practical effect on substantive rights and is distinct from subsequent adjudication or enforcement resolving compliance on the merits).

Consistent with the statute and the 1993 Guidance, the Secretary relies on states and program administrators to verify STD grantee eligibility and funding, while reserving federal oversight to post-certification audits and enforcement actions. Because eligibility for STD covered entity status turns on receipt of funding through states or local governments, reliance on state-level verification is both reasonable and expected. *See In re Permanent Surface Mining Regulation Litigation*, 653 F.2d at 523. Nothing in § 256b(a)(7) requires the Secretary to duplicate or supplant those determinations at the certification stage.

The cooperative agreement structure of the STD program further confirms Congress's intent to afford states significant administrative latitude. And although Congress has amended the 340B statute multiple times since 1992, it has never altered § 256b(a)(7) to require centralized data submission, prohibit reliance on state verification, or impose additional certification mandates. Where an agency adopts an interpretation contemporaneous with a statute's enactment and Congress repeatedly leaves that interpretation undisturbed, legislative acquiescence reinforces the lawfulness of the agency's approach. *See N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 275 (1974). The Secretary's certification and recertification framework for STD clinics has remained materially consistent since it was first

41

articulated in 1993.  *See* AR 18.

> **2.      The Secretary's Certification Practices Are Consistent With His Certification Procedures and Otherwise Permissible**

In certifying and recertifying STD entities, the Secretary engages in the reasoned decision-making the APA requires and follows the 340B statute's requirements.  The Drug Companies fail to show that the Secretary's certification and recertification process for STD entities was "arbitrary and capricious." MSJ Br. 36–39; *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

The Drug Companies are wrong that the Secretary solely relied on emails and disregarded statutory eligibility requirements for STD covered entities like diversion and making a certification process available to manufacturers.  MSJ Br. 36–38.  First, the Secretary's certification and recertification process did not ignore the 340B statute's diversion requirements.  As explained above, certification of whether an STD covered entity operates within the scope of its STD grant contains no requirement, or prescription-level test, that examines whether a particular prescription is also consistent with the scope of the STD covered entity's grant.  42 U.S.C. § 256b(a)(7).  The Secretary continuously monitors and enforces diversion of 340B drugs through conducting audits, imposing sanctions, and through the ADR process as prescribed by the 340B statute.  *Id.* § 256b(a)(5)(C)-(D); *id.* § 256b(d)(3).

The Secretary's certification and recertification process for STD covered entities is the product of reasoned decisionmaking.  Because the funding comes though state or local governments, 42 U.S.C. § 256b(a)(4), the Secretary properly relies on those states and local governments to help it determine STD covered entity eligibility requirements.  The Secretary's reliance on state and program administrator verification is consistent with the certification framework described in his 1993 Federal Register notice.  AR 17–21.  While The Drug

Companies may dislike the process the Secretary established, its "path may reasonably be discerned" and must be upheld even if its process is "of less than ideal clarity." *Bowman*, 419 U.S. at 285–86. Furthermore, this Court may not substitute its judgment for the Secretary's as covered entity eligibility and certification is the Secretary's area of technical expertise and demands deference. *Fox*, 684 F.3d at 75. The Drug Companies' citation of one example of an allegedly ineligible site does not negate that the Secretary's established process for certifying and recertifying STD covered entities has worked properly for decades.

The Drug Companies are also wrong that the Secretary's use of state employee email attestations to help certify and recertify STD entities results in relying on "factors which Congress has not intended it to consider." MSJ Br. 38–39. The certification and recertification emails the Drug Companies cite do not consider irrelevant factors but confirm, through state agencies, that the entities receive the statutorily required Section 318 funds to qualify as STD covered entities. Section 318 of the Public Health Service Act (codified at 42 U.S.C. § 247c). For example, in one email exchange, the Secretary asked the Connecticut Department of Public Health: "Can you confirm the attached entity receives 318 funding?" AR 13408. The Connecticut Department of Public Health responded: "Yes, they receive in-kind 318 funding." *Id.* at 13409. The list of emails the Drug Companies cite provide similar confirmation that the relevant STD covered entities received Section 318 funding through their state or local governments. MSJ Br. 36-37. The Secretary's reliance on state agency attestations to confirm statutorily mandated funding is, therefore, not arbitrary and capricious.

### 3.    The Secretary Does "Make Available" Its Criteria to Manufacturers

The Drug Companies contend that the Secretary violated § 256b(a)(7)(C) by certifying covered entities without adequately "making available" its certification criteria to manufacturers. That argument fails because it misreads the statute. Section 256b(a)(7)(C) requires only that the

43

Secretary "make available to all manufacturers of covered outpatient drugs a description of the criteria for certification." 42 U.S.C. § 256b(a)(7)(C). It does not require individualized notice, direct transmission of criteria, disclosure of covered-entity-specific purchasing data, or promulgation of a formal rule.

The Secretary has satisfied this requirement by making the certification criteria publicly accessible through multiple channels. From the inception of the 340B Program, the Secretary informed manufacturers of the certification criteria in a Dear Manufacturer Letter. AR 7–14. He identified STD grantees as a covered entity category in Federal Register guidance and described the applicable certification and recertification framework. AR 17–21. The Secretary also provided manufacturers with lists of certified covered entities, thereby identifying which entities were eligible to purchase drugs at 340B prices. AR 13. Together, these measures made the relevant criteria available and provided clear notice of which entities qualified.

That is all the statute requires. Courts have long held that publication in the Federal Register constitutes legally sufficient notice of agency policies and criteria. As the Supreme Court explained, "the appearance of rules and regulations in the Federal Register gives legal notice of their contents." *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947). The D.C. Circuit has likewise confirmed that, under the Federal Register Act, public filing is "sufficient to give [constructive] notice" to affected parties, with publication serving primarily to create a presumption of validity. *Humane Soc'y of the U.S. v. USDA*, 41 F.4th 564, 569–70 (D.C. Cir. 2022) (quoting 44 U.S.C. § 1507).

Nothing in § 256b(a)(7)(C) demands more. The statute does not require the Secretary to individually notify manufacturers, transmit criteria directly, disclose subrecipient-level data, or adopt certification standards through notice-and-comment rulemaking. A requirement to "make

44

available" information is satisfied when the agency places that information in the public domain. The Secretary has gone further still.  Through the Prime Vendor Program, which Congress itself directed the Secretary to establish, the agency's prime vendor maintains a publicly accessible website with detailed guidance, FAQs, and educational materials addressing eligibility, certification, recertification, and compliance.  *See* Apexus, *340B Frequently Asked Questions*, https://www.340bpvp.com/hrsa-faqs (last visited Apr. 24, 2026).  These materials are freely available to manufacturers and reinforce the transparency of the Secretary's certification framework.

Because the Secretary has made its certification criteria publicly available through the Federal Register and other open sources, it has fully complied with § 256b(a)(7)(C).  The Drug Companies' contrary reading would improperly rewrite the statute to impose obligations Congress did not enact.

## CONCLUSION

For the foregoing reasons, this Court should grant CCRF's cross-motion for summary judgment and deny the Drugs Companies' motion for summary judgment.


Dated: April 24, 2026                              Respectfully submitted,

*/s/Ronald S. Connelly*
Ronald S. Connelly, D.C. Bar No. 488298
POWERS PYLES SUTTER & VERVILLE, PC
1250 Connecticut Ave NW, Eighth Floor
Washington DC 20036
T: (202) 466-6550
Ron.Connelly@PowersLaw.com
*Counsel for Intervenor-Defendant Community Care Services of Florida*

45