**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMGEN INC., *et al.*,

*Plaintiffs*,

v.

ROBERT F. KENNEDY JR., in his official capacity, *et al.*,

*Defendants*.

Civil Action No. 1:24-cv-3571

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' AND INTERVENOR'S CROSS-MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 3

I. HRSA Violated Section 340B by Failing to Develop and Publish Its Certification Criteria. ........ 3

A. HRSA's Certification and Recertification Actions Were Unlawful. ........ 4

B. HRSA's Certification—Absent Making the Certification Criteria Available to Manufacturers—Was Contrary to Law. ........ 11

II. HRSA's Certification Decisions Were Contrary to Law Because the Sagebrush Entities Were Ineligible on Multiple Grounds. ........ 12

A. HRSA's Certification of Sagebrush Entities that Have Unlawfully Diverted 340B Drugs Was Contrary to Law. ........ 12

B. HRSA's Certification of Entities that Receive Support Only as Sub-subgrantees of Other Certified Entities Was Contrary to Law. ........ 20

C. HRSA's Certification of Entities Receiving Only In-Kind Contributions, Rather than "Funds," Was Contrary to Law. ........ 24

III. HRSA's Certifications and Recertifications of the Sagebrush Entities Were Arbitrary and Capricious. ........ 27

IV. Intervenor's Procedural Arguments Lack Merit. ........ 29

A. Plaintiffs' Claims Are Timely. ........ 30

B. As This Court Has Already Held, No Exhaustion Was Required. ........ 31

V. The Court Should Vacate HRSA's Unlawful Certifications and Recertifications. ........ 32

CONCLUSION ........ 33

CERTIFICATE OF SERVICE ........ 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
3 F.4th 373 (D.C. Cir. 2021)....................10

*Am. Train Dispatchers Ass'n v. ICC*,
26 F.3d 1157 (D.C. Cir. 1994)....................33

*Ass'n of Civilian Technicians, Wichita Air Capitol Chapter v. FLRA*,
360 F.3d 195 (D.C. Cir. 2004)....................17

*Astra USA, Inc. v. Santa Clara County*,
563 U.S. 110 (2011)....................32

*Avocados Plus Inc. v. Veneman*,
370 F.3d 1243 (D.C. Cir. 2004)....................32

*City & Cnty. of San Francisco v. EPA*,
604 U.S. 334 (2025)....................25

*City of Tacoma v. FERC*,
460 F.3d 53 (D.C. Cir. 2006)....................28

*Cook v. FDA*,
733 F.3d 1 (D.C. Cir. 2013)....................5

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024)....................30

*Ctr. For Pub. Integrity v. FCC*,
505 F. Supp. 2d 106 (D.D.C. 2007)....................29

*Cutler v. Hayes*,
818 F.2d 879 (D.C. Cir. 1987)....................29

*Darby v. Cisneros*,
509 U.S. 137 (1993)....................32

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
545 U.S. 546 (2005)....................10

*Functional Music, Inc. v. FCC*,
274 F.2d 543 (D.C. Cir. 1958)....................30

*Gallardo v. Marstiller*,
596 U.S. 420 (2022)....................25, 26

*Kimberlin v. Quinlan*,
199 F.3d 496 (D.C. Cir. 1999)....................31

*Kingdomware Techs., Inc. v. United States*,
579 U.S. 162 (2016)....................5

*LaShawn A. v. Barry*,
87 F.3d 1389 (D.C. Cir. 1996)....................31

*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357 (2025)....................18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................29

*NARUC v. ICC*,
41 F.3d 721 (D.C. Cir. 1994)....................29

*NLRB Union v. FLRA*,
834 F.2d 191 (D.C. Cir. 1987)....................30

*Petro Star Inc. v. FERC*,
835 F.3d 97 (D.C. Cir. 2016)....................29

*PhRMA v. McCuskey*,
171 F.4th 675 (4th Cir. 2026)....................18

*Rapanos v. United States*,
547 U.S. 715 (2006)....................10

*Ratzlaf v. United States*,
510 U.S. 135 (1994)....................10

*Russello v. United States*,
464 U.S. 16 (1983)....................26

*Sagebrush Health Servs. v. Kennedy*,
No. 25-cv-915 (JEB), 2026 WL 1130313 (D.D.C. Apr. 27, 2026)....................1, 6, 7

*Sinclair Wyoming Refin. Co. LLC v. EPA*,
101 F.4th 871 (D.C. Cir. 2024)....................32

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004)....................25

*Susquehanna Int'l Grp., LLP v. SEC*,
866 F.3d 442 (D.C. Cir. 2017) .....28

*Telesat Canada v. FCC*,
999 F.3d 707 (D.C. Cir. 2021) .....10

*The Wilderness Soc. v. Norton*,
434 F.3d 584 (D.C. Cir. 2006) .....31

*In re United Mine Workers of Am. Int'l Union*,
190 F.3d 545 (D.C. Cir. 1999) .....31

*United States v. Faiella*,
39 F. Supp. 3d 544 (S.D.N.Y. 2014) .....26, 27

*United States v. Murgio*,
209 F. Supp. 3d 698 (S.D.N.Y. 2016) .....25, 26, 27

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) .....32

**Statutes**

21 U.S.C.
§ 355 .....17

42 U.S.C.
§ 247c .....26
§ 256b ..... *passim*

**Regulations**

21 C.F.R. § 201.56 .....17

21 C.F.R. § 201.57 .....17

58 Fed Reg. 27,289 (May 7, 1993) .....5

59 Fed. Reg. 47,884 (Sept. 19, 1994) .....23

61 Fed. Reg. 55,156 (Oct. 24, 1996) .....15, 16, 17, 18, 20

**Legislative Materials**

138 Cong. Rec. S17899 (Oct. 8, 1992) .....11

**Other Authorities**

2A Singer, *Statutes & Statutory Construction* § 46:06 (6th rev. ed. 2000) .....25

Ellen Gabler, *Senate Questions Health Care Firm for Profiting Off Program Meant for Poor*, N.Y. Times (Feb. 12, 2026) ....................7

*Fund*, Black's Law Dictionary (12th ed. 2024) ....................24

*Fund*, Merriam-Webster Law Dictionary, https://www.merriam-webster.com/dictionary/fund ....................24

*Funds*, Cambridge Dictionary....................24

HRSA, 340B FAQs, https://www.hrsa.gov/opa/faqs....................16, 18

HRSA, *2024 340B Covered Entity Purchases*, https://www.hrsa.gov/opa/updates/2023340-b-covered-entity-purchases ....................2, 8, 13

## INTRODUCTION

HRSA's submissions confirm what has long been apparent: Despite its statutory obligations, HRSA routinely certifies and recertifies STD covered entities with *no* substantive review of 340B program eligibility. Under this "cursory" process, "[c]overed entities upload documentation and assert that it shows they are eligible, and HRSA basically takes their word for it." *Sagebrush Health Servs. v. Kennedy*, No. 25-cv-915 (JEB), 2026 WL 1130313, at *2 (D.D.C. Apr. 27, 2026). As a result, HRSA has looked the other way while numerous purported "STD clinics" claim millions in 340B price reductions for drugs that *do not* treat STDs, prescribed by medical practices *unrelated* to STD treatment or prevention, to individuals who *are not* "patients" of a covered entity under the proper reading of that term. The Sagebrush entities whose certifications are challenged here have made a lucrative business model out of HRSA's abdication of its statutory duties, pocketing tens of millions of dollars annually in 340B profits to which they are plainly not entitled. This must stop.

HRSA disputes none of the foregoing. The agency concedes that it certifies and recertifies STD covered entities with no independent eligibility review, relying for its certification decisions on a single email from a state health agency, and automatically recertifying any covered entities that "attest" that they are eligible. HRSA MSJ, ECF 37, at 7. Indeed, HRSA acknowledges that its certifications are at odds with express statutory requirements. By statute, HRSA's "process for … certification … shall include a requirement that an entity applying for certification … submit information to the Secretary concerning the amount such entity expended for covered outpatient drugs in the preceding year." 42 U.S.C. § 256b(a)(7)(A)-(B); *see id.* § 256b(a)(7)(E) (similar for recertification). Yet HRSA concedes that it fails to fulfill this mandatory duty: "At present, HRSA *does not* request information from covered entities or States regarding the amount a covered entity

expended for covered outpatient drugs in the preceding year." Britton Decl., ECF 37-1, ¶ 12 (emphasis added). Nor has it ever made the supposed "process in place today" for certifications available to manufacturers as the 340B statute requires. HRSA MSJ 9; *see* 42 U.S.C. § 256b(a)(7)(C). The agency complains (at 17) that it would be "administratively difficult" to verify the eligibility of all STD covered entities. But it is not too much to expect HRSA—before requiring manufacturers to make billions of dollars' worth of discounted drugs available to third parties—to verify that those third parties are indeed eligible for them. *See* HRSA, *2024 340B Covered Entity Purchases*, at https://www.hrsa.gov/opa/updates/2023-340b-covered-entity-purchases (indicating that STD clinics made $2.257 billion in 340B purchases in 2024). And regardless, that is what Congress obligated the agency to do.

Nor does HRSA dispute any of the facts that would independently render the certifications and recertifications at issue here substantively unlawful even if they were procedurally proper. The agency offers no defense of Sagebrush's systematic diversion of non-STD-related drugs to ineligible rheumatology, dermatology, and oncology practices. Instead, HRSA responds that diversion is an enforcement issue, not an eligibility issue. But Congress expressly disagreed: it made non-diversion an explicit precondition for 340B program eligibility. Congress incorporated the anti-diversion "requirement" into the definition of what "the term 'covered entity means,'" specifying that an entity qualifies as such *only* if it "meets the requirements described in paragraph [(a)](5)" governing diversion, duplicate discounting, and auditing, *and* "is one of" the types of entities enumerated in the statute. 42 U.S.C. § 256b(a)(4). HRSA does not dispute that the Sagebrush entities at issue here *do not* "meet[] th[ose] requirements." Likewise, HRSA does not dispute that many of the entities at issue received only *de minimis* in-kind contributions from Sagebrush, rather than "funds … through a State or unit of local government" as the 340B statute

requires. *Id.* § 256b(a)(4)(K). None of the agency's interpretative hand-waving can transform in-kind contributions of condoms into "funds."

Largely retreading the same ground as the agency, Intervenor asserts a variety of policy and procedural arguments to oppose what it characterizes as a "facial challenge" to the 340B program. Intervenor misunderstands our position. Plaintiffs challenge the certifications and recertifications of nine covered entities engaged in uniquely unlawful and extensive program abuse. Despite Intervenor's overheated rhetoric (at 1), Plaintiffs do not seek "to invalidate the Secretary's 340B certification of virtually every STD clinic in the country." To be sure, some of Plaintiffs' arguments, if accepted, may require HRSA to revise its procedures and scrutinize covered entities more closely, consistent with Congress's instructions. But none of the remedies that Plaintiffs seek would exclude eligible STD grantees from the 340B program. That the agency has failed to adhere to statutory requirements in the past is no reason to permit it to continue to do so going forward.

For decades, HRSA has failed to perform the vital role in safeguarding 340B-program integrity that Congress has assigned to it. Enough is enough. The Court should set aside the challenged certifications and recertifications and direct the agency to develop and publish criteria for certification that are now more than 30 years overdue.

## ARGUMENT

### I. HRSA Violated Section 340B by Failing to Develop and Publish Its Certification Criteria.

HRSA's certifications and recertifications violate the statute's commands in two separate ways. First, HRSA has shirked its duty to put in place a certification process that meets the statutory criteria. Second, HRSA has failed to make a description of its criteria for certification available to manufacturers as required by statute. This is not some technical procedural misstep; it is a

wholesale abdication of the vital gatekeeping role that Congress assigned to the agency. HRSA's and Intervenor's responses on both points are unavailing.

### A. HRSA's Certification and Recertification Actions Were Unlawful.

The 340B statute requires HRSA to "develop and implement a process for the certification of" STD subgrantees that apply to become 340B-eligible. 42 U.S.C. § 256b(a)(7)(A). As Plaintiffs explained (at 18-23), HRSA has done neither.

#### 1. The 340B Statute Requires HRSA to Meaningfully Assess Eligibility When Certifying and Recertifying STD Covered Entities.

HRSA first asserts (at 10) that it retains "broad authority" to manage the certification and recertification process for STD subgrantees—suggesting that it may act with virtually unfettered discretion. Not so. The statute contemplates that HRSA shall "evaluat[e] the validity of the entity's subsequent purchases of covered outpatient drugs at discounted prices." 42 U.S.C. § 256b(a)(7)(B). To that end, Congress imposed clear, mandatory, and carefully delineated requirements on the agency when certifying and recertifying STD subgrantees: HRSA's certification process "*shall include* a requirement that an entity applying for certification under this paragraph *submit information to the Secretary* concerning the amount such entity expended for covered outpatient drugs in the preceding year." *Id.* (emphases added). The statute goes further still, requiring that "the certification process developed by the Secretary under subparagraph (A) *shall include* procedures under which each State shall … prepare and submit a report to the Secretary that contains a list of" STD subgrantee entities "that are located in the State." *Id.* § 256b(a)(7)(D) (emphasis added). And the statute adds that, for *re*certification, the Secretary "*shall require* that such entities submit information to the Secretary to permit the Secretary *to evaluate the validity* of subsequent purchases by such entities in the same manner as" at the time of initial certification. *Id.* § 256b(a)(7)(E) (emphases added). Taken together, these provisions leave no doubt that Congress set clear and

specific mandates for the agency—not broad and permissive guidelines subject to agency discretion. *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *Cook v. FDA*, 733 F.3d 1, 7-8 (D.C. Cir. 2013) (similar).

**2. HRSA Has No Statutorily Permissible Certification Process.**

HRSA candidly admits that it *does not* "evaluate the validity" of covered entity purchases, collect any purchase data, or require the submission of "a list of" STD subgrantees "that are located in [each] State" when the agency certifies or recertifies STD covered entities. 42 U.S.C. § 256b(a)(7)(B), (D), (E); *see* HRSA MSJ 11-12. To the contrary, it points to nothing either in agency publications that have been made available to manufacturers or even in internal agency documents that embody the purported certification "process in place today." HRSA MSJ 9. That failure compels a determination that the agency has failed to fulfill its statutory certification duties.

Instead, HRSA (joined by Intervenor) suggests that the agency *initially* satisfied its responsibilities under Subparagraph (a)(7)(A) via a 1993 guidance document. *Id.* (citing 58 Fed Reg. 27,289 (May 7, 1993)); Intervenor MSJ, ECF 39, at 39-40 (same). But neither party engages with the actual text of that guidance. There is a reason for this drive-by treatment: Nothing in the 1993 guidance speaks to the agency's eligibility review of STD covered entities, let alone to how HRSA intends to "evaluate the validity" of purchases based on data it collects from those entities. Amgen_AR_9-14, 17-21. While the guidance shows HRSA understood, in 1993 at least, that Congress instructed it to establish a robust certification process, the guidance itself does little more than parrot the statute. Amgen_AR_9-10, 17-21. Instead, it merely mentions an unspecified protocol for having a State "certify the accuracy of the list" of covered entities that HRSA prepares. Amgen_AR_18. It then notes in passing that HRSA's "criteria for eligibility" may "*include* State certification," Amgen_AR_18 (emphasis added)—but never spells out the criteria HRSA will apply

when certifying and recertifying STD subgrantees. Amgen_AR_9-14, 17-21 (emphasis added). The guidance thus does not fulfill HRSA's obligation under Subparagraph (a)(7)(A) to develop a process for certification and recertification of STD subgrantees—much less its obligation to implement such a process. At minimum, the statute demands that process must include a review of "purchase" information submitted by STD entities to ensure eligibility, as well as a "report" from each State "that contains a list of" those entities "that are located in the State." 42 U.S.C. § 256b(a)(7)(B), (D) (certification); *see id.* § 256b(a)(4), (7)(E) (recertification).

Some daylight then emerges between HRSA and Intervenor. Intervenor assiduously defends the 1993 guidance (at 40) as "satisfy[ing] each component of § 256b(a)(7)" and describes it as "consistent with" HRSA's current practice, going so far as to declare (at 41) that "[t]he Secretary's certification and recertification framework for STD clinics has remained materially consistent since it was first articulated in 1993." Not according to HRSA. As the agency explains (at 10), although "HRSA provided its certification process to manufacturers in 1993," there is a *different* "modern process in place today." HRSA then admits, citing a sworn affidavit from the agency's Office of Pharmacy Affairs, that "[c]ertification procedures have since been modified to the process in place today." HRSA MSJ 9 (citing Britton Decl. ¶ 11). Even if the 1993 guidance had once been sufficient—though it most certainly was not—it has since been superseded.

To the extent a discernible "process" currently governs HRSA's certifications and recertifications at all, that process conflicts with the statute's plain text in multiple respects. Indeed, the agency openly acknowledges the many ways in which it has failed to fulfill its statutory duties.

***First***, under Subparagraph (a)(7)(A), HRSA must "develop and implement a process for the certification of [STD] entities." Yet as this Court observed in litigation brought by Sagebrush, HRSA's "[c]ertification" framework is "rather cursory." *Sagebrush Health Servs.*, 2026 WL

1130313, at *2. So cursory, in fact, that even the Sagebrush entities whose 340B eligibility was under active investigation by HRSA were recertified as a matter of course. *Id.* As the Court put it, "[c]overed entities upload documentation and assert that it shows they are eligible, and HRSA basically takes their word for it." *Id.* Agency counsel explained that STD subgrantees like Sagebrush simply "self-attest that they meet the statutory requirements," adding for good measure that "[i]t's somewhat automatic that after you attest that the information is correct and accurate, the certification goes through." *Id.* (citations omitted). Having instructed HRSA to "develop and implement a process for … certification" of the covered entity types most at risk of abuse, 42 U.S.C. § 256b(a)(7)(A), Congress obviously did not contemplate that the agency would solely rely on an entity's self-attestation of eligibility uploaded to HRSA's Office of Pharmacy Affairs Information System (OPAIS)—with "automatic" certification thereafter.

***Second***, under Subparagraph (a)(7)(B), "[t]he process developed under subparagraph (A) shall include a requirement that an entity applying for certification under this paragraph submit [purchase] information to the Secretary." Yet the agency admits that, "[a]t present, HRSA *does not* request information from covered entities or States regarding the amount a covered entity expended for covered outpatient drugs in the preceding year." Britton Decl. ¶ 12 (emphasis added). Instead, it claims in a declaration that it delegates to a for-profit third-party vendor, Apexus, the task of gathering "information about the total amount that a covered entity has expended on covered outpatient drugs on a quarterly basis." *Id.* ¶ 11; *see* HRSA MSJ 9. Nothing in the administrative record supports that assertion, and so it cannot sustain the agency's actions. In any event, HRSA's failure to require covered entities to submit drug purchase information *to the Secretary* in itself renders the certification process unlawful.

To be sure, Section 340B separately authorizes the agency to "establish a prime vendor program under which covered entities may enter into contracts with prime vendors for the distribution of covered outpatient drugs." 42 U.S.C. § 256b(a)(8). But the statute gives the prime vendor no role in the required collection of drug-purchase information from STD entities or in assessing those entities' 340B eligibility during the certification process. That role is assigned solely to the agency. *Compare id.* § 256b(a)(7)(A), (C), (E) (setting out responsibilities that the Secretary must undertake), *with id.* § 256b(a)(8) (directing the Secretary to partner with a prime vendor). Indeed, the agency's statement that Apexus gathers purchase data for *all* 340B covered entities *generally*—rather than for STD subgrantees in particular, in light of the requirements that uniquely apply to them—further underscores the degree to which HRSA has neglected its Subsection (a)(7)(B) STD grantee obligations. Moreover, the agency's publications make clear that even Apexus does not gather purchase information on "all 340B transactions." HRSA, *2024 340B Covered Entity Purchases*, *supra*.

HRSA's abdication of its statutory duties extends beyond its reliance on a non-governmental entity to perform tasks assigned to the agency itself. The agency's declarant does not claim that HRSA actually *employs* the data collected by its vendor to carry out its duty to "evaluat[e] the validity" of STD subgrantees' purchases when certifying and recertifying them. *See* Britton Decl. ¶ 7. Nor is there any evidence in the administrative record that it does so. Indeed, the record contains no drug purchase information whatsoever or any indication that HRSA considered the data it asserts that Apexus collected. So HRSA's "process for the certification of [STD] entities" apparently amounts to: Require Apexus to collect purchase data, then ignore it.

***Third***, under Subparagraph (a)(7)(D), the agency's certification must "include procedures under which each State shall … prepare and submit a report to the Secretary that contains a list of"

STD subgrantees "that are located in the State." Yet the agency admits (at 11) "that it does not require State health departments to compile a list of entities receiving Section 318 funds." Instead, HRSA sends emails to state public health departments after an entity claims 340B eligibility, asking their employees to confirm whether a particular covered entity "receive[d] funding," was "part of [the state's] 340B program," or "receive[d] in-kind support." Amgen_AR_13409, 13412, 13447, 13528, 13604, 13681; *see* HRSA MSJ 9; Britton Decl. ¶¶ 6-7. And HRSA allows STD entities to *self*-attest as to the accuracy of any information entered in OPAIS, which the agency also does not independently verify. HRSA MSJ 10. This is the *only* information that HRSA apparently requires STD subgrantees to provide to demonstrate their 340B eligibility.

***Fourth***, under Subparagraph (a)(7)(E), the agency "shall require the recertification of [STD] entities … on a not more frequent than annual basis, and shall require that such entities submit information … to permit the Secretary to evaluate the validity of subsequent purchases." Yet HRSA says nearly nothing about its recertification process. The agency cites the relevant provision just once, for the proposition that Congress included it in the statute. HRSA MSJ 6 (citing 42 U.S.C. § 256b(a)(7)(E)). Its declarant says only that an entity "must attest" to its continuing eligibility (simply by signing a statement that "the covered entity will meet all 340B Program eligibility requirements")—again relying on entities to evaluate their own eligibility. Britton Decl. ¶¶ 7-8. And the agency says nothing about whether recertification includes "evaluat[ing] the validity of subsequent purchases."

### 3. Legislative History and Statutory Purpose Cannot Justify HRSA's Actions.

HRSA and Intervenor's remaining attempts to defend the agency are equally unavailing. Intervenor argues (at 41-42) that Congress's inaction has somehow transformed HRSA's persistent statutory violations into permissible agency practice. But while courts have "sometimes relied on congressional acquiescence when there is evidence that Congress considered and rejected the

'*precise* issue' presented before the Court," that is hardly the default rule. *Rapanos v. United States*, 547 U.S. 715, 750 (2006). In fact, "absent such *overwhelming evidence* of acquiescence, [courts] are loath to replace the plain text and original understanding of a statute with an amended agency interpretation." *Id.* (brackets and citation omitted); *see Telesat Canada v. FCC*, 999 F.3d 707, 712 (D.C. Cir. 2021) ("Congressional silence does not imply acquiescence absent additional indications of ratification."). Here, there is no evidence—much less the overwhelming evidence required—that Congress was even aware of HRSA's Section 256b(a)(7) noncompliance, let alone that it deliberately acquiesced in the agency's cavalier approach to certifying and recertifying STD subgrantees. To the contrary, because the agency has never published any document setting forth what it calls its current certification "process," Congress would never have known the extent of the agency's noncompliance until it was revealed in litigation.

Finally, HRSA and its amicus ask this Court to override the statutory text, relying instead on purported statutory purpose. HRSA MSJ 2, 15; Amicus Br., ECF 40-1, at 3. But legislative history plays a supporting role in the interpretive enterprise "only to the extent [legislative materials] shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). Because the 340B statute clearly requires HRSA to develop criteria for assessing STD grantees' eligibility, legislative history is irrelevant; courts "do not resort to legislative history to cloud" an unambiguous statute's plain terms. *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 383 (D.C. Cir. 2021) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994)).

In any event, the legislative history here helps *Plaintiffs*, not HRSA. The final legislation reflected a compromise between a version that would have applied the certification and recertification requirements to all 340B covered entities, and another that contained no certification

requirement at all. *See* 138 Cong. Rec. S17899 (Oct. 8, 1992). Congress's choice to impose heightened certification requirements for only two types of covered entity—including the STD covered entities at issue here—balances 340B program access against the need for meaningful (and actual) supervision of those covered entities that present the greatest risk for program abuse. *See* 42 U.S.C. § 256b(a)(4)(K); *id.* § 256b(a)(7)(A).

### B. HRSA's Certification—Absent Making the Certification Criteria Available to Manufacturers—Was Contrary to Law.

As Plaintiffs have explained (at 23-24), HRSA independently violated Subsection (a)(7)(C) by failing to make "a description of the criteria for certification under this paragraph" available to manufacturers participating in the 340B program.

The agency responds (at 10) that manufacturers have "digital access to the modern process in place today"—which it clarifies to mean that manufacturers (like any member of the public) may view self-reported covered entity information "via OPAIS." That is no answer to Plaintiffs' claim. Recall that OPAIS covers *all* 340B covered entities, not just the STD subgrantees that Congress subjected to heightened agency review. Accordingly, the OPAIS database says nothing about the criteria or process that HRSA applies in certifying STD clinics. OPAIS data represents the *output* of the agency's decision whether to certify an entity, not a "description of the criteria for certification." 42 U.S.C. § 256b(a)(7)(C). The agency's failure to appreciate this distinction only underscores the gravity of its statutory violations.

Intervenor's separate defenses of HRSA's action (at 43-45) are similarly unavailing. The issue here is not the *manner* in which HRSA made public its criteria; the problem is that the agency never even attempted to set out HRSA's criteria for certifying and recertifying STD subgrantees anywhere that was publicly visible. The materials that Intervenor cites—a Dear Manufacturer letter, a Federal Register notice, and the OPAIS database—do nothing more than recharacterize

the statutory scheme or reflect the outcome of certification. And any descriptive value the agency's guidance documents might have once held for manufacturers is now nonexistent, because HRSA itself has explained repeatedly that the certification process described in those materials *is no longer the agency's process*. *See* pp. 5-6, *supra*.

## II. HRSA's Certification Decisions Were Contrary to Law Because the Sagebrush Entities Were Ineligible on Multiple Grounds.

### A. HRSA's Certification of Sagebrush Entities that Have Unlawfully Diverted 340B Drugs Was Contrary to Law.

#### 1. Non-Diversion Is an Express Requirement for 340B-Program Eligibility.

The eligibility requirements in Section 256b(a)(4) could not be clearer: "In this section, the term 'covered entity' means an entity that meets the requirements described in paragraph (5) and is one of [the types of entities enumerated in the statute]." An entity thus qualifies as a covered entity *only* if it "meets the requirements described in paragraph [a](5)." Paragraph (a)(5), in turn, sets forth the statutory prohibition against diversion of 340B drugs. *See* 42 U.S.C. § 256b(a)(5)(B) ("With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity."). As a result, if an entity diverts 340B drugs to non-patients, then it *does not* "meet[] the requirements described in paragraph [a](5)," and hence it *is not* a "covered entity." HRSA's assertion (at 17) that this express eligibility requirement appears "[n]owhere on the face of the statute" is plain wrong. Indeed, Section 340B places the non-diversion eligibility requirement on exactly the same statutory footing as the requirement that an STD covered entity must be "receiving funds under [a federal STD grant]." 42 U.S.C. § 256b(a)(4). Both are part of what "the term 'covered entity' means" under the statute's definition of that term. *Id.*

HRSA complains (at 17) that assessing this eligibility requirement for STD entities would be "administratively difficult." But that is the gatekeeping function that Congress has assigned to

the agency. It is also an important one, given that HRSA is not playing with government money: Billions of non-federal dollars are at stake. *See* HRSA, *2024 340B Covered Entity Purchases*, *supra* ($2.2 billion in aggregate 340B purchases by STD entities in 2024). Recognizing that STD covered entities present a particularly acute risk of program abuse, Congress charged HRSA to certify and regularly recertify them: An entity receiving federal STD grant funds is eligible "only if the entity is certified by the Secretary pursuant to paragraph [a](7)." 42 U.S.C. § 256b(a)(4)(K). Notably, Congress imposed this heightened certification responsibility on HRSA with respect to only two of the fifteen covered entity types. *See id.* § 256b(a)(4)(J)-(K).

Subparagraph (a)(7) itself confirms HRSA's certification procedures must account for diversion. The certification process "shall include a requirement that an entity applying for certification under this paragraph submit information to the Secretary concerning the amount such entity expended for covered outpatient drugs in the preceding year so as to assist the Secretary in evaluating the validity of the entity's subsequent purchases of covered outpatient drugs at discounted prices." *Id.* § 256b(a)(7)(B). And for recertifications, the agency "shall require that such entities submit information to the Secretary to permit the Secretary to evaluate the validity of subsequent purchases by such entities in the same manner as that required under subparagraph [(a)(7)](B)." *Id.* § 256b(a)(7)(E). In so providing, Congress sought to equip HRSA to "evaluate the validity of subsequent purchases"—*i.e.*, to assess diversion—in the course of making its recertification decisions. Indeed, the requirement to gather drug-purchase information would serve no purpose within the certification process if diversion had no bearing on eligibility. That this statutorily mandated task might be difficult (though HRSA offers no evidence that it would be) is no excuse for HRSA to disregard it.

Contrary to Intervenor's assertion (at 22), the statute's audit provisions plainly supplement, rather than supplant, this statutory requirement to certify that STD covered entities are not engaged in diversion. First, the audit provisions apply to *all* covered entities, whereas the certification requirements apply only to those (including STD entities) listed in Subsections (a)(4)(J) and (K). Second, the statute tells HRSA to require recertification "on a not more frequent than annual basis." 42 U.S.C. § 256b(a)(7)(E). By contrast, the audit process permits HRSA to take action against covered entities based on their present eligibility at any time—*i.e.*, *outside* the recertification process—ensuring that manufacturers do not bear the costs of unlawful diversion for a year or more between recertifications. Third, the consequences to a covered entity of failing an audit are different from being found ineligible for recertification. When an audit reveals substantial diversion, HRSA may impose various "sanctions": for a knowing and intentional violation, requiring the covered entity "to pay a monetary penalty to a manufacturer," *id.* § 256b(d)(2)(B)(v)(I); for a "systematic and egregious" violation, "disqualifying the entity from re-entry into [the] program for a reasonable period to be determined by the Secretary," *id.* § 256b(d)(2)(B)(v)(II); and for other serious violations, "[r]eferring matters to appropriate Federal authorities," § 256b(d)(2)(B)(v)(III). The sanctions available following an audit thus serve a punitive role. The requirement to recertify a covered entity only if it "meets the requirements" of the non-diversion provision, by contrast, is mandatory and concerns threshold eligibility.

**2. The Sagebrush Entities Engage in Disqualifying Diversion by Purchasing 340B Drugs Unrelated to STD Treatment or Prevention.**

To qualify as an STD covered entity, an entity must "receiv[e] funds under [42 U.S.C.] section 247c … relating to treatment of sexually transmitted diseases"; must be "certified by the Secretary" of the Department of Health and Human Services (HHS); and must not "resell or otherwise transfer [discounted] drug[s] to a person who is not a patient of the entity." 42 U.S.C.

§ 256b(a)(4)(K), (a)(5)(B). Under HRSA's longstanding guidance, individuals are not patients of an STD clinic—and therefore not 340B-eligible—unless they have "established a relationship" with the entity and "receive[ ] a health care service or range of services … which is consistent with the service or range of services for which" the STD grant was provided. 61 Fed. Reg. 55,156, 55,157-58 (Oct. 24, 1996).

Despite these requirements, the agency does not dispute that Sagebrush registered—and HRSA certified—entities that regularly offer services and prescribe medication wholly unrelated to STD treatment or prevention. HRSA MSJ 14-15. Because these entities access 340B-disounted medicines for conditions unrelated to STDs, *see* Amgen_AR_13172, their patients do not receive services consistent with the scope of a grant "relating to treatment of sexually transmitted diseases." 42 U.S.C. § 256b(a)(4)(K). When an entity claims 340B pricing on patient prescriptions outside the scope of grant funding, it necessarily diverts the discounted drugs to individuals who are not "patient[s] of the entity." HRSA offers several arguments to sidestep this plain reading of the text and its own longstanding guidance. None is persuasive.

***First,*** the agency argues (at 14) that the 340B statute contains no "limitation on the types of drugs dispensed"; rather, it only "defines" covered entities. But the covered entity definition *itself* contains the essential limitation: An entity that sells discounted drugs to non-patients cannot qualify as a covered entity under the statute. 42 U.S.C. § 256b(a)(4) (limiting definition of "covered entity" to "an entity that meets the requirements described in paragraph (5)"); *id.* § 256b(a)(5)(B) (prohibiting resale of drugs to non-patients). When 340B eligibility is based on a federal grant, HRSA has long instructed that the line between patients and non-patients turns on whether "the individual receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding … has been

provided to the entity." 61 Fed. Reg. at 55,157-58. Entities treating conditions entirely unrelated to STDs—like the rheumatology, dermatology, and oncology practices here—are accordingly *not* operating as 340B eligible STD clinics.

The agency (at 14-15) and Intervenor (at 26-28) insist that HRSA "d[id] not consider a limitation on which *drug products* a covered entity may purchase to be a reasonable component of the definition of covered entity 'patient.'" *Id*. (quoting 61 Fed. Reg. at 55,157) (emphasis added). But the agency has never suggested that STD entities are free to purchase discounted drugs unconnected to any medical service for which grant funding was provided. Rather, HRSA informs STD clinics that they may "purchase and dispense" 340B drugs "associated with a service for which the covered entity is responsible, including contraceptives" but *only* "to the extent it aligns with [the] patient definition and is consistent with the scope of the grant." HRSA, 340B FAQs, https://www.hrsa.gov/opa/faqs. The agency (at 15) faults Plaintiffs for citing HRSA's FAQs instead of the patient definition, but the scope-of-the-grant requirement comes from that patient definition: Only individuals "receiv[ing] a health care service or range of services" from a covered entity "consistent with … grant funding" are considered "'patient[s]' of [the] covered entity." 61 Fed. Reg. at 55,157. HRSA's contrary interpretation would read the scope-of-the-grant test out of its own patient definition.

Intervenor further argues (at 28-29) that interpreting the scope-of-the-grant limitation as applying to particular health care services—as HRSA's guidance expressly does, *see* 61 Fed. Reg. at 55,157—would cause "practical hardships." This policy argument is better directed toward Congress. *See Ass'n of Civilian Technicians, Wichita Air Capitol Chapter v. FLRA*, 360 F.3d 195, 200 (D.C. Cir. 2004). In any event, the agency's announced test is a simple one to apply given that all prescription drugs, including drugs that treat STDs, already include comprehensive prescribing

information indicating the conditions that they are approved to treat. *See* 21 U.S.C. § 355; 21 C.F.R. §§ 201.56-57. As Plaintiffs have explained, *none* of their drug products are indicated for the treatment or prevention of STDs. *See* Plfs. MSJ 27. Thus, even if the scope-of-the-grant requirement applied on a per-patient basis—rather than a per-drug basis—the rheumatology, dermatology, and oncology patients being seen at the for-profit Sagebrush entities *still* would not be "receiv[ing] a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding … has been provided," 61 Fed. Reg. at 55,157-58; namely, STD treatment and prevention.

HRSA next asserts (at 14-15) that the Secretary's obligation to "develop and implement a process for the certification" of STD clinics, 42 U.S.C. § 256b(a)(7)(A), excludes determining whether the entity is making purchases within the scope of an STD grant. That assertion is remarkable. The 340B statute *specifically* directs the agency to "evaluate the validity" of an STD clinic's purchases of covered outpatient drugs, both at certification upfront and at recertification. *Id.* § 256b(a)(7)(E); *see id.* § 256b(a)(7)(B). This language imposes a heightened burden on HRSA to confirm that an STD clinic's purchases of discounted drugs actually align with the statutory requirements that Congress chose to impose, including the anti-diversion provision. *See id.* § 256b(a)(5)(B).

Yet, as HRSA does not dispute (at 14-16), the agency made no effort to determine whether the 340B purchases for the Sagebrush entities at issue were "consistent with the service or range of services" for which the STD grant funding was provided. 61 Fed. Reg. at 55,157. To the contrary, the evidence before the agency made clear that Sagebrush would purchase 340B drugs for patients at "infusion-based specialty clinics, such as Infectious Disease, Rheumatology, Neurology, Nephrology, Cardiology, Gastroenterology, Oncology, and other applicable

specialties," Amgen_AR_13172—practices wholly unrelated to STD treatment or prevention. Nor did the agency review the purchase information that the 340B statute expressly requires it to collect, which would have shown that none of the medications the Sagebrush entities purchased from Plaintiffs are used to treat or prevent STDs. Indeed, Plaintiffs manufacture no such medications.

HRSA has no meaningful response to these concerns. It merely asserts (at 15) that complying with the patient definition would be at odds with the 340B statute's purpose to stretch federal resources as far as possible. But "no statute pursues any single purpose at all costs." *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 368 (2025) (cleaned up). Section 340B's limitations—including the diversion prohibition—are as much a part of Congress's objectives as the statute's drug discount requirement, and there is no legal basis to favor one of those statutory objectives at the expense of all others. *See, e.g.*, *PhRMA v. McCuskey*, 171 F.4th 675, 684 (4th Cir. 2026) ("[T]hese lucrative discounts are not a free-for-all at the manufacturers' expense."). Consistent with this understanding, HRSA has long interpreted the anti-diversion prohibition to apply to individuals seeking care inconsistent with the scope of "services" for which STD grant funding was provided. 61 Fed. Reg. at 55,157; *accord* HRSA, 340B FAQs, *supra*. HRSA's decision to certify and recertify, as STD clinics, entities that routinely claim discounts unrelated to treating STDs disregards this limitation. Those decisions are accordingly arbitrary, capricious, and contrary to law.

**3. The Sagebrush Entities Engage in Disqualifying Diversion by Steering 340B Drugs to Purported Affiliate Practices.**

Even apart from whether individuals prescribed 340B-priced drugs unrelated to STDs can ever qualify as "patients" of an STD covered entity, extensive record evidence demonstrates that the Sagebrush entities at issue *here* unlawfully divert 340B drugs as a matter of course. As set

forth at length in Plaintiffs' motion for summary judgment, Sagebrush's contracts with its purported affiliates outline a scheme of systematic drug diversion for the express purpose of obtaining 340B-priced drugs for medical practices that are ineligible to receive them. *See* Plfs. MSJ 8-11, 29-31. While these rheumatology, dermatology, and oncology practices bear sole responsibility for patient care—including prescribing the 340B drugs that Sagebrush purchases at steep discounts—Sagebrush obtains 340B drugs in its own name as the covered entity, hands them off to the purported affiliate, and pockets the 340B profits. That is textbook diversion.

Ignoring the administrative record on this point, HRSA dismisses (at 18) these "diversion concerns" as "speculation." But Sagebrush's contracts expressly call for Sagebrush—the supposed STD covered entity—to "provide or arrange for the provision of those 340B Drugs to [an] Affiliate" for the purported non-STD affiliate to administer to the affiliate's own non-STD patients. Amgen_AR_13212. These are drugs for which the purported affiliate handles "prescription and administration." Amgen_AR_13208-10. Indeed, the affiliate "retains responsibility for the performance of all Professional Services," none of which relate to the treatment of STDs. Amgen_AR_13211. Sagebrush Health Services—despite calling itself the "Covered Entity," Amgen_AR_13222; *see* Amgen_AR_13208—lacks authority "to exercise any control or discretion over any Practitioner's professional judgment" or to prescribe "340B Drugs" to patients directly. Amgen_AR_13212.

HRSA's attempt to explain away the diversion here is unpersuasive. First, HRSA observes (at 18) that "Healthnomic Partners LLC is not one of the clinics or certifications included in the complaint." But that is precisely the point. Healthnomic has never been certified as a covered entity and is plainly ineligible because the medical practices it operates receive no STD grant funds and provide no services related to STDs. Sagebrush is the supposed covered entity; yet it diverts the

340B drugs that it purchases to Healthnomic, which Healthnomic in turn administers to its rheumatology, dermatology, and oncology patients.

Second, HRSA asserts (at 18) that agency "guidance recognizes that healthcare is often provided through complex arrangements between different medical providers." Yet that same guidance makes clear that even under such arrangements, "responsibility for care provided … must remain with the covered entity." 61 Fed. Reg. at 55,157. Here, Sagebrush's contracts expressly disclaim that responsibility: Healthnomic "retains responsibility for the performance of all Professional Services." Amgen_AR_13211.

HRSA also asserts (at 19) that while a mere self-attestation is enough to certify a covered entity, "Congress required much for HRSA to remove a covered entity from the 340B program." That position turns the 340B statute on its head. Congress charged HRSA with certifying and recertifying only those entities eligible for the program, which requires (among other things) compliance with the statute's non-diversion provisions. Because—as the record makes clear—the Sagebrush entities systematically divert drugs to persons who are not their patients, those entities are ineligible, and HRSA's certifications and recertifications of those entities were contrary to law.

### B. HRSA's Certification of Entities that Receive Support Only as Sub-subgrantees of Other Certified Entities Was Contrary to Law.

To qualify as an STD covered entity, the entity must be "receiving funds under [a federal STD grant] through a State or unit of local government." 42 U.S.C. § 256b(a)(4)(K). HRSA does not dispute that an entity receiving grant funds only indirectly through another subgrantee, rather than "through a State or unit of local government," is ineligible as an STD covered entity. Instead, HRSA asserts (at 19) it does not certify sub-subgrantees and, for that reason, it "took action to remove the Sagebrush sites that claimed program eligibility based on [a] grant but were not listed

as individual grant recipients." HRSA asserts (at 19) that it reinstated several of the entities when Sagebrush "obtained an amended notice of award that listed each Sagebrush site individually."

At the outset, even under HRSA's characterization of the record, the Nevada Sagebrush entities were plainly ineligible before Sagebrush "obtained an amended notice of award that listed each Sagebrush site individually," *id.*—apparently a reference to the 2023 Nevada award. *See* Amgen_AR_13333-39. The agency thus effectively concedes that Rainbow Rheumatology was ineligible when HRSA first certified it effective January 1, 2022; that Eastern Rheumatology was ineligible when HRSA first certified it effective January 1, 2022; that Fire Mesa ID was ineligible when HRSA first certified it effective January 1, 2022; and that Hummingbird Medical Group was ineligible when HRSA first certified it effective November 29, 2022. *See* Plfs. MSJ 13-15. Absent any record evidence that these entities received funding through a State or unit of local government prior to 2023, the Court should hold that these entities were unlawfully certified as ineligible sub-subgrantees and set their 2022 certifications aside. There is no legal or factual dispute as to these certifications, which continue to injure Plaintiffs by allowing those entities to retain 340B profits to which they were not entitled and which further underscore HRSA's failure to perform its statutory obligations.

But the defect in HRSA's position is much more fundamental. The agency's single-paragraph treatment of the sub-subgrantee issue misunderstands both the record evidence and Plaintiffs' claim. The subawards that Nevada's Department of Health and Human Services issued for 2023 and later years do not list as recipients the Sagebrush entities whose certifications Plaintiffs challenge. They list only a single "Subrecipient": "Sagebrush Health Service [sic]." Amgen_AR_13334, 13351. Thus, Sagebrush Health Services itself is the only subgrantee even arguably receiving support "through a State or unit of local government" pursuant to these

subawards. 42 U.S.C. § 256b(a)(4)(K). Other Nevada Sagebrush entities, which receive support like condoms only indirectly through Sagebrush Health Services, are *sub*-subgrantees. The 340B statute does not allow one covered entity to bootstrap its own eligibility into eligibility for an indefinite—and potentially infinite—number of other entities.

To be sure, the Nevada subawards also list the "locations" of various purported Sagebrush clinics that fall within the "[s]cope of work" that Sagebrush Health Services supposedly provides. *E.g.*, Amgen_AR_13339. But the 340B statute authorizes the certification of "entities," not addresses. 42 U.S.C. § 256b(a)(4). The fact that a subaward lists various "site[s]" at which a subgrantee may provide services under the subaward, HRSA MSJ 19, does not transform *other* entities that operate at those locations into 340B-eligible STD clinics. Here, such other entities do not receive "funds … through a State or unit of local government," 42 U.S.C. § 256b(a)(4)(K); they receive only the indirect support that Sagebrush Health Services—the named subgrant recipient—purports to provide them. Even worse, for the 2024-2025 grant period, there is no record that any entity certified by HRSA received any part of these grant funds: Sagebrush Health Services instead spent the grant money on marketing materials, including "Neon Sunglasses" and "Mardi Gras Beads." *See* Amgen_AR_12355-60 (documenting requests for reimbursement).

Indeed, Section 340B itself requires distinguishing between subgrantees and other separately incorporated entities (here, the Sagebrush sub-subgrantees). Congress made clear that covered entities must be defined narrowly: Even certification of a "distinct part of a hospital" as a covered entity does not confer eligibility on the hospital as a whole. 42 U.S.C. § 256b(a)(6). In light of that limitation, Congress could not have intended that a single named subgrant recipient could extend its eligibility to cover 19 other entities by providing them with $32 worth of condoms each. *See* Plfs. MSJ 9. Nothing in the 340B statute supports that absurd reading.

An interpretation that would allow a subgrantee like Sagebrush to confer eligibility on separate entities merely by listing them as affiliated "sites" also contravenes HRSA's own guidelines. Those guidelines already address the eligibility of separate outpatient facilities: HRSA has prescribed specific requirements governing the certification of so-called "child sites." Among other things, for outpatient facilities to claim 340B eligibility based on a hospital's status as a covered entity, those facilities must at the very least demonstrate that they "are included in [the hospital's] Medicare cost report" and thus, in HRSA's view, form "an integral part of the 'hospital.'" 59 Fed. Reg. 47,884, 47,886 (Sept. 19, 1994). While Plaintiffs disagree with HRSA that the agency's child-site guidelines applicable to hospitals comport with the 340B statute, those guidelines reflect HRSA's longstanding view that mere association with another entity is insufficient on its own to confer 340B-program eligibility. In essence, HRSA has allowed Sagebrush to obtain 340B coverage for separate outpatient sites without satisfying even the minimal eligibility requirements that HRSA's own guidelines prescribe for such sites. Taken to its logical conclusion, HRSA's approach to certification would allow Sagebrush to transform any (and every) medical practice in the country into a covered entity simply by providing it condoms.

None of the Nevada Sagebrush entities at issue here is the recipient of any Nevada STD subaward, and each receives support—if at all—only indirectly through Sagebrush Health Services. Thus, none of the Sagebrush entities receives funds "through a State or unit of local government," as the 340B statute requires as a condition of eligibility for an STD clinic. 42 U.S.C. § 256b(a)(4)(K). Those entities are accordingly ineligible sub-subgrantees, and HRSA's certifications and recertifications of those entities were contrary to law.

### C. HRSA's Certification of Entities Receiving Only In-Kind Contributions, Rather than "Funds," Was Contrary to Law.

HRSA does not dispute that many of the for-profit Sagebrush entities at issue received only *de minimis* in-kind contributions in the form of condoms or STD test kits, often second-hand from other subgrantees, rather than "funds" as the 340B statute requires for eligibility. 42 U.S.C. § 256b(a)(4)(K); *see* HRSA MSJ 13-14; Plfs. MSJ 12-17; Amgen_AR_13372, 13414 (showing that sole grant support to Connecticut Sagebrush entities was HIV test kits); Amgen_AR_13167, 13191 (showing that only "Sagebrush Health Service" received funds from Nevada, which it used to purchase "Condoms $100/ box for 6 boxes" and apparently distributed to other Sagebrush entities). "Funds" means "money." *Funds*, Cambridge Dictionary. Neither condoms nor STD test kits are "funds."

HRSA and Intervenor fail to offer any competing definition of the word "funds." Instead, both point to definitions of *a* "fund," which they contend can encompass "other liquid assets" or "other resources whose principal or interest is set apart for a specific objective." HRSA MSJ 13 (first quotation) (quoting *Fund*, Black's Law Dictionary (12th ed. 2024)); Intervenor MSJ 33 (second quotation) (quoting *Fund*, Merriam-Webster Law Dictionary, https://www.merriam-webster.com/dictionary/fund). But "receiving funds" is different from "receiving *a* fund." The former is the phrase that someone would use when describing a bank transfer; the latter has the different connotation of resources "set apart for a specific objective." *See United States v. Murgio*, 209 F. Supp. 3d 698, 708-09 (S.D.N.Y. 2016) (describing as "error" a litigant's reliance on "the definition of 'fund,' singular," when trying to interpret the statutory term "'funds'"). Regardless, HRSA and Intervenor's definitions confirm that the term refers to fungible assets that function as a medium of exchange equivalent to money. Condoms and STD test kits are *not* "liquid assets";

nor are they resources that have a "principal" or that accrue "interest." No one could—with a straight face—refer to the receipt of condoms or STD test kits as "receiving funds."

The 340B statute's structure confirms this commonsense interpretation. HRSA and Intervenor contend that STD covered entities are "grant" recipients, and grants can sometimes encompass in-kind assistance, so the term "funds" should be read here to include more than just money. But the 340B statute does not require that an STD covered entity must receive a "grant." Instead, it expressly requires that that an STD covered entity must be "receiving *funds*" under a federal STD grant. 42 U.S.C. § 256b(a)(4)(K) (emphasis added). That makes the provision different from other covered entity categories, which condition eligibility on the receipt of "grants" or "assistance." *See id.* § 256b(a)(4)(B) ("entity receiving a grant under section 256a"), *id.* § 256b(a)(4)(C) ("family planning project receiving a grant or contract under section 300"), *id.* § 256b(a)(4)(D) ("entity receiving a grant under subpart II"), *and id.* § 256b(a)(4)(J) ("entity receiving assistance under subchapter XXIV").

That choice of different language is significant. As the Supreme Court has held, "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (quoting 2A Singer, *Statutes & Statutory Construction* § 46:06 (6th rev. ed. 2000)); *see City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 344 (2025); *Gallardo v. Marstiller*, 596 U.S. 420, 431 (2022); *Russello v. United States*, 464 U.S. 16, 23 (1983). Neither HRSA nor Intervenor offers any explanation for Congress's choice of the word "funds" when describing the type of support required for STD covered entities, while using "grants" or "assistance" for other covered entity types. This Court must "give effect to" that textual choice. *Gallardo*, 596 U.S. at 431.

In addition, the cross-referenced section, 42 U.S.C. § 247c(e)(4), which defines the relevant STD grants, makes clear that even the term "grant" in this context means only money. That section permits the Secretary to "reduce such grant by the fair market value of any supplies or equipment furnished" to the recipient. Intervenor argues (at 34-35) that this language implies that "grant" can be used interchangeably with "supplies or equipment." But the text again compels the opposite conclusion: "Supplies or equipment" are *not* the "grant." Instead, the statute expressly distinguishes the "grant"—*i.e.*, money—from the "supplies or equipment" whose fair market value must be deducted from the grant. 42 U.S.C. § 247c(e)(4). Indeed, the instruction to "reduce such grant by the fair market value of supplies or equipment" reinforces that the grant itself is a sum of money, with a clear monetary value that can be "reduce[d]." Meanwhile, supplies or equipment are not money, and instead must be converted to fair market value to be subtracted from a monetary grant. Intervenor further emphasizes (at 35-36) that HHS defines terms like "direct assistance" to include "non-monetary assistance." But that fact, too, makes Congress's considered choice to specify that STD covered entities must receive "funds," rather than "assistance," all the more notable.

Lacking support in either ordinary usage or statutory structure, Intervenor cites two cases (at 36) for the proposition that "funds" extends "beyond conventional currency." *See Murgio*, 209 F. Supp. 3d at 707; *United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014). But those cases in fact undermine Intervenor's argument further. As they explain, "[t]he ordinary meaning of 'funds' … is available *pecuniary* resources"—that is, "something generally accepted as a medium of exchange, a measure of value, or a means of payment." *Murgio*, 209 F. Supp. 3d at 707 (emphasis added and quotation marks omitted). At issue in both cases was whether bitcoin can count as "funds." The courts said yes because bitcoin "can be easily purchased in exchange for

ordinary currency, acts as a denominator of value, and is used to conduct financial transactions." *Faiella*, 39 F. Supp. 3d at 545. Needless to say, condoms and STD test kits are not mediums of exchange like bitcoin; do not act as a denominator of value; and are not used to conduct financial transactions. Nowhere does the 340B statute provide that these for-profit entities may bootstrap their way into the 340B program through *de minimis*, in-kind contributions. At bottom, HRSA and Intervenor can escape neither the everyday meaning of "funds" nor Congress's choice to require that STD entities—unlike most other covered entities—receive "funds" in order to qualify. HRSA's certifications and recertifications of Sagebrush entities receiving only in-kind contributions were thus contrary to law.

## III. HRSA's Certifications and Recertifications of the Sagebrush Entities Were Arbitrary and Capricious.

The challenged certifications and recertifications must also be set aside because those decisions were arbitrary and capricious. Neither HRSA nor Intervenor meaningfully addresses this claim, which Plaintiffs briefed at length. *See* Plfs. MSJ 36-39. And HRSA makes no attempt to defend its rubber-stamp approach to certification as compliant with the reasoned and reasonable decision-making the APA demands. As Plaintiffs explained in their motion for summary judgment, HRSA's certification and recertification decisions were arbitrary and capricious in numerous ways. At least two of those grounds would require vacating those decisions even if the Court were to side with HRSA on every disputed legal issue in this case.

***First***, HRSA's admitted reliance solely on covered entities' self-attestations to recertify their eligibility was arbitrary and capricious. The agency's explanation for doing so (at 11-12) is that "HRSA has no reason to believe that entities participating in a government program would lie or commit fraud to obtain program benefits"—a preposterous position considering the enormous financial incentive for entities to purchase 340B drugs that insurers reimburse at full price. But

that has it exactly backwards. The D.C. Circuit has expressly held that an agency's "unquestioning reliance" on the "self-serving views of the regulated entity" is "arbitrary and capricious." *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017) (cleaned up).

Indeed, HRSA acknowledges (at 12) that to "blindly adopt" an entity's self-serving eligibility assertions would fall short of the reasoned decision-making the APA demands. *See City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006). That is all the more true in light of Congress's directive that the agency shall "evaluate the validity of subsequent purchases" by covered entities. 42 U.S.C. § 256b(a)(7)(E). HRSA says (at 12) that its blind acceptance of Sagebrush's self-verifications at the time of recertification was cured through after-the-fact "compliance checks." Yet Congress clearly intended for the agency to confirm the eligibility of STD entities *during* the recertification process, not at some point after it: The agency "shall require the recertification of entities … on a not more frequent than annual basis," including "requir[ing] that such entities submit information" to enable substantive eligibility review. 42 U.S.C. § 256b(a)(7)(E). After all, actually checking eligibility is what "certification" and "recertification" mean. Congress also made recertification mandatory for *all* STD entities, whereas HRSA admits (at 12) that it performs "compliance checks" only for some unspecified subset of them.

***Second***, the agency failed to consider evidence that Congress directed should guide its certification and recertification decisions. The administrative record contains no evidence that HRSA considered drug purchase information. *See* pp. 7-8, *supra*. Indeed, the record contains no drug purchase information whatsoever. As HRSA concedes, the agency "does not request information from covered entities or States regarding the amount a covered entity expended for covered outpatient drugs in the preceding year." Britton Decl. ¶ 12. HRSA admits that it instead relies on Apexus "to provide information about the total amount that a covered entity has expended

on covered outpatient drugs." *Id.* ¶ 11. As noted, however, the statute gives the prime vendor no role in the collection of drug-purchase information from covered entities or in assessing those entities' 340B eligibility. *See* p. 8, *supra*. Even if Apexus actually gathers this data (which nothing in the administrative record indicates), either the agency never received Sagebrush purchase data, or else it received the data but ignored it when deciding to certify and recertify the entities at issue here. Either way, HRSA "entirely failed to consider an important aspect of the problem" that Congress told it to consider. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**IV. Intervenor's Procedural Arguments Lack Merit.**

In an attempt to escape the merits, Intervenor advances two procedural arguments—statute of limitations and exhaustion—squarely foreclosed by binding precedent and the law of the case. At the outset, "[i]ntervenors may only argue issues that have been raised by the principal parties." *Petro Star Inc. v. FERC*, 835 F.3d 97, 110 (D.C. Cir. 2016) (quoting *NARUC v. ICC*, 41 F.3d 721, 729 (D.C. Cir. 1994)). "[I]t is questionable whether [Intervenor] ha[s] standing to raise an exhaustion defense because the primary purpose of exhaustion—permitting top agency managers to correct mistakes by lower-level employees—would not be advanced by allowing third parties to contest exhaustion when an agency declines to do so." *Ctr. For Pub. Integrity v. FCC*, 505 F. Supp. 2d 106, 110 n.2 (D.D.C. 2007); *see Cutler v. Hayes*, 818 F.2d 879, 891 n.95 (D.C. Cir. 1987) (holding that exhaustion argument was waived where "the agency itself does not press the exhaustion issue"). Because HRSA presses neither a statute-of-limitations nor an exhaustion argument at this stage, Intervenor may not assert such defenses on the agency's behalf, and the Court should not entertain them in this posture. In any event, both arguments are meritless.

**A. Plaintiffs' Claims Are Timely.**

Contending that four of Plaintiffs' claims amount to "facial challenges," Intervenor argues (at 20-21) that the six-year statute of limitations for those claims ran from the date of the 1993 guidance that HRSA concedes it no longer applies. *See* HRSA MSJ 9. Plaintiffs do not assert facial challenges; they challenge the certifications and recertifications of nine specific covered entities. A half-century of D.C. Circuit precedent recognizes that the statute of limitations permits a litigant to challenge longstanding agency policies when those policies are *applied* in a subsequent final agency action: "As applied to rules and regulations, the statutory time limit restricting judicial review of agency action is applicable only to cut off review directly from the order promulgating a rule. It does not foreclose subsequent examination of a rule where properly brought before this court for review of further agency action applying it." *NLRB Union v. FLRA*, 834 F.2d 191, 195-96 (D.C. Cir. 1987) (brackets omitted) (quoting *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958)).

The Supreme Court's recent decision in *Corner Post, Inc. v. Board of Governors of the Federal Reserve System* expressly rejected the position that a "different" rule governs claim accrual for so-called "facial challenges." 603 U.S. 799, 813 (2024). Instead, "[a]n APA claim does not accrue for purposes of § 2401(a)'s 6-year statute of limitations until the plaintiff is injured by final agency action." *Id.* at 825. The certifications and recertifications at issue here were each made within the past six years. *See* Plfs. MSJ 12-17 (identifying certifications and recertifications between 2022 and 2025). Those claims are thus timely regardless of whether they amount to a "facial" challenge. In addition, the D.C. Circuit "has repeatedly refused to hold that actions seeking relief under 5 U.S.C. § 706(1) to 'compel agency action unlawfully withheld or unreasonably delayed' are time-barred if initiated more than six years after an agency fails to meet a statutory deadline." *The Wilderness Soc. v. Norton*, 434 F.3d 584, 588 (D.C. Cir. 2006). Even apart from

the Sagebrush certifications, then, HRSA's ongoing failure to develop and make available to manufacturers lawful criteria for certification of STD covered entities—*for more than three decades* after Congress directed it to do so, *see* 42 U.S.C. § 256b(a)(7)(A) (requiring HRSA to do so "[n]ot later than 60 days after November 4, 1992")—constitutes a "continuing violation" of the statute. A claim to compel such action "'does not complain about what the agency has done but rather about what the agency has yet to do,'" and thus is not "time-barred by 28 U.S.C. § 2401(a)." *Wilderness Soc.*, 434 F.3d at 589 (quoting *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999)).

**B. As This Court Has Already Held, No Exhaustion Was Required.**

Intervenor's exhaustion argument (at 21-25) fares even worse. As an initial matter, it directly conflicts with this Court's prior ruling that "Plaintiffs need not exhaust administrative remedies." Mem. Op. Denying Mot. to Dismiss, ECF 21, at 7. That ruling is the law of the case and "may be revisited only if there is an intervening change in the law or if the previous decision was 'clearly erroneous and would work a manifest injustice.'" *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996)). Intervenor does not even acknowledge—much less meet—that high bar. Nor should Intervenor be allowed to relitigate exhaustion now when it declined to intervene while that issue was before the Court. This is particularly so given Intervenor's statement in its intervention brief that it "does not seek to expand the scope of litigation," Mot. to Intervene, ECF 27-2, at 25, which the Court relied upon when granting the motion to intervene. *See* Memo. Op. Granting Mot. to Intervene, ECF 32, at 4 (allaying "Plaintiffs' worry that [Intervenor] will complicate proceedings" by pointing out that Intervenor had "assured the Court" it would not expand the litigation).

In any event, Intervenor's exhaustion argument is meritless. As this Court held, consistent with binding precedent, only "express[]" statutory language that "speak[s] in 'clear, unequivocal

terms'" can override the default rule that "plaintiffs challenging final agency action need not exhaust administrative remedies." Mem. Op. Denying Mot. to Dismiss 6 (quoting *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1248 (D.C. Cir. 2004)); *see Darby v. Cisneros*, 509 U.S. 137, 146 (1993). Intervenor identifies no such language here. Intervenor instead tries (at 23) to invoke *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011). But that was not a case about administrative exhaustion; it addressed overcharge claims asserted by one private party against another. *See id.* at 113. Nothing in *Astra* purports to preclude APA suits challenging HRSA's failure to fulfill its statutory duties. And the Supreme Court's primary concern in *Astra*—that "dispersed and uncoordinated lawsuits" between private parties would leave HHS out of the loop, *id.* at 120—obviously does not apply to an APA suit against the agency itself.

## V. The Court Should Vacate HRSA's Unlawful Certifications and Recertifications.

Vacatur of HRSA's actions is appropriate on all Plaintiffs' claims. *See* Plfs. MSJ 40. HRSA's request for remand without vacatur (at 12-13) ignores that setting aside unlawful agency action is the default remedy under the APA, and it also understates the significance of the agency's failures: Its unlawful conduct goes far beyond a mere failure to explain. No amount of agency rhetoric could rectify the fact that HRSA has entirely failed to satisfy its duties under 42 U.S.C. § 256b(a)(7). The appropriate remedy is thus to vacate HRSA's certification actions. *See, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *Sinclair Wyoming Refin. Co. LLC v. EPA*, 101 F.4th 871, 895 (D.C. Cir. 2024) ( "a legal mistake … subjects the resulting [agency action] to vacatur").

Moreover, the record unequivocally demonstrates that, independent of HRSA's failure to develop lawful criteria for certification and make those criteria available to all manufacturers, the challenged certifications and recertifications were unlawful because the Sagebrush entities are ineligible to participate in the 340B program. *See* pp. 12-27, *supra*. No further reasoning or

explanation could change the fact that the Sagebrush entities whose certifications are challenged here do not "receiv[e] … funds through a State or unit of local government" or "meet[] the requirements" of the 340B statute's non-diversion provisions as the statute requires for eligibility. 42 U.S.C. § 256b(a)(4), (a)(4)(K). "A remand is unnecessary where, as here, the outcome of a new administrative proceeding is preordained." *Am. Train Dispatchers Ass'n v. ICC*, 26 F.3d 1157, 1163 (D.C. Cir. 1994).

* * *

Congress deliberately chose, for the category of covered entities that presents the greatest risk of abuse (as evidenced in this case), to require HRSA to certify eligibility as a precondition to participation in the 340B program. For more than three decades, HRSA has been asleep at the wheel, leaving manufacturers to foot the bill for the program abuse that has ensued. The agency's approve-first, ask-questions-later—or never—approach is flatly inconsistent with the statute and is the epitome of arbitrary and capricious decision-making. This Court's intervention is required to right the ship.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment, deny the cross-motions for summary judgment, and enter the relief set forth in Plaintiffs' proposed order (ECF 35-2). Plaintiffs do not seek any relief with respect to Intervenor's certification.

Dated: May 15, 2026

Respectfully submitted,

*/s/ Allon Kedem*
Allon Kedem (D.C. Bar No. 1009039)
Jeffrey L. Handwerker (D.C. Bar. No. 451913)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
allon.kedem@arnoldporter.com
jeffrey.handwerker@arnoldporter.com

*Counsel for Plaintiffs Eli Lilly and Company and UCB, Inc.*

HOGAN LOVELLS US LLP

/s/ *Susan Cook*
Susan Cook (D.C. Bar No. 462978)
Marlan Golden (D.C. Bar No. 1673073)
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel: (202) 637-5600
susan.cook@hoganlovells.com
marlan.golden@hoganlovells.com

*Counsel for Plaintiff Amgen Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2026, the foregoing memorandum of law was served via ECF to all counsel of record.

*/s/ Allon Kedem*
Allon Kedem
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000